**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **THE BIG APPLE CIRCUS, LTD.** | **Case No. 16-13297 (___)** |
| **Debtor.** | |

**DECLARATION OF WILL MAITLAND WEISS,**
**EXECUTIVE DIRECTOR OF THE BIG APPLE CIRCUS, LTD.,**
**IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

I, Will Maitland Weiss, under penalty of perjury, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.       I am the Executive Director of The Big Apple Circus, Ltd. (the "**Circus**" or the "**Debtor**"), a Type B not-for-profit corporation organized under section 201 of the New York Not-for-Profit Corporation Law that is exempt from federal taxes under section 501(c)(3) of the Internal Revenue Code.  As Executive Director, I am responsible for overseeing the operations of the Circus in administration, community programs, development, finance, and marketing/communications, as well as the hiring and supervision of staff directors and/or senior managers in the aforementioned program and support areas.

2.       I joined the Circus in 2013 as Vice President of Development, after more than seven years as Executive Director of the Arts & Business Council of New York.  I have more than three decades of executive experience in board relations, fundraising, marketing, and management, through positions at CSC Repertory, City Opera, City Center, and as Vice President of Development & Communications for The Healthcare Chaplaincy.  I am familiar with the Circus' day-to-day operations, business affairs, and books and records.

3.      On the date hereof (the "**Petition Date**"), the Circus commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in this Court.  The Circus is operating its business and managing its property as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made, and no statutory committee has been appointed or designated, in this chapter 11 case.

4.      In connection with its chapter 11 case, the Circus has requested a variety of relief in "first day" motions and applications (collectively, the "**First Day Pleadings**"), filed concurrently herewith.  A list of the First Day Pleadings is attached hereto as <u>**Exhibit A**</u>.  As set forth below, I believe that approval of the relief requested in the First Day Pleadings will minimize disruptions to the Circus' operations and permit an effective transition into chapter 11, thereby preserving and maximizing the value of the Circus' estate and facilitating the successful administration of the Circus' chapter 11 case.

5.      This Declaration is submitted pursuant to rule 1007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**"), and I am authorized to submit it on behalf of the Circus.  No one individual at the Circus has personal knowledge of all of the facts set forth in this Declaration.  All facts set forth herein are based upon my personal knowledge of the Circus' operations and finances, information learned from my review of relevant documents, and information supplied to me by other members of the Circus' management and staff.  If called upon to testify, I would testify to the facts set forth herein on that basis.

6.      This Declaration is divided into four parts.  Part I provides background information with respect to the Circus' corporate history, operations and capital structure.  Part II describes the circumstances leading to the commencement of the Circus' chapter 11 case. Part III addresses the relief sought by the Circus in the First Day Pleadings.  Part IV provides an overview of **Exhibits E** through **P** attached hereto, which in turn set forth certain additional information about the Circus, as required by Local Bankruptcy Rule 1007-2(a) and (b).

## I.

### DESCRIPTION OF THE CIRCUS' CORPORATE HISTORY, OPERATIONS AND CAPITAL STRUCTURE

**A.     The Circus' Corporate History and Operations**

7.      Founded in 1977 by Paul Binder and Michael Christensen to establish a performing circus and school for the instruction and artistic development of circus arts, the Big Apple Circus is a venerated cultural institution of New York City renowned for its critically-acclaimed performances and dedicated community programs.[1]  During its illustrious history, the Circus has performed 38 unique seasons of an annual ring show under the Big Top at venues across the country, featuring circus performers from around the globe and bringing the highest standards of artistic excellence to its multigenerational, multiethnic, and multilingual audience, both on tour and from the Circus' home base in New York City's Lincoln Center.  Last year's ring show, entitled "The Grand Tour," was set in the 1920s and designed to showcase "the golden age of transportation," received rave reviews, and was a Critic's Pick by both *The New York Times* and *The Boston Globe*.

---

[1]   A copy of the Circus' certificate of incorporation (and amendment thereto) is attached hereto as **Exhibit B**, and a copy of the Circus' by-laws is attached as **Exhibit C**.

8.      In nearly four decades, the Circus' performers have played to millions of parents, children, and fans.  At its height, in 2008, the Circus performed more than 350 shows in eight cities and towns, generating more than $18 million of earned revenue from performances for the organization.  But unlike other well-known circuses run by corporate conglomerates, the Big Apple Circus, from its inception, has been a nonprofit organization focused on utilizing its funds to bring the joy and wonder of the classic circus arts to people of all ages and means.

9.      Over the years, the organization's mission expanded to include special performances for blind, deaf, and autistic children.  For example, "Circus of the Senses" is a special performance of the Circus' annual ring show adapted for children with hearing and vision impairments and offered free of charge through the Circus' extensive network of schools and nonprofit service providers.  The performance utilized American Sign Language interpreters, live audio play-by-play description through wireless headsets, and Braille and large-print descriptive programs.  After the show, vision-impaired children were invited into the ring for special "touch" sessions, where they can squeeze a clown's nose, run their hands along circus equipment, and stroke the silky coats of performing animals.

10.     Similarly, the "Circus Embraces Autism" program provided performances adapted for the needs of children on the autism spectrum.  A 75-minute show was performed without intermission, with modified lighting and sound.  The Circus provided a calming center, staffed by experienced volunteers with training from Autism Speaks and other organizations, which included coloring books, plush toys, and manipulatives to help calm children who might be over-stimulated.

11.     To improve access to shows, the Big Apple Circus established "Circus for All!," a program that distributed free, discounted, and subsidized tickets to schools and not-for-

profit organizations serving disadvantaged children, enabling them to experience the circus under the Big Top.  The program provided 30,000 or more tickets each year to low-income children, families, and seniors at all tour stops, making sure that they were able to experience live ring shows.  The Circus worked with more than 2,000 nonprofit service organizations and schools located in each city where it performs to provide free or deeply discounted tickets.

12.     The Circus is equally dedicated to art and care, and has historically served thousands of people each year creating direct, shared connections through various community programs in hospitals, nursing homes, and schools in New York City and other cities across United States (collectively, the "**Community Programs**").  Most notably, the Circus created "Clown Care," its signature community outreach program, which is the world's first professional hospital clowning program that brings laughter and joy to aid the healing process of patients in leading pediatric hospitals.  Clown Care sends "clown doctors" into hospitals across the country, and has served over three million seriously ill children, their families, and their professional caregivers.  "Vaudeville Visits" is a similar program designed to bring the uplifting power of the circus to elderly living in residential care facilities, utilizing music, juggling, magic, and improvisational theater.

13.     The Circus also offers "Circus After School," a program that provides an opportunity for at-risk youth to develop life-enhancing skills such as teamwork, commitment, and self-worth through a structured program of learning and performing the circus arts.  The Circus' teaching artists lead sessions on clowning, juggling, stilts, acrobatics, unicycling, and aerials, and help the students put on a show for family and friends.  At the conclusion of the program, students historically attended a live performance of the ring show, where they would interact with professional performers, and occasionally, performed in the ring for special events.

5

14.     To put on the Big Top ring show, provide the special performances, and support its Community Programs, the Circus annually employed over 100 performers, choreographers, directors, designers, managers, musicians, technicians, management, and staff, as well as over 80 "clown doctors" and "Circus After School" faculty.

15.     For its Lincoln Center productions, the Circus is party to an agreement, dated March 31, 2009, pursuant to which the Circus is permitted to use Damrosch Park at the Lincoln Center for fall/winter performances through 2019.  The Circus also leases office space at One MetroTech Center North, Brooklyn, New York, for its headquarters, and owns real property located at 39 Edmunds Lane, Walden, New York (the "**Walden Property**"), where the Circus maintains storage and training facilities.

**B.     The Circus' Capital Structure**

16.     The Circus estimates that it currently holds endowment and other restricted funds in the aggregate amount of approximately $1.0 million.  The majority of these funds, totaling approximately $859,000, are held and administered by the Trischman Group at Morgan Stanley at the request of the benefactors, the Ilma F. Kern Foundation and the Jean L. and Robert A. Stern Foundation.  These funds are invested and managed in accordance with established investment guidelines, and the Circus receives dividend and interest payments that can be applied to general operations.

17.     Also, since 2010, the Circus has held approximately $143,000 of funds that have been classified in the Circus' audited financial statements as restricted funds in a non-interest bearing checking account at Bank of America managed by the Circus (the "**Restricted**

**Investments Account**").[2]  On November 10, 2016, Bank of America debited the entirety of this

account in response to a levy and restraining notice served on Bank of America with respect to a

judgment (the "**Whelan Judgment**") in the amount of $88,567.88 obtained on October 7, 2016

by The Whelan Group Incorporated against the Circus.  Upon information and belief, debited

funds in the amount of $49,766.50 have been returned to the Restricted Investments Account and

the remaining funds are currently being held by Bank of America, who also imposed a freeze on

all of the Circus' bank accounts maintained at Bank of America that has now been lifted.  The

Circus has informed the New York State Attorney General's Charities Bureau of these actions

and intends to seek immediate turnover of the debited amounts not yet returned to ensure the

proper protection of restricted funds.

18.    During  fiscal  years  2010  and  2011,  the  Circus  made  authorized

borrowings against certain restricted funds in the amount of $1.65 million, which borrowings

remain outstanding.  Each year, the Circus records the interest expense due and payable on these

borrowings as well as the interest income from the restricted funds.  During its chapter 11 case,

the Circus will not withdraw or use any endowment or other restricted funds (other than income,

interest, and dividends, which are unrestricted and used in the ordinary course of business)

without further order of this Court in consultation with and on notice to the New York State

Attorney General.

19.    Also, as of the Petition Date, the Circus has non-endowment loans

outstanding in an aggregate amount of approximately $2.56 million, including approximately:

---

[2]    The funds deposited in the Restricted Investments Account represent charitable donations from certain entities
and individuals.  The Circus is currently reviewing the history of these donations to determine what restrictions
have been placed on the use of such funds.  At this time, however, the Circus' records and audited financials
indicate that the funds are restricted from general operating use or creditor levy.

(a) $760,000 outstanding under five cash flow loans from the Fund for the City of New York bearing no interest and paid in monthly installments of $10,000 until paid in full; (b) $737,500 outstanding under a note payable at 3% interest to Barbara Slifka that matures in January 2022; (c) $740,940 outstanding under a mortgage on the Walden Property owed to Nonprofit Finance Fund that bears interest at 4.25% interest and is paid in monthly installments of $12,000 through December 31, 2023; (d) $237,794 outstanding under several notes payable at various interest rates and with various maturities to certain of the Circus' current and former directors and officers, which represent critical financial support repeatedly provided by these individuals during difficult times in the Circus' history; and (e) $86,471 outstanding under a loan agreement with Celtic Bank Corporation, as lender, and Square, Inc., as servicer, bearing no interest and paid from 25% of the Circus' gross credit card receivables when processed (but in no event less than approximately $5,300 in any 60-day period) until paid in full or no later than October 29, 2017.

20.     As of the date hereof, the Circus estimates that it has total liabilities of approximately $8.3 million, and total assets of approximately $3.8 million.  A copy of the Circus' most recent audited annual financial statement is attached hereto as **Exhibit D**.

## II.

### CIRCUMSTANCES LEADING TO
### THE CIRCUS' CHAPTER 11 CASE

21.     For decades, the Circus has pursued its mission to provide circus performances and programs of the highest quality for the communities it serves.  However, like other not-for-profit organizations, the Circus relies on a combination of earned revenue and support from individual donors, government agencies, and private foundations to fund its

performances and community programs.  Since the financial crisis of 2008, the Circus has faced

challenging headwinds.

22.    <u>First</u>, the Circus' earned revenue has steadily declined, primarily due to a

precipitous drop-off in demand for private show performances.  Specifically, prior to 2008, over

$2 million of the Circus' annual income was generated from approximately 20 private

performances a year that were typically purchased by companies and financial institutions during

the holiday season.  In the time since, the number of private performances fell below 10 per year,

and annual revenue from private performances correspondingly decreased by nearly half.  And

while attendance has remained essentially flat at Lincoln Center shows (with a downturn in fiscal

year 2016), attendance per performance decreased at most venues outside of New York City.

Declines in net ticket and concessions revenue were exacerbated by Hurricane Sandy (2012), the

Boston Marathon bombing (2013), and a massive and terribly-timed 2014 ice storm in Atlanta,

each of which significantly impacted the cities where the Circus was performing at those times.

For fiscal year 2016, the Circus estimates earned income from performances of only $11.9

million, down from a peak of over $18 million during the 2007-08 season.

23.    <u>Second</u>, although contributions restricted for use in the Community

Programs have increased in recent years, general operating support was static, except for major,

non-renewable gifts received in 2011 and 2015.  Overall, contributions for fiscal year 2016 are

estimated to be nearly $2.5 million less than the prior year; a 40 percent decline.  Meanwhile, the

costs of touring the Circus show – moving a "village" of production employees and their living

quarters to each venue – steadily increased.

24.    Accordingly, for fiscal year 2016, the Circus estimates combined income

from earned revenue and contributions of $16.8 million, while operating expenses during the

same period will exceed $17.8 million, of which approximately 77 percent is attributable to the circus performing unit.  The Circus incurred various borrowings from lenders and its endowments totaling approximately $4.2 million in attempts to fill these growing income gaps; nonetheless, the Circus has accumulated accounts payable and accrued expenses totaling over $3.2 million.

25.     To address its liquidity issues, the Circus reduced the number of venues for the annual ring show performances from eight in 2013 to four in 2016, focusing on those with the most net income potential, and made great strides in reducing costs per show without sacrificing performance quality.  Also, the Circus actively sought contributions to support the organization.  Most recently, in June 2016, the Circus launched an emergency fundraising campaign called "Save the Circus" with significant attention in *The New York Times* and other media.  The "Save the Circus" campaign utilized online crowd-funding and traditional solicitations for donations to attempt to raise $2 million by the end of July 2016 – the deadline by which the Circus' staff needed to design and market the next circus show scheduled to open in October.  Proceeds of the campaign would have enabled the Circus to continue to pay down its outstanding debt obligations and start work on a new production.  However, despite receiving donations from over 1,400 different donors as well as the continued financial support of the organization's directors, the Circus was ultimately unable to raise sufficient funds.  In July 2016, the Circus made the very difficult decision to cancel the 2016-17 performance season requiring the unfortunate, but necessary, release of the Circus' artists and production crew.

26.     Following cancellation of the 2016-17 season, the Circus began considering alternatives that would allow it to restructure its operations around the Community Programs on a standalone basis in furtherance of its mission.  Unfortunately, the Circus subsequently learned

10

that a separate, unaffiliated not-for-profit corporation was formed in June 2016 with the intent to compete with the Circus' long-standing Clown Care program. Since creation of this new organization, several of the hospitals that sponsor and host Clown Care have elected to terminate their relationship with the Circus. As a result, the scope and sustainability of Clown Care – the centerpiece of the Circus' Community Programs – have been seriously undermined, which, in turn, forced the Circus to reconsider its strategic planning.

27.     Based on the foregoing, and in consultation with the its directors, officers, and advisors, the Circus determined that the best course of action to maximize the Circus' value for creditors and honor its mission was to commence this chapter 11 case to effectuate an orderly wind down of the Circus' affairs, sell certain assets, and satisfy creditor claims, all while continuing a downsized operation of its Community Programs, some of which may be transitioned to other capable not-for-profit organizations, and preserving the opportunity to restart the annual ring show with new financial support or through a sale of the circus to an interested buyer.

28.     To this end, the Circus is currently finalizing an agreement for the purchase and sale of its Walden Property, which is no longer necessary to support the Circus' mission. The Circus anticipates seeking Court approval of this sale imminently. Also, in light of the cancellation of the Circus' performance season, the Circus intends to sell its circus equipment and other related personal property as well as the intellectual property associated with the Circus' performance unit (collectively, the "**Circus Assets**"), much of which is stored at the Walden Property.

29.     Prior to the Petition Date, the Circus solicited proposals from several reputable auctioneers to facilitate the marketing and sale of the Circus Assets, and following

11

thorough consideration, the Circus selected an auctioneer well-suited to oversee the sale of both tangible personal property and intangible intellectual property that comprise the Circus Assets. Unfortunately, despite extensive negotiations, the Circus and the auctioneer were unable to reach agreement on terms that would maximize the value of the Circus Assets and grant the Circus appropriate oversight of the selection of successful bidders. The Circus is now considering various alternatives to efficiently and effectively sell the Circus Assets and will promptly seek approval of the appropriate sale process.

30.     In order to provide critical liquidity to fund administrative expenses incurred by the Circus during this chapter 11 case until the sale of the Circus Assets or the Walden Property closes, three of the Circus' directors have generously agreed to provide a zero-interest term loan in an amount equal to approximately $66,000 that will be secured by a junior lien on the Walden Property. The Circus believes the sale of the Walden Property and the Circus Assets can generate considerable value for its estate to help satisfy creditors' claims while providing an opportunity for these assets to continue advancing the Circus' mission in the hands of new owners. In facilitating these sales, the DIP Loan represents another remarkable example of the considerable financial support that has been provided by the Circus' officers and directors over the years during the Circus' most difficult moments, and, in particular, their steadfast commitment to ensure that the Circus' affairs are properly wound down for the benefit of creditors, donors, and all other parties in interest.

### III.

### THE CIRCUS' FIRST DAY PLEADINGS

31.     In order to enable the Circus to minimize the adverse effects of the commencement of this chapter 11 case on its ongoing operations, promote a smooth transition into chapter 11, and facilitate the sale of its assets, the Circus has requested various relief in its

First Day Pleadings, described in more detail therein.  The First Day Pleadings seek authority to, among other things, (a) obtain postpetition financing, (b) maintain the Circus' existing bank accounts and business forms, and (c) pay certain prepetition claims.  Receiving Court approval of the relief sought in the First Day Pleadings is essential to giving the Circus an opportunity to efficiently and effectively administer its chapter 11 case for the benefit all of the Circus' stakeholders.  I have reviewed each of the First Day Pleadings.  The facts stated therein and herein are true and correct to the best of my knowledge, information, and belief, and I believe that the relief sought in each of the First Day Pleadings is necessary to enable the Circus to operate in chapter 11 with minimal disruption to its operations.

## IV.

## OVERVIEW OF EXHIBITS SETTING FORTH INFORMATION ABOUT THE CIRCUS PURSUANT TO LOCAL BANKRUTPCY RULE 1007-2(a)-(b)

32.     Local Bankruptcy Rule 1007-2 requires certain information related to the Circus, which I have provided in the exhibits attached hereto as **Exhibits E** through **P**. Specifically, these exhibits contain the following information with respect to the Circus:[3]

- Pursuant to Local Bankruptcy Rule 1007-2(a)(3), Exhibit E provides information with respect to any committee organized prior to the order of relief.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(4), Exhibit F provides information with respect to the holders of the 20 largest unsecured claims against the Circus, excluding insiders.

---

[3]   The information contained in the Exhibits attached to this Declaration shall not constitute an admission of liability by, nor is it binding on, the Circus.  The Circus reserves all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt.  The descriptions of the collateral securing the underlying obligations are intended only as brief summaries.  In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(5), <u>Exhibit G</u> provides information with respect to the holders of the 5 largest secured claims against the Circus.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(6), <u>Exhibit H</u> provides a summary of the Circus' assets and liabilities.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(7), <u>Exhibit I</u> provides information on the Circus' outstanding publicly held securities.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(8), <u>Exhibit J</u> provides information on the Circus' property in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents or secured creditor or agent for any such entity.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(9), <u>Exhibit K</u> provides information on the property or premises owned, leased or held under other arrangement from which the Circus operates its business.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(10), <u>Exhibit L</u> lists the locations of the Circus' substantial assets, the location of its books and records, and the nature, location, and value of any assets held by the Circus outside the territorial limits of the United States.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(11), <u>Exhibit M</u> lists the nature and present status of each action or proceeding, pending or threatened against the Circus or its properties where a judgment against the Circus or a seizure of its property may be imminent.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(12), <u>Exhibit N</u> provides the names of the individuals who comprise the Circus' existing senior management, their tenure with the Circus, and a brief summary of their relevant responsibilities and experience.

- Pursuant to Local Bankruptcy Rules 1007-2(b)(1)-(2)(A) and (C), <u>Exhibit O</u> provides the estimated amount of weekly payroll to the Circus' employees (not including officers and directors) and the estimated amount to be paid to officers, directors, and financial and business consultants retained by the Circus, for the 30-day period following the Petition Date.

14

- Pursuant to Local Bankruptcy Rule 1007-2(b)(3), <u>Exhibit P</u> provides the Circus' estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees for the 30-day period following the Petition Date.

Executed on this 20th day of November, 2016.

|        |                              |
|--------|------------------------------|
| By:    | */s/ Will Maitland Weiss*    |
| Name:  | Will Maitland Weiss          |
| Title: | Executive Director           |

15

## Exhibit A

### List of First Day Pleadings

1.      Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Obtain Postpetition Financing and (II) Granting Related Relief

2.      Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Continue Existing Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Maintain Business Forms and Existing Bank Accounts; (II) Extending Time to Comply With 11 U.S.C. § 345(b); and (III) Granting Related Relief

3.      Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Pay and Honor Certain Prepetition Wages, Benefits and Other Compensation Obligations and (B) Continue Such Compensation and Benefits and Other Employee-Related Programs, and (II) Authorizing Financial Institutions to Honor and Process Checks and Transfers Related Thereto

4.      Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Continue Prepetition Insurance Programs in the Ordinary Course of Business and (B) Pay All Prepetition Obligations in Respect Thereof and (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers

5.      Debtor's Motion for Entry of an Order Waiving the Requirement to Retain a Claims and Noticing Agent Pursuant to Local Bankruptcy Rule 5075-1(b)

6.      Debtor's Motion for Entry of an Order Extending Time for the Debtor to File Schedules and Statements

7.      Debtor's Motion for Entry of an Order (I) Authorizing the Debtor to Pay Certain Prepetition Taxes and Fees and (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers

8.      Debtor's Motion for Entry of an Order (I) Prohibiting Utilities From Altering, Refusing or Discontinuing Service, (II) Deeming Utilities Adequately Assured of Future Performance and (III) Establishing Procedures for Determining Adequate Assurance of Payment

9.      Debtor's Application for Entry of an Order Authorizing the Employment and Retention of Debevoise & Plimpton LLP as Attorneys for the Debtor

**<u>Exhibit B</u>**

**Big Apple Circus Certificate of Incorporation**

THE NEW YORK SCHOOL
FOR CIRCUS ARTS, INC.

CERTIFICATE

OF

INCORPORATION

UNDER SECTION 402 OF THE
NOT-FOR-PROFIT CORPORATION LAW

Federal ID #
13 290 6037

Organized under the laws of the

STATE OF NEW YORK

A404044

P 3935675

STATE OF NEW YORK
DEPARTMENT OF STATE
TAX $
FILING FEE $

FILED MAY 31 1977

State of New York }
Department of State } ss.:

16114

*I hereby certify that I have compared the annexed copy with the original document filed by the Department of State*

*and that the same is a correct transcript of said original.*

*Witness my hand and seal of the Department of State on*    MAY 3 1 1977

*Secretary of State*

0-504 (10/76)



## The University of the State of New York

STATE OF NEW YORK )
                  )ss.:
COUNTY OF ALBANY  )

Pursuant to the provisions of section 216 of the Education Law and section 404, subdivision (d) of the Not-For-Profit Corporation Law, consent is hereby given to the filing of the annexed certificate of incorporation of

        THE NEW YORK SCHOOL FOR CIRCUS ARTS, INC.

as a not-for-profit corporation.

        This consent to filing, however, shall not be construed as approval by the Board of Regents, the Commissioner of Education or the State Education Department of the purposes or objects of such corporation, nor shall it be construed as giving the officers or agents of such corporation the right to use the name of the Board of Regents, the Commissioner of Education, the University of the State of New York or the State Education Department in its publications or advertising matter.

        This consent to filing is granted with the understandings and upon the conditions set forth on the reverse side of this form.

                        IN WITNESS WHEREOF this instrument is
                        executed and the seal of the State
                        Education Department is affixed this
                        29th day of  April    , 1977.

                        Ewald B. Nyquist
                        Commissioner of Education

                        BY

                        Robert D. Stone
                        Counsel and Deputy Commissioner
                            for Legal Affairs

This consent to filing is granted w    the understanding
that nothing contained in the annexed certificate of incorpora-
tion shall be construed as authorizing the  orporation to
engage in the practice of law, except as pre ided by subdivision
5 of Section 495 of the Judiciary Law, or of any of the pro-
fessions designated in Title VIII of the Education Law, or to
use any title restricted by such law, or to conduct a school
for any such profession, or to hold itself out to the public
as offering professional services.

This consent to filing is granted with the further under-
standing that nothing contained in the certificate of incor-
poration shall be construed as authorizing the corporation to
operate a nursery school, kindergarten, elementary school,
secondary school, institution of higher education, cable tele-
vision facility, educational television station pursuant to
Section 236 of the Education Law, library, museum, or historical
society, or to maintain an historic site.

This consent to filing shall not be deemed to be or to
take the place of registration for the operation of a private
business school in accordance with the provisions of Section
5002 of the Education Law, nor shall it be deemed to be, or to
take the place of, a license granted by the Board of Regents
pursuant to the provisions of Section 5001 of the Education
Law, a license granted by the Commissioner of Motor Vehicles
pursuant to the provisions of Section 394 of the Vehicle and
Traffic Law, a license as an employment agency granted pursuant
to Section 172 of the General Business Law, or any other license,
certificate, registration, or approval requi...

CERTIFICATE OF INCORPORATION

OF

THE NEW YORK SCHOOL FOR CIRCUS ARTS, INC.

UNDER SECTION 402 OF THE NOT-FOR-PROFIT CORPORATION LAW

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

THE UNDERSIGNED, a natural person, over the age of nineteen, desiring to form a corporation pursuant to Section 402 of the Not-for-Profit Corporation Law, does hereby certify:

FIRST:  The name of the Corporation is

The New York School for Circus Arts, Inc.

SECOND:  The Corporation is a Corporation as defined in subparagraph (a) (5) of Section 102 of the Not-for-Profit Corporation Law and shall be a Type B corporation under Section 201 of the Not-for-Profit Corporation Law.

THIRD:  The purposes for which the Corporation is formed are as follows:  To conduct activities which are exclusively charitable, literary and educational within the meaning of Section 501 (c) (3) of the Internal Revenue Code of 1954, as the same may be amended from time to time, including the establishment and operation of a permanent performing circus and affiliated school for the instruction and artistic development of circus arts and the advancement of public knowledge, appreciation and encouragement of circus arts, and the conduct of any and all other activities as shall from time to time be found appropriate in connection with the foregoing and as are lawful for not-for-profit corporations.

FOURTH:  In furtherance of the foregoing purposes, the Corporation shall have all general powers enumerated in Section 202 of the Not-for-Profit Corporation Law together with the power to solicit grants and contributions for any corporate purpose and the power to maintain a fund or funds of real or personal property for any corporate

3

purposes. The Corporation shall have the power to exercise such other powers as are now, or hereafter may be, conferred by law upon a corporation organized for the purposes hereinabove set forth or necessary or incidental to the powers so conferred, or conducive to the furtherance thereof, subject to the limitation and condition that, notwithstanding any other provision of this article (4), the Corporation shall not have the power to carry on any activity not permitted to be carried on by a corporation exempt from Federal income taxation under Section 501 (c) (3) of the Internal Revenue Code of 1954 (or the corresponding provision of any future United States Internal Revenue Law).

FIFTH: The Corporation is not formed for pecuniary profit or for financial gain and no part of its assets, income or profit shall be distributed to or inure to the benefit of any private individual. Reasonable compensation, however, may be paid for services rendered to or for the Corporation in furtherance of one or more of its purposes.

SIXTH: Nothing herein shall authorize the Corporation, directly or indirectly, to engage in or include among its purposes any of the activities mentioned in Section 404 (b) (c) and (e) through (q) of the Not-for-Profit Corporation Law or Executive Law, Section 757.

SEVENTH: No substantial part of the activities of the Corporation shall be devoted to carrying on propaganda, or otherwise attempting to influence legislation, and the Corporation shall not participate or intervene (including the publishing or distributing of statements) in any political campaign on behalf of any candidate for public office.

EIGHTH: The office of the Corporation shall be located in the City of New York, County of New York, State of New York.

NINTH: The Corporation's activities will be conducted principally within the City of New York and State of New York, but the activities of the Corporation shall not be limited to such territory

-2-

and may be conducted throughout the United States, its territories and possessions, and the rest of the world.

TENTH:  The names and addresses of the initial directors of the Corporation are as follows:

| Name | Address |
|------|---------|
| Paul Binder | 36 Lispenard Street<br>New York, New York  10013 |
| Richard Levy | 93 Eighth Avenue<br>Brooklyn, New York  11215 |
| Alan Rosenthal | 301 Dobbs Lane<br>Princeton, New Jersey |

ELEVENTH:  The post office address within this State to which the Secretary of State shall mail a copy of any notice required by law is 36 Lispenard Street, New York, New York  10013.

TWELVTH:  In the event of the dissolution of the Corporation, all of the assets of the Corporation remaining after the payment or satisfaction of its liabilities shall be distributed subject to the approval of a Justice of the Supreme Court of the State of New York, sitting in and for the County in which the principal office of the Corporation is then located, but only to such organizations who shall conduct activities and whose purposes are exclusively charitable, literary, and educational and which qualify under Section 501 (c) (3) of the Internal Revenue Code of 1954, as amended.

THIRTEENTH:  Prior to delivery to the Department of State for filing, all approvals or consents required by law will be endorsed upon or annexed to this Certificate.

IN WITNESS WHEREOF this Certificate has been signed and the statements made herein are affirmed as true under the penalties of perjury this 22nd day of April , 1977.

JOSEPH C. BENEDETTI
1271 Avenue of the Americas
New York, New York  10022

-5-

Motion for Approval and Waiver of Notice of Application
of
Certificate of Incorporation
Under Section 402 of the Not-For-Profit Corporation Law
of
The New York School for Circus Arts, Inc.

Notice of Application Waived
(This is not to be deemed an
approval on behalf of any
Department or Agency of the
State of New York, Nor an
authorization of activities
otherwise limited by law.)

Dated: May 13, 1977
            Louis J. Lefkowitz
            Attorney General
            State of New York

By: _Robert J. Task_
            Assistant Attorney General
            ROBERT J. TASK
            ASSISTANT ATTORNEY GENERAL

Approval of Application
            I, a Justice of the Supreme Court of the State of New York, of
the First Judical District, in which the office of the Corporation
is to be located, approve of the foregoing Certificate of Incorporation
of The New York School for Circus Arts, Inc. and consent to its filing.

Dated: NEW YORK, N.Y.

MAY 24 1977                                        Justice of the Supreme Court
                                                            of the State of New York,
                                                            First Judicial District.

                                                            SIDNEY H. ASCH

# CERTIFICATE OF RESERVATION

STATE OF NEW YORK                                    2961
                                    DEPARTMENT OF STATE

I DO HEREBY CERTIFY TO THE

RESERVATION OF NAME

OF     (corporation name)

The New York School for Circus Arts, Inc.    ON  (dated)    April 13, 1977

TO BE FILMED AS MICROFILM FRAME NUMBER:

A 392675-1

THE ABOVE CORPORATE NAME HAS BEEN RESERVED FOR A PERIOD OF
SIXTY DAYS FROM THE ABOVE DATE FOR THE USE OF

Joseph C. Benedetti, Esq.

FOR

( NOT FOR PROFIT )
Creation of a domestic corporation

Secretary of State

NAME
AND        Joseph C. Benedetti
ADDRESS    1271 Avenue of the Americas
OF         New York, NY 10020
FILER

☒ CHK.    ☐ M.O.    ☐ CASH              $ 10

$10.00    CERTIFICATE          TOTAL  $10.00
                               REFUND OF  $          TO FOLLOW

CERTIFICATE OF RESERVATION MUST ACCOMPANY CERTIFICATE OF INCOR-
PORATION OR APPLICATION OF AUTHORITY WHEN PRESENTED FOR FILING.

# State of New York
# Department of State      } ss:

I hereby certify, that the Certificate of Incorporation of THE BIG APPLE
CIRCUS, LTD. was filed on 05/31/1977, under the name of THE NEW YORK
SCHOOL FOR CIRCUS ARTS, INC., as a Not-for-Profit Corporation and that a
diligent examination has been made of the Corporate index for documents
filed with this Department for a certificate, order, or record of a
dissolution, and upon such examination, no such certificate, order or
record has been found, and that so far as indicated by the records of
this Department, such corporation is an existing corporation.

A Certificate of Amendment THE NEW YORK SCHOOL FOR CIRCUS ARTS, INC.,
changing its name to THE BIG APPLE CIRCUS, LTD., was filed 09/02/1988.



\*\*\*

*WITNESS my hand and the official seal
of the Department of State at the City of
Albany, this 24th day of January two
thousand and eleven.*

*First Deputy Secretary of State*

201101250419  102



STATE OF NEW YORK
DEPARTMENT OF
FILED SEP 2 - 19

AMT. OF CHECK $
FILING FEE $
TAX $
COUNTY FEE $
CERT $
REFUND $
SPEC HANDLE $
BY:

Certificate of Amendment

of the

Certificate of Incorporation

of

The New York School for Circus Arts, Inc.

under Section 803

of the

Not-For-Profit Corporation Law

Paul, Weiss, Rifkind, Wharton & Garrison
ATTORNEYS AT LAW
1285 AVENUE OF THE AMERICAS ● NEW YORK, N.Y. 10019

COMMISSIONER OF PATENTS

RECORDED
AUG-7 89
PATENT AND TRADEMARK OFFICE

241025

STATE OF NEW YORK )
                   :
COUNTY OF NEW YORK )

    I, Dorcas Dawe, a Notary Public of the State of New York, do hereby certify that the attached photocopy of a certified copy of the Certificate of Amendment changing the name of the New York School for Circus Arts, Inc. to The Big Apple Circus, Ltd. is a true and correct copy of the certified copy issued by the Department of State of New York on September 2, 1988.

    WITNESS my hand and seal on July 31, 1989.

DORCAS DAWE
Notary Public, State of New York
No. 31-4877033
Qualified in New York County
Cert. filed in Kings & Queens County
Commission Expires February 2, 1991

**State of New York**
**Department of State** } ss:                    060668

*I hereby certify that I have compared the annexed copy with the original document filed by the Department of State and that the same is a correct transcript of said original.*

*Witness my hand and seal of the Department of State on*    SEP 0 2 1988

*Secretary of State*

380507-004 (12 87)





# The University of the State of New York

STATE OF NEW YORK:
:
COUNTY OF ALBANY :

In accordance with the provisions of section 804 of the Not-for-Profit Corporation Law, consent is hereby given to the change of name of **THE NEW YORK SCHOOL FOR CIRCUS ARTS, INC.** to **THE BIG APPLE CIRCUS, LTD.** contained in the annexed certificate of amendment to the certificate of incorporation.

This consent to filing, however, shall not be construed as approval by the Board of Regents, the Commissioner of Education or the State Education Department of the purposes or objects of such corporation, nor shall it be construed as giving the officers or agents of such corporation the right to use the name of the Board of Regents, the Commissioner of Education, the University of the State of New York or the State Education Department in its publications or advertising matter.

This consent to filing is granted with the understandings and upon the conditions set forth on the reverse side of this form.



IN WITNESS WHEREOF this instrument is executed and the seal of the State Education Department is affixed this 24th day of August, 1988.

Thomas Sobol
Commissioner of Education

By : *James H. Whitney*

James H. Whitney
Deputy Counsel

This consent to filing is granted with the understanding that nothing contained in the annexed certificate of incorporation shall be construed as authorizing the corporation to engage in the practice of law, except as provided by subdivision 7 of section 495 of the Judiciary Law, or of any of the professions designated in Title VIII of the Education Law, or to use any title restricted by such law, or to conduct a school for any such profession, or to hold itself out to the public as offering professional services.

This consent to filing is granted with the further understanding that nothing contained in the annexed certificate of incorporation shall be construed as authorizing the corporation to operate a nursery school, kindergarten, elementary school, secondary school, institution of higher education, cable television facility, educational television station pursuant to section 236 of the Education Law, library, museum, or historical society, or to maintain an historic site.

This consent to filing shall not be deemed to be or to take the place of registration for the operation of a private business school in accordance with the provisions of section 5002 of the Education Law, nor shall it be deemed to be, or to take the place of, a license granted by the Board of Regents pursuant to the provisions of section 5001 of the Education Law, a license granted by the Commissioner of Motor Vehicles pursuant to the provisions of section 394 of the Vehicle and Traffic Law, a license as an employment agency granted pursuant to section 172 of the General Business Law, or any other license, certificate, registration, or approval required by law.

PC1010/1.txt[2]

Certificate of Amendment of the Certificate of Incorporation 

of

The New York School for Circus Arts, Inc.

Under Section 803 of the Not-for-Profit Corporation Law

---

It is hereby certified that:

FIRST:    The name of the corporation is The New York School for Circus Arts, Inc.

SECOND:    The certificate of incorporation of the corporation was filed by the Department of State on May 31, 1977.

THIRD:    The corporation was formed under the Not-for-Profit Corporation Law.

FOURTH:    The corporation is a corporation as defined in subparagraph (a)(5) of Section 102 of the Not-for-Profit Corporation Law.

FIFTH:    The corporation is a Type B corporation under Section 201 of the Not-for-Profit Corporation Law.

SIXTH:    The amendments of the certificate of incorporation of the corporation effected by this certificate of amendment are to change the name of the corporation to THE BIG APPLE CIRCUS, LTD., to change the post office address to which the Secretary of State shall mail a copy of any notice required by law and to add an indemnification provision.



SEVENTH:  To accomplish the foregoing amendments, Articles "FIRST" and "ELEVENTH" of the certificate of incorporation of the corporation, relating to the corporate name and the post office address to which the Secretary of State shall mail a copy of any notice or process served upon her are hereby amended to read as follows:

"FIRST:  The name of the corporation is:
THE BIG APPLE CIRCUS, LTD.

"ELEVENTH:  The Secretary of State is designated as the agent of the corporation upon whom process against the corporation may be served.  The post office address within the State of New York to which the Secretary of State shall mail a copy of any process against the corporation served upon her is:  220 West 42nd Street, New York, New York 10036."

In addition, the following new Article "FOURTEENTH," relating to indemnification, is added to the certificate of incorporation of the corporation:

"FOURTEENTH:  The Corporation shall, to the fullest extent permitted by Article 7 of the Not-for-Profit Corporation Law of the State of New York, as the same may be amended and supplemented, indemnify any and all persons whom it shall have power to indemnify under said Article from and against any and all of the expenses, liabilities, or other matters referred to in or covered by said Article, and the indemnification provided for herein shall not be deemed exclusive of any other rights to which any person may be entitled under any By-Law, resolution or shareholders, resolution of directors, agreement, or otherwise, as permitted by said Article, as to action in any capacity in which he served at the request of the Corporation."

EIGHTH:  The foregoing amendments of the certificate of incorporation of the corporation were authorized by the unanimous written consent of all of the members of the



3

corporation entitled to vote on the said amendments of the certificate of incorporation.

IN WITNESS WHEREOF, we have subscribed this document on July 25, 1988 and do hereby affirm, under the penalties of perjury, that the statements contained therein have been examined by us and are true and correct.

George J. Wade, President

and

Nathaniel J. Bickford, Secretary

5

STATE OF NEW YORK    )
                     :  ss.:
COUNTY OF NEW YORK   )

      JOHN F. BREGLIO, being duly sworn, deposes and says that he is an attorney and counsellor at law and a member of the firm of Paul, Weiss, Rifkind, Wharton & Garrison, attorneys for the corporation submitting the annexed Certificate of Amendment of the Certificate of Incorporation of THE NEW YORK SCHOOL FOR CIRCUS ARTS, INC., and that no previous application for the approval of said Certificate of Amendment by any Justice of the Supreme Court has ever been made.

_____
   John F. Breglio

Subscribed and sworn to
before me on July 26TH, 1988.

_____
Notary Public

DORCAS DAWE
Notary Public, State of New York
No. 31-4877033
Qualified in New York County
Cert. filed in Kings & Queens County
Commission Expires February 2, 1989

    I, WILLIAM P. McCOOE, a Justice of the Supreme Court of the State of New York, First Judicial District, do hereby approve the annexed Certificate of Amendment of the Certificate of Incorporation of THE NEW YORK SCHOOL FOR CIRCUS ARTS, INC. and consent to the filing thereof

Dated:    AUG. 16, 1988.

_____
Justice of the Supreme Court of
the State of New York, First
Judicial District

THE UNDERSIGNED HAS NO OBJECTION
TO THE GRANTING OF JUDICIAL
APPROVAL HEREON AND WAIVES
STATUTORY NOTICE.

ROBERT A RIAS, ATTORNEY GEN.
STATE OF NEW YORK

## **Exhibit C**

**Big Apple Circus By-Laws**

**Second Amended and Restated**

**The Big Apple Circus Ltd.**

**By-Laws**

**[Amended effective as of March 12, 2015]**

**Article I**
**Names and Offices**

**Section 1.**   Name.  The name of the corporation is *The Big Apple Circus, Ltd.* (the "Corporation").

**Section 2.**   Main Office. The office of the Corporation shall be located in the City of New York, Kings County, State of New York.

**Section 3.**   Other Offices. The Corporation may also have offices at other such places both within the State of New York as the Board of Directors may from time to time determine or as the business of the Corporation may require.

**Article II**
**Members**

**Section 1.**   No Members. The Corporation shall have no members.

**Article III**
**Board of Directors**

**Section 1.**   Powers. The Board of Directors (the "Board") shall have the general power to control and manage the affairs and property of the Corporation, subject to applicable law and in accordance with the purposes and limitations set forth in the certificate of incorporation and herein.

**Section 2.**   Number and Qualifications. The number of Directors shall not be less than fifteen (15) nor more than forty (40) in number. Directors shall be at least eighteen years of age, and need not be residents of the State of New York.

**Section 3.**   Election and Term of Office. At each annual meeting, the Board of Directors, by majority vote, shall elect Directors to hold office for a term of one year, and each such Director shall continue in office for such term and until such Director's successor shall have been elected or qualified, or until such Director's death, resignation or removal.

**Section 4.**   Removal. Any or all of the Directors may be removed, with cause, at any time by the vote of the Directors at any meeting of the Board; provided that there is a quorum of not less than a majority of Directors present at the meeting.

**Section 5.**   <u>Resignation</u>. A Director may resign at any time by submitting a written notice of his resignation to the Secretary of the Corporation, effective on receipt thereof by the Secretary, with a copy to the Chair.

**Section 6.**   <u>Vacancies and Newly Created Directorships</u>. Newly created Directorships resulting from an increase in the number of Directors of the Corporation and all vacancies among such Directors, including vacancies caused by removal without cause, may be filled by the affirmative vote of the remaining Directors, though less than a quorum of the Board of Directors. A Director so elected to fill a vacancy and a Director so elected to fill a newly created Directorship, shall serve in accordance with a term designated by the Board of Directors pursuant to Section 3 above.

**Section 7.**   <u>Bookkeeping</u>. The Directors may keep the books of the Corporation, except such as are required by law to be kept within the state, outside of the State of New York, at such place or places as they may from time to time determine.

**Section 8.**   <u>Compensation</u>. The Board of Directors, by the affirmative vote of a majority of the Directors then in office, and irrespective of a personal interest in any of its Directors, shall have authority to establish reasonable compensation of all officers for services to the Corporation.

**Section 9.**   <u>Directors Emeritus</u>. The Directors may designate one or more Director Emeritus. A Director or former Director who has served as a Founding Director, Officer or Chair of a Standing Committee or has rendered exceptional and outstanding service to The Big Apple Circus during such service may be considered for such designation.  A Director Emeritus shall be entitled to notice of all meetings of the Board of Directors and to receive minutes of such meetings.  A Director Emeritus shall be entitled to participate in all meetings of the Board of Directors, but without vote.

**Article IV**
**Meetings of the Board of Directors**

**Section 1.**   <u>Meetings</u>. Meetings of the Board of Directors, regular or special, may be held either within or without the State of New York.

**Section 2.**   <u>Time and Place</u>. The first meeting of each newly elected Board of Directors shall be held at such time and such place as shall be fixed by the consent of the Directors.

**Section 3.**   <u>Regular Meetings</u>. Regular meetings of the Board of Directors may be held upon such notice, or without notice, and at such time and at such place as shall from time to time be determined by the Board.

**Section 4.**   <u>Special meetings</u>. Special meetings of the Board of Directors may be called by the Chair of the Board of Directors, the President or the Renaissance Committee on two days notice to each Director.

**Section 5.**   <u>Notice</u>. Notice of the time and place of each meeting of the Board shall be mailed to each Director, postage prepaid, addressed to such Director at such Director's residence or usual place of business (or at such other address as such Director may have designated in a written

request filed with the Secretary), sent by electronic mail or other form of electronic communication or given personally or by telephone no less than forty-eight hours before the time at which such meeting is to be held.  Notice of a meeting need not be given to any Director who submits a signed waiver of notice, whether before or after the meeting, or who attends the meeting without protesting, prior thereto or at its commencement, the lack of notice. Neither the business to be transacted at, nor the purpose of, any such regular or special meeting of the Board of Directors need to be specified in the notice or waiver of notice of such meeting.

**Section 6.**   Quorum and Voting. A quorum at a meeting of the Board of Directors shall consist of (a) a majority of those Directors who hold such of  the offices of Chair, Vice Chair, President, Secretary, Treasurer, Artistic Director and Executive Director as are at that time filled plus (b) a majority of the Executive Committee present at a meeting of the Board of Directors, unless a greater or lesser number is required by law or by the certificate of incorporation, provided, however, that during the tenure of the Renaissance Committee, the reference to the "Executive Committee" in the foregoing clause (b) shall be deemed to be a reference to the "Renaissance Committee."  The vote of a majority of the Directors present at any meeting at which quorum is present shall be the act of the Board of Directors, unless the vote of a greater number is required by law or by the certificate of incorporation.

If a quorum shall not be present at any meeting of Directors, a majority of the Directors present may adjourn the meeting from time to time, without notice, other than announcement at the meeting, until a quorum shall be present.

**Section 7.**   Board Action. Unless the certificate of incorporation provides otherwise, any action required or permitted to be taken at a meeting of the Directors or a committee thereof, may be taken without a meeting if all Directors entitled to vote with respect to such action consent in writing to the adoption of a resolution authorizing the action, which consent may be given by electronic mail. The resolution and written consents thereto shall be filed with the minutes of the proceedings of the Board.

**Section 8.**   Tele-conferencing. Unless otherwise restricted by the certificate of incorporation or these By-Laws, Directors, or any committee designated by the Board of Directors, may participate in a meeting of the Board of Directors, or any committee, by means of conference telephone or similar communications equipment by means which all persons participating in the meeting can hear each other at the same time, and such participation in a meeting shall constitute presence in person at the meeting.

### Article V
### Committees of the Board

**Section 1.**   Executive Committee. The Board of Directors, by resolution, shall appoint an Executive Committee of five (5) or more Directors, to consist of those Directors who are officers of the Corporation, Chair of committees specifically referred to in this Article and such additional Directors as the Board may appoint. It shall be the duty of the Executive Committee to act in the name and place of the Board of Directors at all times that the Board is not in session and to have and exercise during such times all powers and duties of the Board of Directors, reporting thereon at the next meeting of the Board of Directors. An Executive Committee session

shall be required to take place at each full Board meeting, unless a majority of the members of the Executive Committee shall decide otherwise.

**Section 2.**   Finance Committee. The Board of Directors, by resolution, shall appoint a Finance Committee consisting of not less than three (3) persons, one of whom shall be the Treasurer, if a Treasurer is then in office, and at least three (3) of whom shall be Directors; provided, however, that (a) in no event will officers of the Corporation constitute a majority of the members of the Finance Committee and (b) persons on the Finance Committee shall have an understanding of financial matters and shall be comfortable reviewing financial reports and other financial records.  It shall be the duty of the Finance Committee to assist the Board in the oversight and monitoring of (1) the quality and integrity of the financial statements and the financial reporting process of the Corporation, (2) the Corporation's compliance with the applicable legal and regulatory requirements, (3) the independent auditor's qualifications and independence, and (4) the performance of the independent auditor.  The Finance Committee shall meet as often as it determines, but no less frequently than semi-annually.

**Section 3.**   Nominating Committee. The Board of Directors, by resolution, shall appoint a Nominating Committee of three (3) or more persons, at least three (3) of whom shall be Directors. It shall be the duty of the Nominating Committee to select and nominate Directors to coordinate the work of the Directors and to involve each of the Directors in the work of the Corporation.

**Section 4.**   Development Committee. The Board of Directors, by resolution, shall appoint a Development Committee to consist of three (3) or more persons, at least three (3) of whom shall be Directors. The Development Committee shall supervise, plan and cause the implementation of all fund raising activities of the Corporation.

**Section 5.**   Community Programs Committee. The Board of Directors, by resolution, shall appoint a Community Programs Committee of three (3) or more persons, at least three (3) of whom shall be Directors. It shall be the duty of the Community Programs Committee to supervise the community programs including Big Apple Circus Clown Care, Beyond The Ring, Circus For All!, Circus Of The Senses, and others as developed by the Corporation.

**Section 6.**   Artistic Excellence Committee. The Board of Directors, by resolution, shall appoint an Artistic Excellence Committee of three (3) or more persons, at least three (3) of whom shall be Directors. It shall be the duty of the Artistic Excellence committee to ensure that the highest possible standards of artistic excellence are being achieved throughout all aspects of the organization and that the artistic vision is shared by all members of the Big Apple Circus family.

**Section 7.**   Other Standing Committees. The Board of Directors, by resolution, from time to time as seems to it appropriate may designate other standing committees, each consisting of three (3) or more persons, at least three (3) of whom shall be Directors, and each of which shall have the authority granted to it by the Board of Directors in the resolution creating such committee. Notwithstanding anything to the contrary herein, the Board of Directors may, by resolution, (a) grant to any standing committee some or all authority previously granted to any other committee, and accordingly, (b) suspend, limit or otherwise modify such previously granted authority during all or part of such standing committee's tenure.

**Section 8.**  <u>Committee Membership</u>. The Board of Directors, by resolution, shall appoint Directors to standing committees, and may appoint non-Directors to standing committees provided that there are a majority of Directors on each committee. However, the Executive Committee shall include only Directors.

**Section 9.**  <u>Vacancies</u>. Vacancies in the membership of the Executive, Finance, Nominating and Director Evaluation, Development, Community Programs and Artistic Excellence Committees, and other standing committees, shall be filled by the Board of Directors at a regular or special meeting of the Board of Directors. Those committees shall keep regular minutes of their proceedings and report the same to the Board when required.

**Section 10.**  <u>Committee Chairs</u>. The Chair of the Board of Directors shall appoint the Chair of each committee of the Board of Directors, other than of such committees, the duly approved charters of which provide otherwise.

**Section 11.**  <u>Director Absence</u>. Committees of the Board of Directors shall continue to function when appointed Directors take a leave of absence.

**Article VI**
**Officers**

**Section 1.**  <u>Officers</u>. The officers of the Corporation shall consist of those persons so elected by the Board of Directors. In recognition of the fact that the Corporation is an arts organization, the Founding Artistic Director, the Founding Creative Director, the Artistic Director, the Executive Director and the Founding Chair Emeritus shall be ex-officio members of the Board of Directors. The officers may include a Chair of the Board of Directors, a President, a Secretary, a Treasurer and such vice-chairs, vice presidents and other officers as the Board may elect from time to time. The Chair of the Board of Directors, any vice-chairs and the Treasurer shall be chosen from among the Directors; the President, Secretary and any vice-presidents may, but need not be a member of the Board. Any two (2) or more offices may be held by the same person, except that the Chair may not also be either Secretary or Treasurer. Each officer shall serve at the pleasure of the Board for a term of one year and shall be eligible for reelection.

**Section 2.**  <u>Chair</u>. The Chair of the Board of Directors (which shall not be the Chief Executive Officer of the Corporation) shall preside at all meetings of the Board of Directors, and shall be responsible for, among other duties as may be assigned from time to time by the Renaissance Committee or the Board of Directors, overall strategic planning for the affairs of the Corporation, including, but not limited to, preparing and implementing long range goals and plans for the Corporation and its future growth and continued vitality, fund-raising and artistic development. The Chair shall confer with the Renaissance Committee or, following the tenure of the Renaissance Committee, any one or more officers of the Corporation or Directors as designated by the Board of Directors by resolution from time to time, on the conduct of the daily affairs of the Corporation, and shall also be concerned with the work of the Nominating Committee, in conjunction with the Chair of that Committee, on the selection and nomination of suitable directors for the Corporation, and the full involvement of all Directors in the life of the organization. The Chair shall also, ex -officio, be a member of all standing and other committees

of the Corporation, other than of such committees, the duly approved charters of which provide otherwise.

**Section 3.**  <u>Vice-Chair</u>. The Board of Directors shall, in the absence or disability of the Chair of the Board of Directors, choose one of the vice-chair or one of its Directors to perform duties and exercise the powers of the Chair of the Board of Directors and other such duties as such other powers as the Board of Directors may from time to time prescribe.

**Section 4.**  <u>President</u>. The President of the Corporation shall supervise and control the activities and businesses of the Corporation and shall, in consultation with the Chair of the Board of Directors, assure that all orders and resolutions of the Board of Directors are carried into effect. She/He shall perform such other duties incidental to the office as may be required by law, by the Articles of Incorporation, or by these Amended By-Laws, or which may be validly prescribed from time to time by the Board of Directors. The President shall, in the name of the Corporation, execute such instruments which may from time to time be authorized by the Board of Directors, except where required and permitted by law to be otherwise signed and executed and except where the signing and execution thereof shall be expressly delegated by the Board of Directors to another officer or delegate or the Corporation. Additionally, the President shall preside at all meetings of the Executive Committee of the Board of Directors, and she/he shall also, ex - officio, be a member of all standing and other committees of the Corporation, other than of such committees, the duly approved charters of which provide otherwise.

**Section 5.**  <u>Vice-Presidents</u>. A Vice-President in the order determined by the Board of Directors, shall, in the absence or disability of the President, perform the duties and exercise the powers of the President and shall perform such other duties and have such other powers as the Board of Directors may from time to time.

**Section 6.**  <u>Secretary</u>. The Secretary shall see that the records of the Corporation are kept, including minutes of meetings of the Board of Directors, in hardcopy and electronic files set aside for that purpose and accessible to the full Board. He/she shall see that notice is given to regular and special meetings of the Board of Directors. He/she shall have access to the corporate seal of the Corporation and he/she shall have authority to affix the same to any instrument requiring it and, when so affixed, it may be attested to by his/her signature. The Board of Directors may also give authority to any other officer to affix the seal of the Corporation and to attest to the affixing of his/her signature.

**Section 7.**  <u>Treasurer</u>. The Treasurer shall periodically review operational profit and loss statements and balance sheets along with the annual audited financial statements as requested by the Board or the Executive Committee. He/she shall chair the Finance Committee of the Board and be available to address management's reports on the financial condition of the Corporation at Board meetings.

**Section 8.**  <u>Assistant Secretary and Assistant Treasurer</u>. The Board of Directors may appoint an Assistant Secretary and Assistant Treasurer who shall have all of the powers and duties respectively of the Secretary and Treasurer in their absence.

## Article VII
### General Provisions

**Section 1.**  <u>Checks</u>. All checks or demands for money and notes of the Corporation shall be signed by such officer or officers or such other person or persons as the Board of Directors may from time to time designate.

**Section 2.**  <u>Fiscal Year</u>. The fiscal year of the Corporation shall be fixed by resolution of the Board of Directors.

**Section 3.**  <u>Seal</u>. The corporate seal shall have inscribed thereon the name of the Corporation, the year of its organization and the words "Corporate Seal, New York." The seal may be used by causing it or facsimile thereof to be impressed or affixed or in any manner reproduced.

**Section 4.**  <u>Equal Opportunity</u>. The Corporation shall not discriminate on the basis of race, creed color, sex or national or ethnic origin in the administration of educational policies, student admission policies, scholarship and loan programs or any other program administered by the Corporation in connection with the school for circus arts operated by the Corporation.

## Article VIII
### Indemnification

**Section 1.**  <u>Indemnification</u>. The Corporation shall, to the fullest extent now or hereafter permitted by law, indemnify any person made, or threatened to be made, a party to any action or proceeding by reason of the fact that he or she or his or her testator was a Director, officer, employee or agent of the Corporation, against judgments, fines, amounts paid in settlement and reasonable expenses, including attorneys' fees. No indemnification may be made to or on behalf of any such person if (a) his or her acts were committed in bad faith or were the result of his or her active and deliberate dishonesty and were material to such action or proceeding or (b) he or she personally gained in fact a financial profit or other advantage to which he or she was not legally entitled. The Corporation may pay in advance of final disposition of any such action or proceeding, expenses incurred by such person in defending such action or proceeding.

**Section 2.**  <u>Insurance</u>. The Corporation shall have the power to purchase and maintain insurance to indemnify the Corporation for any obligation which it incurs as a result of its indemnification of Directors, officers and employees pursuant to Section 1 above, or to indemnify such persons in instances in which they may be indemnified pursuant to Section 1 above.

## Article IX
### Amendments

**Section 1.**  These By-Laws may be amended or repealed or new By-Laws may be adopted by the affirmative vote of a majority of the Board present at any meeting of the Board of Directors. Any amendment or repeal of these By-Laws is authorized only at a duly called and held meeting of the Board for which written notice of such meeting, setting forth the proposed alteration, is given in accordance with the notice provisions for special meetings set forth in Article IV of these By-Laws.

**Article X**
**Conflicts of Interest**

**Section 1.**  <u>Disclosure</u>. (a) Prior to election to the Board, and thereafter on an annual basis, all Directors shall disclose in writing, to the best of their knowledge, any Interest (as defined below) such Director may have in any Corporation, organization, partnership or other entity which provides professional or other goods or services to the Corporation for a fee or other compensation, and any position or other material relationship such Director may have with any other not-for-profit Corporation with which the Corporation has an attorney-client or other business relationship (collectively, a "Conflict of Interest"). A copy of each disclosure statement shall be available to any Director of the Corporation on request.

(b) If at any time during his or her term of service, a Director acquires any Interest or otherwise a circumstance arises which may pose a Conflict of Interest, that Interest or other conflict shall be promptly disclosed in writing to the Chair of the Board.

(c) When any matter for decision or approval comes before the Board or any committee of the Board in which a Director has an Interest or other Conflict, that Interest or other Conflict shall be immediately disclosed to the Board or relevant Committee by that Director.

**Section 2.**  <u>Definition of "Interest"</u>. Whether a Director has an Interest in an entity shall be determined by whether that Director would derive a significant individual economic benefit, either directly or indirectly, from any transaction or relationship involving such entity or any decision on a matter involving such entity by the Board or a committee. The fact that an entity may take positions on legislative matters of general impact shall not constitute an Interest or Conflict.

**Section 3.**  <u>Voting</u>. No Director shall vote on any matter in which he or she has a Conflict of Interest.

**Section 4.**  <u>Non-Participation</u>. Any  Director who has a Conflict of Interest in a matter shall leave the room in which discussion regarding that matter is carried on, if so requested by the Board or the relevant Committee; provided, however, that the interested Director may participate in any discussion regarding his or her absence.

**Section 5.**  <u>Attempts to Influence</u>. Directors shall not attempt to influence other Directors regarding matters in which they have a Conflict of Interest, without first disclosing that Conflict of Interest.

**Section 6.**  <u>Contract Review Committee</u>. The Board may, in its own discretion establish a Contract Review Committee consisting of at least three (3) Directors to review any contract that is proposed for approval by the Board respecting which a Director may have a Conflict of Interest (an "Interested Party Contract"). If no Contract Review Committee has been duly appointed, at any time, the Board (not including the Directors having an interest in the applicable contract) shall serve such role. The Contract Review Committee or Board shall review the Interested Party Contract and determine whether to authorize the contract; provided that if the contract is of a magnitude that it would otherwise require Board approval, the Contract Review

Committee shall submit the contract to the Board with its recommendation whether or not to approve it. The Contract Review Committee or the Board must approve an Interested Party Contract by a majority vote of the disinterested Directors entitled to vote on the matter.


**Adopted by the Board as of December 8th, 2011 and effected as of June 9, 2011.  Amended on March 12, 2015.**

**<u>Exhibit D</u>**

**Audited Financials for Fiscal Years 2014 and 2015**

# The Big Apple Circus, Ltd.

Financial Statements

July 31, 2015 and 2014

**The Big Apple Circus, Ltd.**

Table of Contents
July 31, 2015 and 2014

|  | Page |
|---|---|
| Independent Auditors' Report | 1-2 |
| Financial Statements | |
|     Statements of Financial Position | 3 |
|     Statements of Activities | 4 |
|     Statements of Cash Flows | 5 |
|     Notes to Financial Statements | 6-18 |



**Independent Auditors' Report**

**Board of Directors**
**The Big Apple Circus, Ltd.**

We have audited the accompanying financial statements of The Big Apple Circus, Ltd. (the "Circus") which comprise the statements of financial position as of July 31, 2015 and 2014, and the related statements of activities and cash flows for the years then ended, and the related notes to the financial statements.

### *Management's Responsibility for the Financial Statements*

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

### *Auditors' Responsibility*

Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditors' judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

PKF O'CONNOR DAVIES, LLP
665 Fifth Avenue, New York, NY 10022 I Tel: 212.867.8000 or 212.286.2600 I Fax: 212.286.4080 I www.pkfod.com

PKF O'Connor Davies, LLP is a member firm of the PKF International Limited network of legally independent firms and does not accept any responsibility or liability for the actions or inactions on the part of any other individual member firm or firms.

**Board of Directors**
**The Big Apple Circus, Ltd.**
Page 2

*Opinion*

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of The Big Apple Circus, Ltd. as of July 31, 2015 and 2014, and the changes in its net assets (deficit) and its cash flows for the years then ended in accordance with accounting principles generally accepted in the United States of America.

*Emphasis-of-Matter Regarding Going Concern*

The accompanying financial statements as of July 31, 2015 and for the year then ended have been prepared assuming that the Circus will continue as a going concern.  As discussed in Note 2 to the financial statements, the Circus has suffered recurring significant reductions in performance revenue, has defaulted on certain loans and has a deficiency in net assets that raise substantial doubt about its ability to continue as a going concern.  Management's plans regarding these matters are also described in Note 2.  The financial statements do not include any adjustments that might result from the outcome of this uncertainty.  Our opinion is not modified with respect to that matter.

*PKF O'Connor Davies, LLP*

February 5, 2016

**The Big Apple Circus, Ltd.**

Statements of Financial Position

|  | July 31 | |
|---|---|---|
|  | 2015 | 2014 |
| **ASSETS** | | |
| Cash and cash equivalents | $ 977,739 | $ 196,618 |
| Accounts receivable | 58,677 | 31,151 |
| Contributions receivable, net (Note 5) | 275,250 | 258,995 |
| Inventories, net | 27,604 | 26,770 |
| Prepaid expenses and other assets | 124,473 | 365,129 |
| Property and equipment, net (Note 7) | 3,473,745 | 3,959,925 |
| Deposits | - | 5,640 |
| Restricted investments (Notes 6 and 12) | 902,187 | 1,026,389 |
|  | $ 5,839,675 | $ 5,870,617 |
| | | |
| **LIABILITIES AND NET ASSETS (DEFICIT)** | | |
| Liabilities | | |
| Accounts payable and accrued expenses | $ 2,654,656 | $ 3,979,531 |
| Deferred revenue | 1,114,032 | 1,146,240 |
| Loans payable (Note 8) | 2,521,516 | 2,053,876 |
| Amount due to purchaser of future sales (Note 9) | 436,288 | - |
| Total Liabilities | 6,726,492 | 7,179,647 |
| | | |
| Net Assets (Deficit) | | |
| Unrestricted | (4,258,112) | (5,477,447) |
| Temporarily restricted (Note 11) | 919,108 | 1,592,028 |
| Permanently restricted (Note 12) | 2,452,187 | 2,576,389 |
| Total Net Assets (Deficit) | (886,817) | (1,309,030) |
|  | $ 5,839,675 | $ 5,870,617 |

See notes to financial statements

3

## The Big Apple Circus, Ltd.

### Statements of Activities

| | Year Ended July 31, 2015 | | | | Year Ended July 31, 2014 | | | |
|---|---|---|---|---|---|---|---|---|
| | Unrestricted | Temporarily Restricted | Permanently Restricted | Total | Unrestricted | Temporarily Restricted | Permanently Restricted | Total |
| **OPERATING SUPPORT AND REVENUE** | | | | | | | | |
| Contributions | | | | | | | | |
| Government | $ 269,840 | $ - | $ - | $ 269,840 | $ 470,792 | $ - | $ - | $ 470,792 |
| Foundations | 631,951 | 683,108 | - | 1,315,059 | 581,082 | 1,092,028 | - | 1,673,110 |
| Corporations | 136,800 | 10,000 | - | 146,800 | 101,928 | - | - | 101,928 |
| Individuals | 3,829,771 | 16,680 | - | 3,846,451 | 2,219,756 | - | - | 2,219,756 |
| Special events revenue, net of cost of direct benefit to donors of $45,646 and $142,949 | 477,758 | - | - | 477,758 | 474,090 | - | - | 474,090 |
| Total Contributions | 5,346,120 | 709,788 | - | 6,055,908 | 3,847,648 | 1,092,028 | - | 4,939,676 |
| Revenue | | | | | | | | |
| Performance revenue | 11,510,752 | - | - | 11,510,752 | 12,074,865 | - | - | 12,074,865 |
| Concessions revenue, net of expenses of $377,708 and $572,149 | 816,161 | - | - | 816,161 | 966,763 | - | - | 966,763 |
| Clown Care Unit earned revenue | 1,021,222 | - | - | 1,021,222 | 837,475 | - | - | 837,475 |
| Circus to Go fees, net of expenses of $57,681 and $107,873 | 125,027 | - | - | 125,027 | (23,239) | - | - | (23,239) |
| Investment income (loss) (Note 6) | - | 67,816 | (124,202) | (56,386) | - | 86,514 | (92,472) | (5,958) |
| Other revenue | - | 66,565 | - | 66,565 | 19,087 | 66,565 | - | 85,652 |
| Total Contributions and Revenue | 18,819,282 | 844,169 | (124,202) | 19,539,249 | 17,722,599 | 1,245,107 | (92,472) | 18,875,234 |
| Net assets released from restrictions (Note 10) | 1,517,089 | (1,517,089) | - | - | 251,079 | (251,079) | - | - |
| Total Operating Support and Revenue | 20,336,371 | (672,920) | (124,202) | 19,539,249 | 17,973,678 | 994,028 | (92,472) | 18,875,234 |
| | | | | | | | | |
| **OPERATING EXPENSES** | | | | | | | | |
| Program Services | | | | | | | | |
| Circus performing unit | 11,524,898 | - | - | 11,524,898 | 12,435,976 | - | - | 12,435,976 |
| Clown Care Unit | 1,697,049 | - | - | 1,697,049 | 1,553,856 | - | - | 1,553,856 |
| Marketing and promotion | 3,269,680 | - | - | 3,269,680 | 3,496,290 | - | - | 3,496,290 |
| Total Program Services | 16,491,627 | - | - | 16,491,627 | 17,486,122 | - | - | 17,486,122 |
| Management and general | 2,231,497 | - | - | 2,231,497 | 2,553,045 | - | - | 2,553,045 |
| Fundraising | 393,912 | - | - | 393,912 | 480,473 | - | - | 480,473 |
| Total Operating Expenses | 19,117,036 | - | - | 19,117,036 | 20,519,640 | - | - | 20,519,640 |
| Change in Net Assets | 1,219,335 | (672,920) | (124,202) | 422,213 | (2,545,962) | 994,028 | (92,472) | (1,644,406) |
| | | | | | | | | |
| **NET ASSETS (DEFICIT)** | | | | | | | | |
| Beginning of year | (5,477,447) | 1,592,028 | 2,576,389 | (1,309,030) | (2,931,485) | 598,000 | 2,668,861 | 335,376 |
| End of year | $ (4,258,112) | $ 919,108 | $ 2,452,187 | $ (886,817) | $ (5,477,447) | $ 1,592,028 | $ 2,576,389 | $ (1,309,030) |

See notes to financial statements

**The Big Apple Circus, Ltd.**

Statements of Cash Flows

| | Year Ended July 31 | |
| --- | --- | --- |
| | 2015 | 2014 |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Change in net assets | $   422,213 | $ (1,644,406) |
| Adjustments to reconcile change in net assets to | | |
| net cash from operating activities | | |
| Depreciation and amortization | 486,180 | 536,955 |
| Realized and unrealized loss on investments | 112,839 | 79,808 |
| Non cash contribution (loan forgiveness) | (325,000) | - |
| Changes in operating assets and liabilities | | |
| Accounts receivable | (27,526) | (15,990) |
| Contributions receivable | (16,255) | (251,495) |
| Inventories | (834) | 36,174 |
| Prepaid expenses and other assets | 240,656 | (103,337) |
| Deposits | 5,640 | - |
| Accounts payable and accrued expenses | (1,324,875) | 878,766 |
| Deferred revenue | (32,208) | 221,026 |
| Net Cash from Operating Activities | (459,170) | (262,499) |
| | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Proceeds from sales of investments | 301,698 | 260,314 |
| Purchases of investments | (290,335) | (256,163) |
| Purchases of property and equipment | - | (26,182) |
| Net Cash from Investing Activities | 11,363 | (22,031) |
| | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Repayments on mortgage note payable | (101,280) | (11,521) |
| Repayment of other notes payable | (531,080) | (162,045) |
| Proceeds from other notes payable | 1,425,000 | 100,000 |
| Proceeds from future sales agreement | 450,000 | - |
| Remittance to purchaser of future sales | (13,712) | - |
| Net Cash from Financing Activities | 1,228,928 | (73,566) |
| Net Change in Cash and Cash Equivalents | 781,121 | (358,096) |
| | | |
| **CASH AND CASH EQUIVALENTS** | | |
| Beginning of year | 196,618 | 554,714 |
| | | |
| End of year | $   977,739 | $   196,618 |
| | | |
| **SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION** | | |
| Interest paid | $   139,838 | $   32,790 |
| Non cash financing activity | | |
| Forgiveness of loans payable | 325,000 | - |

See notes to financial statements

**The Big Apple Circus, Ltd.**

Notes to Financial Statements
July 31, 2015 and 2014

1.    **Organization and Tax Status**

The Big Apple Circus, Ltd. (the "Circus"), is a not-for-profit corporation that presents performances of a one ring, classical style circus in New York City and throughout the United States. The Circus administers community programs, including Clown Care, which staffs children's hospital wards with specially trained clowns.

The Circus is a not-for-profit organization as defined under Section 501(c)(3) of the Internal Revenue Code, and is, therefore, exempt from federal income taxes under Section 509(a) of the Internal Revenue Code and has been designated as an organization which is not a private foundation. The Circus is also exempt from state and local income taxes.

2.    **Net Assets Deficit and Management Plans**

Management is encouraged by the financial progress from a fiscal year 2014 deficit of $1.7 million to a fiscal year 2015 surplus of $400K.

The Circus has engaged a new management team dedicated to stabilizing its finances and sustainability.

The Circus is aggressively seeking partners who can share the Circus' operating costs, can bring expanded expertise, and can underwrite projects or programs that extend the reach of the Big Apple Circus mission to bring joy and wonder inside and outside the tent. Starting in spring 2015, the Circus has been communicating with a for-profit producer of national family entertainment with an interest in promoting the Circus in new markets. The Circus has also been meeting with a company that programs entertainment at several sports arenas and facilities; the goal is to create a package of Big Top performances on the grounds of a major stadium plus indoor arena shows. And the Circus has expanded, in fiscal year 2015 and to a greater extent in fiscal year 2016, its Clown Care programming with existing healthcare partners in New Jersey and Miami, with new partners in NYC, and with a new partner in Orange County, California - in each case because of a new relationship with a private foundation or individual donor with interest in pediatric care in those markets.

The Circus senior management team, with engagement from the Board, is working closely with all its lenders and has successfully negotiated payment plans with every lender, and is currently in full compliance with agreed-upon payment terms.

The entire executive team of the Circus continues to be in close contact with several high-net worth individuals who each have the ability to make a very large transformative gift.  A gift (or gifts) this size could enable the Circus to continue operating for years to come.

**The Big Apple Circus, Ltd.**

Notes to Financial Statements
July 31, 2015 and 2014

3.    **Summary of Significant Accounting Policies**

*Basis of Presentation and Use of Estimates*

The accompanying financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP"). The preparation of financial statements in accordance with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reported period. Accordingly, actual results could differ from those estimates.

*Fair Value Measurements*

The Circus follows U.S. GAAP guidance on fair value measurements which defines fair value and establishes a fair value hierarchy organized into three levels based upon the input assumptions used in pricing assets. Level 1 inputs have the highest reliability and are related to assets with unadjusted quoted prices in active markets. Level 2 inputs relate to assets with other than quoted prices in active markets which may include quoted prices for similar assets or liabilities or other inputs which can be corroborated by observable market data. Level 3 inputs are unobservable inputs and are used to the extent that observable inputs do not exist.

*Cash and Cash Equivalents*

The Circus considers all highly liquid debt instruments, with a maturity of three months or less at the time of purchase, to be cash equivalents, except those that are held as part of the investment portfolio.

*Contributions Receivable*

Contributions receivable that are due in more than one year have been discounted to their present value using risk-adjusted rates. Contributions receivable are reported net of estimated uncollectible amounts. Management deems accounts receivable from earned revenues to be fully collectible, and no allowance was calculated.

*Inventories*

Inventories, primarily comprised of concession items, are stated at the lower of cost or market using a first-in, first-out valuation method.

*Property and Equipment*

Purchased property and equipment are stated at cost and depreciated on a straight line basis over the estimated useful lives of the assets. Purchases of $1,000 or less are expensed. The Circus follows the practice of charging repairs and maintenance to expense as incurred.

The Circus reviews long-lived assets to determine whether there has been any permanent impairment whenever events or circumstances indicate the carrying amount of an asset may not be recoverable. If the sum of the expected future undiscounted cash flows is less than the carrying amount of the assets, the Circus recognizes an impairment loss. No impairment losses were recognized for the years ended July 31, 2015 and 2014.

7

**The Big Apple Circus, Ltd.**

Notes to Financial Statements
July 31, 2015 and 2014

3.   **Summary of Significant Accounting Policies** *(continued)*

*Investment Valuation and Income Recognition*

Investments, other than cash investments, are carried at fair value. Cash investments are carried at cost plus accrued interest. Purchases and sales of securities are recorded on a trade-date basis. Interest income is recorded on the accrual basis and dividends are recorded on the ex-dividend date. Realized and unrealized gains and losses are included in the determination of the change in net assets.

*Deferred Revenue*

Deferred revenue consists primarily of amounts received in advance for future performances, tours and Clown Care Unit hospital fees. Amounts are recognized as revenue when performances are held or services are performed.

*Net Asset Classifications*

The Circus has reflected amounts related to its financial position and activities in three classes of net assets - unrestricted, temporarily restricted and permanently restricted.

Unrestricted net assets are fully available, at the discretion of management and the Board of Directors, for the Circus to utilize in any of its programs or supporting services.

Temporarily restricted net assets are restricted by donors for specific purposes or time periods that will be met either by action of the Circus or passage of time.

Permanently restricted net assets are restricted by donors to be maintained in perpetuity. The related income may be expended for such purpose as specified by the donor or, if none, then for general operating needs of the Circus.

*Contributions*

Conditional contributions are recognized as revenue when the conditions on which they depend have been substantially met. In addition, the Circus reports cash, promises to give, contributed services, and other gifts at their fair value when they are received. Substantially all of the Circus' grants are considered to be contributions for purposes of applying income recognition policies.

The Circus reports contributions received as unrestricted, temporarily restricted, or permanently restricted support, depending on the existence and/or nature of any donor restrictions. Contributions are recognized when the donor makes an unconditional promise to give to the Circus. Contributions that are restricted by the donor are reported as increases in unrestricted net assets if the restrictions expire in the fiscal year in which the contributions are received. All other donor-restricted contributions are reported as increases in temporarily or permanently restricted net assets depending on the nature of the restrictions.  When a restriction is satisfied, temporarily restricted net assets are reclassified to unrestricted net assets.

**The Big Apple Circus, Ltd.**

Notes to Financial Statements
July 31, 2015 and 2014

3.    **Summary of Significant Accounting Policies** *(continued)*

*Contributions (continued)*

Donations of property and equipment are recorded as support at their estimated fair value. Such donations are reported as unrestricted support unless the donor has restricted the donated asset to a specific purpose. Assets donated with explicit property and equipment are reported as restricted support. Absent donor stipulations regarding how long those donated assets must be maintained, the Circus reports expirations of donor restrictions when the donated or acquired assets are placed in service as instructed by the donor.

*Revenue Recognition*

Revenue from services and performances is recognized when the services are performed or the event takes place.

*Advertising Costs*

Advertising costs are expensed at the time the advertising takes place. Advertising costs amounted to approximately $2,820,000 and $2,851,000 for the years ended July 31, 2015 and 2014.

*Accounting for Uncertainty in Income Taxes*

The Circus recognizes the effect of income tax positions only if those positions are more likely than not to be sustained. The Circus is no longer subject to examinations by the applicable taxing jurisdictions for periods prior to fiscal 2012.

*Reclassification*

Certain information in the fiscal 2014 financial statements was reclassified to conform to the fiscal 2015 presentation.

*Subsequent Events Evaluation by Management*

Management has evaluated subsequent events for disclosure and/or recognition in the financial statements through the date that the financial statements were available to be issued, which date is February 5, 2016.

4.    **Concentration of Credit Risk**

The Circus maintains its cash in financial institutions located in New York City which, at times, may exceed the Federal Deposit Insurance Corporation limit. This potentially subjects the Circus to a concentration of credit risk. The Circus has not experienced any losses in such accounts.

At July 31, 2015 and 2014, 100% of the contributions receivable were due from three and two donors respectively.

9

**The Big Apple Circus, Ltd.**

Notes to Financial Statements
July 31, 2015 and 2014

4.  **Concentration of Credit Risk (continued)**

The investment account is managed by a professional investment advisor and is diversified so that no individual investment represents a significant concentration of market risk.

5.  **Contributions Receivable**

Contributions receivable, discounted to fair value using risk adjusted rates, are as follows as of July 31:

|  | 2015 | 2014 |
|---|---|---|
| Government | $  8,000 | $  49,675 |
| Foundations | 291,250 | 250,000 |
|  | 299,250 | 299,675 |
| Less discount to present value at 4.54% | (24,000) | (40,680) |
|  | $ 275,250 | $ 258,995 |

Management has determined that no allowance for doubtful accounts is necessary.

6.  **Investments**

The following are major categories of investments, including those measured at fair value on a recurring basis, at July 31, 2015, grouped by inputs under the fair value hierarchy:

|  | Level 1 | Level 2 | Total |
|---|---|---|---|
| Investments at Fair Value |  |  |  |
| Equities - Common Stocks |  |  |  |
| Utilities | $ 130,896 | $       - | $  130,896 |
| Technology | 63,240 | - | 63,240 |
| Financial | 55,088 | - | 55,088 |
| Services | 28,934 | - | 28,934 |
| Equities - Preferred Stocks |  |  |  |
| Financial | 144,802 | - | 144,802 |
| Exchange Traded Funds |  |  |  |
| Closed ended fund - foreign equity | 200,118 | - | 200,118 |
| Closed ended fund - domestic equity | 149,485 | - | 149,485 |
| Corporate fixed income security | 21,630 | - | 21,630 |
| Mortgage and asset backed security | - | 72,171 | 72,171 |
| Total Investments at Fair Value | $ 794,193 | $ 72,171 | 866,364 |
| Cash investments, at cost plus accrued interest |  |  | 35,823 |
| Total Investments |  |  | $  902,187 |

10

**The Big Apple Circus, Ltd.**

Notes to Financial Statements
July 31, 2015 and 2014

6.    **Investments**

The following are major categories of investments, including those measured at fair value on a recurring basis, at July 31, 2014, grouped by inputs under the fair value hierarchy:

|  | Level 1 | Level 2 | Total |
|---|---|---|---|
| Investments at Fair Value |  |  |  |
| Equities - Common Stocks |  |  |  |
| Utilities | $ 122,751 | $      - | $   122,751 |
| Technology | 64,343 | - | 64,343 |
| Financial | 52,009 | - | 52,009 |
| Services | 26,858 | - | 26,858 |
| Basic materials | 82,026 | - | 82,026 |
| Equities - Preferred Stocks |  |  |  |
| Financial | 162,025 | - | 162,025 |
| Exchange Traded Funds |  |  |  |
| Closed ended fund - foreign equity | 221,378 | - | 221,378 |
| Closed ended fund - domestic equity | 172,049 | - | 172,049 |
| Mortgage and asset backed security | - | 90,402 | 90,402 |
| Total Investments at Fair Value | $ 903,439 | $  90,402 | 993,841 |
| Cash investments, at cost plus accrued interest |  |  | 32,548 |
| Total Investments |  |  | $ 1,026,389 |

The composition of investment income (loss) as reported in the statement of activities is as follows for the years ended July 31:

|  | 2015 | 2014 |
|---|---|---|
| Interest and dividends | $   67,816 | $   86,514 |
| Realized losses | (20,394) | (109,092) |
| Unrealized gains (losses) | (92,445) | 29,284 |
| Advisory fees | (11,363) | (12,664) |
|  | $  (56,386) | $   (5,958) |

**The Big Apple Circus, Ltd.**

Notes to Financial Statements
July 31, 2015 and 2014

7.     **Property and Equipment**

Property and equipment consist of the following at July 31:

| | Estimated Useful Life | 2015 | 2014 |
|---|---|---|---|
| Land | | $ 373,787 | $ 373,787 |
| Building and improvements | 40 years | 3,438,017 | 3,438,017 |
| Circus tents | 5-10 years | 3,205,066 | 3,205,066 |
| Circus bleachers and equipment | 10-20 years | 3,781,112 | 3,781,112 |
| Trucks and trailers | 5-10 years | 4,373,412 | 4,373,412 |
| Office equipment | 5-10 years | 937,731 | 937,731 |
| Website development | 5 years | 169,272 | 169,272 |
| Leasehold and site improvements | Term of lease | 1,118,367 | 1,118,367 |
| | | 17,396,764 | 17,396,764 |
| Less accumulated depreciation and amortization | | (13,923,019) | (13,436,839) |
| | | $ 3,473,745 | $ 3,959,925 |

The Circus' land, building and improvements are currently placed as collateral on the Circus' mortgage and notes payables (see note 8).

8.     **Loans Payable**

The Circus has a mortgage note outstanding of $812,603 at July 31, 2015, payable in monthly installments of principal and interest up to and including December 31, 2023. Interest is at a fixed rate of 4.25% per annum, and the note is secured by land and building. The Circus was notified of certain events of default under the loan, including failure to remit the payments due under the loan documents on January 1, 2015 and every month thereafter and failures to satisfy real estate taxes due on the collateral which secures the loan.

The Circus also has a note payable that charges interest at the greater of prime rate plus 2.0% or 6.5% per annum and matured July 1, 2014.  On June 20, 2014, the lender deemed the Circus in default due to failure to remit payments due under the note on January 1, 2014 and every month thereafter, and failure to satisfy real estate taxes due on the land and building that secures the note.  At July 31, 2015, the Circus has an outstanding balance of $76,413 on this note, which is secured by property owned by the Circus.

12

**The Big Apple Circus, Ltd.**

Notes to Financial Statements
July 31, 2015 and 2014

8.      **Loans Payable**

On February 3, 2015, the Circus entered into a forbearance agreement for the above mortgage note and other note payable, which require bi-weekly payments of $11,000 to be made by the Circus for the duration of the forbearance period, which terminated on July 1, 2015, or if the Circus shall have repaid the other note payable in full prior to July 1, 2015, then October 1, 2015.   During fiscal 2015, the Circus made total repayments of $337,000 on the above mortgage note and other note payable.

On August 25, 2015, the Circus entered into a second amendment for the above mortgage note and other note payable, which extended the maturity dates to July 1, 2020 and July 1, 2016, respectively.  The Circus shall repay the mortgage and loan in monthly installments in arrears in the amount of $11,000 each.

As of July 31, 2015, the Circus has obtained five cash flow loans from the Fund for the City of New York (the "Fund") amounting to $850,000 to cover the Circus' working capital expenses pending the receipt of ticket revenues from its Lincoln Center performances. In June 2015, the Circus entered into an agreement with the Fund whereby, commencing September 2015, the Circus will make monthly repayments of $10,000 toward the balance due.  At such time, as the Circus has secured more income above its annual operating expenses, the Circus will increase its payments to the Fund, at a rate not less than the increase in repayments to other major lenders.

On August 26, 2014, the Circus entered into a short term debt agreement with an individual and issued a promissory note of $1,000,000 at an annual interest rate of 0.36%. The note matures on August 31, 2015 and originally required installments of principal of $250,000 on or before January 31, 2015, $250,000 on or before June 30, 2015, and $500,000 on or before August 31, 2015.  $250,000 of this outstanding liability has been forgiven by the individual during fiscal 2015.  As of July 31, 2015, the Circus has an outstanding balance of $750,000 on this loan. In December 2015, the Circus renegotiated a repayment agreement with the individual whereby repayment of the loan will commence in December 2015, with two payments of $12,500 to be made within each year, in December and June, through June 2019.  Commencing December 2019, the repayment amounts will increase to $25,000 to be paid monthly, and anticipating that the remaining $650,000 balance would be outstanding at the end of June 2019, the loan from this individual is expected to be fully paid off by January 2022.  Accrued and unpaid interest through the end of fiscal year 2015 is expected to be paid by the Circus during fiscal 2016.  Commencing December 2019, the annual interest rate on this loan will increase to 1.59% with payment from the Circus due in December of each of the following years.

### The Big Apple Circus, Ltd.

Notes to Financial Statements
July 31, 2015 and 2014

8.    **Loans Payable** *(continued)*

The Circus has also obtained several cash loans amounting to $175,000 from various individuals to maintain sufficient cash for normal operation. During 2015, $75,000 of these cash loans was forgiven and $67,500 was repaid thus leaving an outstanding balance of $32,500 at July 31, 2015.

The recapitulation of the total debt for the years ended July 31, 2015 and 2014 is as follows:

|  | 2015 | 2014 |
|---|---|---|
| Mortgage note payable | $          - | $   913,883 |
| Other debt secured by property | - | 239,993 |
| Forbearance agreement for mortgage and other debt secured by property | 889,016 | - |
| Cash flow loans | 850,000 | 900,000 |
| Loans from individuals | 782,500 | - |
| Total Loans Payable | $ 2,521,516 | $ 2,053,876 |

Debt maturities at July 31, 2015 are:

| | |
|---|---|
| Within one year | $    387,500 |
| Year ending July 31, 2017 | 277,000 |
| Year ending July 31, 2018 | 277,000 |
| Year ending July 31, 2019 | 277,000 |
| Year ending July 31, 2020 | 593,016 |
| Due after July 31, 2020 | 710,000 |
| | $ 2,521,516 |

9.    **Amount due to Purchaser of Future Sales**

On June 18, 2015, the Circus entered into a future sales agreement, wherein future sales of $576,000 were sold for a purchase price of $450,000. The Circus agrees to remit 17% of its daily credit card receipts to the lender until the $576,000 is paid. During fiscal 2015, the Circus made repayments of $13,712 thus leaving an outstanding balance of $436,288.

14

**The Big Apple Circus, Ltd.**

Notes to Financial Statements
July 31, 2015 and 2014

10.    **Commitments**

**Operating Leases**

The Circus has a lease agreement for its office space and a usage agreement for its performance venue providing for minimum annual rentals as follows:

|  | Office Space | Lincoln Center Site |
|---|---|---|
| Year Ending July 31: | | |
| 2016 | $    76,939 | $   500,000 |
| 2017 | 52,308 | 500,000 |
| 2018 | - | 500,000 |
| 2019 | - | 500,000 |
|  | $  129,247 | $ 2,000,000 |

Rental expense amounted to $804,227 and $854,748 for the years ended July 31, 2015 and 2014.

**Legal Proceedings**

The Circus is involved in various legal proceedings incurred in the normal course of operations. Management believes it has defenses for all such claims and is vigorously defending the actions. Subsequent to year end, such proceedings were resolved without material effect on the financial position, results of operations or cash flows of the Circus.

11.    **Temporarily Restricted Net Assets**

Temporarily restricted net assets are restricted for the following purposes at July 31:

|  | 2015 | 2014 |
|---|---|---|
| *Clown Care | $            - | $   500,000 |
| Future programs and periods | 919,108 | 1,092,028 |
|  | $   919,108 | $ 1,592,028 |

*The Circus received this contribution in 2001 designated for Clown Care, with the stipulation that the original contribution can be used if the only other alternative is to shut down the Clown Care operations.  During fiscal 2015, after ongoing deficits in the Clown Care operations, the Circus utilized this entire contribution and was therefore released from restriction.

15

**The Big Apple Circus, Ltd.**

Notes to Financial Statements
July 31, 2015 and 2014

11.    **Temporarily Restricted Net Assets** *(continued)*

Net assets were released from restrictions for the following programs and purposes for the years ended July 31:

|  | 2015 | 2014 |
|---|---|---|
| Support operations | $    882,708 | $      98,000 |
| Clown Care | 566,565 | 66,565 |
| Timing | 67,816 | 86,514 |
|  | $ 1,517,089 | $    251,079 |

Included in the release from restrictions for Clown Care is interest due on borrowings from the permanently restricted endowment fund of $66,565 in both 2015 and 2014.

12.    **Permanently Restricted Net Assets**

Permanently restricted net assets as of July 31, are as follows:

|  | 2015 | 2014 |
|---|---|---|
| Support operations | $  1,314,516 | $ 1,438,718 |
| Clown Care | 822,671 | 822,671 |
| Cash reserve | 315,000 | 315,000 |
|  | $  2,452,187 | $ 2,576,389 |

All income that is yielded from the original bequest for Clown Care restricted for this listed purpose.

The cash reserve consists of amounts received matching the National Endowment for the Arts Challenge Grant and other donors designated for the establishment of a permanent cash reserve. Any amounts borrowed from this fund are to be repaid within two years and any income earned can be utilized to support operations.

Realized and unrealized gains on the investments within the permanently restricted endowment decrease the value of permanently restricted net assets.

**The Big Apple Circus, Ltd.**

Notes to Financial Statements
July 31, 2015 and 2014

13.   **Endowment**

*Interpretation of Relevant Law*

The New York Prudent Management of Institutional Funds Act ("NYPMIFA") requires the preservation of the value of the original gift as of the gift date of the donor-restricted endowment funds absent explicit donor stipulations to the contrary, and except in those cases where the law allows appropriation for spending of the original gift amounts. As a result of this interpretation, the Circus classifies as permanently restricted net assets (a) the original value of the gifts donated to the permanent endowment, (b) the original value of subsequent gifts to the permanent endowment, and (c) accumulations of investment returns to the permanent endowment made in accordance with the direction of the applicable donor gift instrument at the time the accumulation is added to the fund. The remaining portion of the donor-restricted endowment fund that is not classified as permanently restricted net assets is classified as temporarily restricted net assets until those amounts are appropriated for expenditure by the Board of Directors in a manner consistent with the standard of prudence prescribed by NYPMIFA.

*Return Objectives and Spending Policy*

The Circus utilizes a conservative investment approach with its asset allocation only in highly liquid short term asset classes.  Target allocation percentages are established for these asset classes and are modified over time.  Performance is measured against a composite benchmark of investment indices reflecting the target asset allocation. The Circus spending policy is to use only the interest and dividends earned on the endowment funds, per donor stipulation.

The following is a reconciliation of the investment activity for the years ended July 31, 2015 and 2014 in the donor restricted and unrestricted board designated funds:

| | Board Designated | Temporarily Restricted | Permanently Restricted |
|---|---|---|---|
| Balance, July 31, 2013 | $      - | $      - | $   1,118,861 |
| Interest and dividends | - | 86,514 | - |
| Investment advisory fees | - | - | (12,664) |
| Realized (loss) | - | - | (109,092) |
| Unrealized gain | - | - | 29,284 |
| Appropriations | - | (86,514) | - |
| Balance, July 31, 2014 | - | - | 1,026,389 |
| Interest and dividends | - | 67,816 | - |
| Investment advisory fees | - | - | (11,363) |
| Realized (loss) | - | - | (20,394) |
| Unrealized (loss) | - | - | (92,445) |
| Appropriations | - | (67,816) | - |
| Balance, July 31, 2015 | $      - | $      - | $   902,187 |
| Borrowings used in operations to be restored | $   100,000 | $      - | $   1,550,000 |

17

**The Big Apple Circus, Ltd.**

Notes to Financial Statements
July 31, 2015 and 2014

**13.    Endowment** *(continued)*

*Return Objectives and Spending Policy (continued)*

During the fiscal year ended July 31, 2010 the Circus borrowed $1,400,000 from the permanently restricted funds and $100,000 from the board designated endowment funds. $1,085,000 of the total amount borrowed was repayable over 11 months beginning February 9, 2010 through June 15, 2010 and bears interest equal to the prime rate plus 2%. The remaining balance of $415,000 was payable over two years beginning February 19, 2011 through March 9, 2011 and does not bear interest. During the fiscal year end July 31, 2011, the Circus borrowed an additional $150,000 from the permanently restricted funds and extended the loan terms for 48 months after receipt of the loan proceeds. On July 31, 2015, the repayment date of the loan was extended for another 48 months.

Interest on the borrowings from permanently restricted endowment funds, amounting to $66,565 in both 2015 and 2014, increased temporarily restricted net assets for those years, per donor stipulation.

**14.    Restatement**

A portion of the beginning fiscal year 2015 permanently restricted net assets totaling $40,558 was reclassified to unrestricted net assets to properly reflect the investment activity in the Morgan Stanley endowment fund account.

**15.    Subsequent Events**

Subsequent to year-end, the Circus entered into multiple debt arrangements to support its normal operations, as described below.

On September 17, 2015, the Circus received advance payment of $128,000 from Department of Cultural Affairs, against its fiscal year 2016 grant of $152,000.

On September 30, 2015, the Circus obtained several loans amounts to $160,000 from various individuals for normal operations. Interest on these loans will be charged at a rate of 5% and will be due on the last day of each month until January 1, 2016, the loan maturity date.

On October 5, 2015, the Circus entered into an agreement for the sale of $202,000 of its future sales for $150,000. The Circus agrees to remit 5.83% of its daily credit card receipts to the lender until the full amount is paid. As an alternative, the Circus elected to make daily payments of $1,534 as repayment.

In January 2016, an individual advanced $165,000 to the Circus as a demand loan which bears no interest.

\* \* \* \* \*

**<u>Exhibit E</u>**

**Committees**

No creditors' committee has been formed prior to the order for relief in this chapter 11 case.

**Exhibit F**

**List of Creditors Holding 20 Largest Unsecured Claims**

The following is a list of the holders of the 20 largest unsecured claims against the Debtor, as of November 20, 2016, excluding claims of insiders as defined in 11 U.S.C. §101.

| | Name of Creditor and Contact Information | Nature of Claim | Amount of Claim | C/U/D/PS |
|---|---|---|---|---|
| 1 | Fund for the City of New York<br>121 Avenue of the Americas<br>New York, New York 10013<br><br>Andrew Walrond<br>212-925-5675 | Loan | $760,000 | |
| 2 | Barbara Slifka<br>One Beekman Place<br>New York, New York 10022<br><br>Michael Hecht<br>Mhecht@hechtcpa.com<br>212-819-8080 | Loan | $737,500 | |
| 3 | Audienceview Ticketing<br>425 Adelaide Street West<br>Toronto, Ontario Canada<br>M5V 3C1<br><br>Charlene DiGiuseppe<br>charlene.DiGiuseppe@audienceview.com | Trade | $426,623.09 | Disputed |
| 4 | Taft Foundation<br>1177 Avenue of the Americas<br>New York, New York 10036<br><br>Shannon Prohaszka<br>shannon@taftfoundation.org | Undelivered Services | $239,500.00 | Contingent |
| 5 | Billups, Inc.<br>PO Box 3558<br>Portland, Oregon 97208-3558<br><br>Natalie Stoll<br>(503) 454-0714  ext 170<br>natalie.stoll@billups.com | Trade | $236,762.00 | |
| 6 | Seiden Advertising<br>112 Madison Avenue<br>9th Floor<br>New York, New York 10016<br><br>Matt Seiden<br>(212) 223-8700<br>mseiden@seidenadvertising.com | Trade | $202,947.26 | |
| 7 | Centro Inc.<br>11 East Madison<br>6th Floor | Trade | $198,510.21 | |

| | Name of Creditor and Contact Information | Nature of Claim | Amount of Claim | C/U/D/PS |
|---|---|---|---|---|
| | Chicago, Illinois 60602<br><br>Carrie King<br>(312) 397-3374<br>carrieking@centro.com | | | |
| 8 | Christie Lites Orlando / Rentals<br>6990 Lake Ellenor Drive<br>Orlando, Florida 32809<br><br>Honey Murphy, Edgar Torres<br>(407) 856-0016<br>ETorr@christielights.com | Trade | $176,843.36 | |
| 9 | Burke Foundation<br>320 E. Buffalo St., Suite 600<br>Milwaukee, Wisconsin 53202<br><br>Casey Casteneda (JP Morgan Chase)<br>323-791-1889<br>and<br>James Burke<br>james@disruptivela.com | Undelivered Services | $150,000.00 | Contingent |
| 10 | Mintz-Hoke<br>40 Tower Lane<br>Avon, Connecticut 6001<br><br>Lynette McCarthy, VP and Director of Broadcast Buying<br>(860) 679-9789<br>lynettem@mintz-hoke.com | Trade | $144,890.83 | |
| 11 | Sunbelt Rentals / GA<br>58-75 Maurice Avenue<br>Maspeth,  NY 11378<br><br>(718) 387-4872<br>www.sunbeltrentals.com | Trade | $127,684.66 | |
| 12 | Rudin Management Inc.<br>345 Park Ave Fl 33<br>New York, New York 10154-0004<br><br>Katie Gallagher<br>212-407-2429<br>kgallagh@rudin.com | Undelivered Services | $105,000.00 | Contingent |
| 13 | IPFS Corporation<br>PO Box 32144<br>New York, New York 10087-2144<br><br>Joseph Bower<br>(212-297-1481)<br>jbower@dewittstern.com | Insurance | $104,364.16 | Contingent |
| 14 | Guillaume Dufresnoy<br>149 Siam Rd. | Employee, Loan | $103,077.11 | Disputed |

2

| | Name of Creditor and Contact Information | Nature of Claim | Amount of Claim | C/U/D/PS |
|---|---|---|---|---|
| | Windham, NY 12496<br><br>Guillaume Dufresnoy<br>(646) 294-0523<br>dufresnoy@aol.com | | | |
| 15 | Mt. Sinai Children's Center Foundation<br>Jack and Lucy Clark Department of Pediatrics<br>Mount Sinai Health System<br>One Gustave L. Levy Place, Box 1198<br>1468 Madison Avenue<br>New York, New York 10029<br><br>Freda Burstyn, Vice Chair for Administration<br>Phone: 212-241-8089<br>Mobile: 917-743-6068<br>freda.burstyn@mssm.edu | Undelivered Services | $101,960.00 | Contingent |
| 16 | The Whelan Group Incorporated<br>Meyers, Saxon, & Cole<br>c/o Whelan Group Inc.<br>3620 Quentin Road<br>Brooklyn, New York 11234<br><br>Irwin Meyers<br>(718) 339-3330<br>imeyers920@aol.com | Judgment | $93,838.29 | Disputed |
| 17 | Arena Americas<br>55 Montgomery Street<br>Belleville, New Jersey 7109<br><br>Dianne Crone<br>(414)831-7036<br>dcronce@arenaamericas.com | Trade | $90,770.07 | |
| 18 | NYS Dept. of Taxation and Finance<br>PO Box 4127<br>Binghamton, NY 13902-4127<br>and<br>PO Box 5300<br>Albany, NY 12205-0300 | Government | $90,470.00 | |
| 19 | Village of Walden Property Tax<br>One Municipal Square<br>Walden, New York 12586<br><br>Janice Cocks | Government, Municipal | $88,657.00 | |
| 20 | Celtic Bank Corporation<br>Capital Square Program<br>1455 Market Street, Suite 600<br>San Francisco, California 94103<br><br>Fax: (801) 363-6562 | Loan | $86,470.00 | |

## <u>Exhibit G</u>

**List of Creditors Holding 5 Largest Secured Claims**

The following is a list of holders of the 5 largest secured claims against the Debtor, as of November 20, 2016.

| | Name of Creditor and Contact Information | Nature of Claim | Amount of Claim and Whether Disputed | Nature and Estimated Value of Collateral |
|---|---|---|---|---|
| 1 | Nonprofit Finance Fund Five Hanover Square, 9th Floor New York, New York 10004 | Mortgage, Secured | $740,940 | Real Property $2,500,000 |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | | | | |

# Exhibit H

## Summary of Assets and Liabilities

Below is a summary of the Debtor's assets and liabilities as of November 14, 2016.

| TOTAL ASSETS | |
|---|---:|
| Cash | 12,351 |
| Deposit – Property Sale Cancellation | 250,000 |
| Reserve for Non-Recovery of Property Sale Deposit | (250,000) |
| Total Current Assets | 12,351 |
| | |
| Property and Equipment | 17,396,766 |
| A/D Property and Equipment | (14,598,019) |
| Property and Equipment, Book Value | 2,798,747 |
| | |
| Restricted Cash | 859,417 |
| Restricted Investments | 142,708 |
| Total Long Term Assets | 1,002,125 |
| | |
| **Total Assets** | **3,813,223** |
| | |
| **TOTAL LIABILITIES AND NET ASSETS** | |
| Accounts Payable – Trade | 3,176,480 |
| Accrued Vacation Obligations | 35,000 |
| GALA Contributions | 110,000 |

| | |
|---|---:|
| Advanced Ticket Sales – Private Performances | 260,213 |
| Advanced Grants – Community Programs | 470,607 |
| Notes Payable – Restricted Fund Borrowings | 1,650,000 |
| Notes Payable – Walden Mortgage | 740,940 |
| Notes Payable – FCNY | 760,000 |
| Notes Payable – Officers & Directors | 237,794 |
| Notes Payable – Barbara Slifka | 737,500 |
| Notes Payable – Square One | 86,471 |
| **Total Liabilities** | **8,265,005** |
| | |
| Net Assets/(Deficit) – Prior Year | (3,871,545) |
| Net Assets/(Deficit) – Current Year | (580,237) |
| Net Assets/(Deficit) | (4,451,782) |
| | |
| **Total Liabilities and Net Assets** | **3,813,223** |

2

**<u>Exhibit I</u>**

**Publicly Held Securities**

The Debtor is a not-for-profit corporation.  Accordingly, there are no shares of stock, debentures, or other securities of the Debtor that are publicly held.

## Exhibit J

**Debtor's Property Not in the Debtor's Possession**

The Debtor is unaware of any of its property that is in the possession of a custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, other than, to the extent applicable, (a) the Debtor's endowment established by the Ilma F. Kern Foundation and the Jean L. and Robert A. Stern Foundation, which is held in an investment account at Morgan Stanley in the name of The Big Apple Circus, Ltd. that is managed by the Trischman Group, and (b) the funds currently held by Bank of America on account of the Whelan Judgment.

## Exhibit K

### Leased and Owned Property

The Debtor leases office space for its headquarters at One MetroTech Center North, 3rd Floor, Brooklyn, New York  11201, and owns real property at 39 Edmunds Lane, Walden, New York  12586.

## Exhibit L

## Location of Substantial Assets and Books and Records

The Debtor's books and records are located at One MetroTech Center North, 3rd Floor, Brooklyn, New York  11201, and the Debtor's substantial assets are located at 39 Edmunds Lane, Walden, New York  12586.  The Debtor does not hold any assets outside the territorial limits of the United States.

**Exhibit M**

**Litigation**

The following is a list of actions or proceedings, pending or threatened, against the Debtor or its properties where a judgment against the Debtor or a seizure of its property may be imminent:

| 1 | <u>Performance Food Group, Inc. d/b/a Performance Foodservice Metro NY v. The Big Apple Circus, Ltd.</u>, Docket No. DC-007123-16, Superior Court of New Jersey, Law Division, Special Civil Part, Union County |
|---|---|
| 2 | <u>Ohio Cat v. The Big Apple Circus, Ltd.</u>, Case No. 255241, Civil Court of the City of New York, County of Kings |
| 3 | <u>The Whelan Group Incorporated v. The Big Apple Circus, Ltd.</u>, Case No. 501085/2013, Kings County Supreme Court |
| 4 | <u>SB New York, Inc. d/b/a METRO v. The Big Apple Circus, Ltd.</u>, Index No. 016927, County of New York Civil Court |

## Exhibit N

### Senior Management

The following provides the names of the individuals who comprise the Debtor's existing senior management, and a brief summary of their relevant responsibilities and experience, and tenure with the Debtor.

| Name / Position | Experience / Responsibilities |
|---|---|
| Will Maitland Weiss<br>*Executive Director* | Will Maitland Weiss joined Big Apple Circus in 2013 as VP of Development, after more than seven years as Executive Director of the Arts & Business Council of New York.  As Executive Director, Mr. Weiss is responsible for overseeing the operations of the Big Apple Circus in administration, community programs, development, finance, and marketing/communications, as well as the hiring and supervision of staff directors and/or senior managers in the aforementioned program and support areas. |

## Exhibit O

**Payroll**

The following provides the estimated amount of weekly payroll to the Debtor's employees (not including officers, directors, and stockholders), and the estimated amount to be paid to officers, stockholders, directors, and financial and business consultants retained by the Debtor, for the 30-day period following the filing of the Debtor's chapter 11 petition.

| | |
|---|---|
| **Payments to Employees (Not Including Officers, Directors, and Stockholders)** | $28,680 bi-weekly |
| **Payments to Officers, Stockholders, and Directors** | $9,230 |
| **Payments to Financial and Business Consultants** | $12,000 |

**Exhibit P**

**Schedule of Cash Receipts and Disbursements,
Net Cash Gain or Loss, Unpaid Obligations and Receivables**

The following provides, for the 30-day period following the filing of the chapter 11 petition, the estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---:|
| **Cash Receipts** | $177,381 |
| **Cash Disbursements** | $136,560 |
| **Net Cash Gain/(Loss)** | $40,821 |
| **Unpaid Obligations** | $0 |
| **Unpaid Receivables** | $0 |