**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

**THE BIG APPLE CIRCUS, LTD.,**

         **Debtor.**

**Chapter 11**

**Case No. 16-13297 (SHL)**

## AMENDED ORDER (I) APPROVING THE SALE OF THE DEBTOR'S CIRCUS ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS AND (II) GRANTING RELATED RELIEF

Upon the motion, dated December 23, 2016 (the "**Motion**"), of The Big Apple Circus, Ltd. (the "**Circus**" or the "**Debtor**"), the debtor and debtor in possession in the above-captioned case, pursuant to sections 105(a), 363, 365, 503, 507, 541, 1107(a), and 1108 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**"), rules 2002, 6004, 6006, 9006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), rules 6004-1, 6005-1, and 9013-1 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**"), the "Amended Guidelines for the Conduct of Assets Sales" promulgated by General Order M-383 of this Court (the "**Sale Guidelines**"), and the applicable provisions of the New York Not-for-Profit Corporation Law, seeking entry of an order (a) approving the sale of certain of the Debtor's circus assets free and clear of all liens, claims, encumbrances, and other interests to Compass Partners LLC or its assignees (the "**Buyer**") pursuant to the terms and conditions of that certain Asset Purchase Agreement attached hereto as __Exhibit 1__ (the "**Agreement**");[1] and (b) granting certain related relief, all as more fully described in the Motion and the Agreement; and the Court having entered an order on

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement.

January 12, 2017 (Docket No. 76) (the "**Bidding Procedures Order**") approving, among other things, (a) bidding and auction procedures (the "**Bidding Procedures**"), attached to the Bidding Procedures Order as <u>Exhibit 1</u>, in connection with the sale of substantially all of the Debtor's Circus Assets (as defined in the Motion), and (b) scheduling an auction for such assets (the "**Phase I Auction**") and a hearing to consider the relief requested in the Motion (the "**Sale Approval Hearing**"); and the Phase I Auction having been held on February 7, 2017, and the Sale Approval Hearing having been held on February 14, 2017; and upon the record of the Sale Approval Hearing and all of the proceedings had before the Court; and the Court having found and determined that the relief requested in the Motion is in the best interests of the Debtor, its estate and creditors, and all parties in interest and that the legal and factual bases set forth in the Motion and at the Sale Approval Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor:

## IT IS HEREBY FOUND AND DETERMINED THAT:

### <u>Jurisdiction and Venue</u>

A.      This Court has jurisdiction to hear and determine the Motion and grant relief requested herein pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of the Motion and the relief requested therein is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### <u>Statutory Predicates</u>

B.      The statutory and legal predicates for the relief requested in the Motion are sections 105, 363, 365, 503, 507 and 541 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9006, and 9014, and Local Bankruptcy Rules 6004-1, 6005-1 and 9013-1.

## Final Order

C.      This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rules 7054 and 9014, this Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein.

## Compliance with Bidding Procedures Order

D.      As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Approval Hearing and (ii) the representations of counsel made on the record at the Sale Approval Hearing, the Debtor has thoroughly and fairly marketed the Acquired Assets and conducted the related sale process in good faith and in compliance in all respects with the Bidding Procedures and the Bidding Procedures Order. All interested persons and entities have been afforded a full, fair and reasonable opportunity to (i) conduct due diligence investigations, (ii) submit higher or otherwise better bids to purchase the Acquired Assets, and (iii) object or be heard with respect to the Motion and the relief granted by this Order. The Bidding Procedures were non-collusive, in good faith, substantially and procedurally fair to all parties, and obtained the highest value for the Acquired Assets for the Debtor and its creditors and estate.

## Notice

E.      As evidenced by the affidavits of service and publication previously filed with the Court, proper, timely, adequate, and sufficient notice of the Motion, the Auction, the Sale Approval Hearing, and the sale of the Acquired Assets (the "**Sale**") has been provided in accordance with sections 102(1) and 363 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004,

and 9014, all applicable Local Bankruptcy Rules, the applicable provisions of the New York Not-for-Profit Corporation Law, and in compliance with the Bidding Procedures Order. Such notice was good, sufficient and appropriate under the particular circumstances, and no other or further notice of the Motion, the Auction, Sale Approval Hearing, or the Sale is required.

F.    Actual written notice of the Motion, the Auction, the Sale Approval Hearing, and the Sale, and a fair and reasonable opportunity to object or be heard with respect to the Motion and the relief granted by this Order has been afforded to all interested persons and entities, including, without limitation, (i) the Office of the United States Trustee for the Southern District of New York, (ii) the U.S. Attorney for the Southern District of New York, (iii) the New York State Attorney General, (iv) all known creditors of the Debtor, (v) any entity known or reasonably believed to have asserted a security interest in, claim or lien against the Circus Assets, (vi) the New York City Department of Cultural Affairs, (vii) any entity that has expressed a bona fide interest in acquiring the Circus Assets, (viii) all taxing authorities having jurisdiction over the Circus Assets, including the Internal Revenue Service, (ix) the United States Environmental Protection Agency, (x) the New York State Department of Environmental Conservation, (xi) the Office of the Mayor of New York City, (xii) counsel to the Creditors' Committee, and (xiii) all parties who have requested notice in the Debtor's chapter 11 case pursuant to Bankruptcy Rule 2002.

G.    On February 8, 2017 and February 9, 2017, the Debtor served notice of the selection of the Buyer as the successful bidder for the Acquired Assets on (i) the Office of the United States Trustee for the Southern District of New York, (ii) the U.S. Attorney for the Southern District of New York, (iii) the New York State Attorney General, (iv) the New York City Department of Cultural Affairs, (v) the United States Environmental Protection Agency,

(vi) the New York State Department of Environmental Conservation, (vii) the Office of the

Mayor of New York City, (viii) counsel to the Creditors' Committee, (ix) all Qualified Bidders,

and (x) all parties who have requested notice in the Debtor's chapter 11 case pursuant to

Bankruptcy Rule 2002.

### Corporate Authority

H.     The Debtor has full corporate power and authority to execute and deliver

the Agreement and all other documents contemplated thereby, and the Sale has been duly and

validly authorized by all necessary corporate action of the Debtor. No further consents or

approvals, including that of any other court or the New York State Attorney General, are

required for the Debtor to consummate the transactions contemplated by the Agreement, except

as otherwise set forth in the Agreement.

### Good Faith Purchaser

I.     The Buyer is purchasing the Acquired Assets in good faith and is a good

faith purchaser within the meaning of section 363(m) of the Bankruptcy Code, and is therefore

entitled to the full protection of that provision and any other applicable or similar bankruptcy and

non-bankruptcy law. The Buyer has at all times acted in good faith and will continue to act in

good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the Sale. The

Buyer is not an "insider" of the Debtor, as that term is defined in section 101(31) of the

Bankruptcy Code.

### Arm's-Length Sale

J.     The Agreement was negotiated, proposed and entered into by the Debtor

and the Buyer without collusion, in good faith and from arm's-length bargaining positions.

Neither the Debtor nor the Buyer have engaged in any conduct that would cause or permit the

avoidance of the Sale or the Agreement or the imposition of costs or damages under

section 363(n) of the Bankruptcy Code.  The Buyer participated in the submission of bids in response to a bidding process established by the Debtor and agreed to by the Creditors' Committee.

### Business Justification

K.      The Debtor has demonstrated good, sufficient and sound business reasons and compelling circumstances to enter into the Agreement and sell the Acquired Assets to the Buyer, and such actions and the transactions contemplated under the Agreement are appropriate and reasonable exercises of the Debtor's business judgment and in the best interests of the Debtor, its estate and creditors, and other parties in interest. Such business reasons include, but are not limited to, the facts that (i) the terms and conditions of the Agreement are fair and reasonable, (ii) there is substantial risk of deterioration of the value of the Acquired Assets if the sale is not consummated quickly, (iii) the Agreement constitutes the highest or best offer for the Acquired Assets, (iv) no other person or entity or group of persons or entities has offered to purchase the Acquired Assets for greater economic value to the Debtor's estate than the Buyer, (v) the Sale pursuant to the terms of the Agreement will present the best opportunity to honor the Debtor's mission, and (vi) unless the sale is concluded expeditiously as provided for in the Motion and pursuant to the Agreement, recoveries to creditors may be diminished. The Debtor's determination that the Agreement constitutes the highest or best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtor's business judgment and complies with the New York Not-for-Profit Corporation Law.

### No Fraudulent Transfer

L.      The consideration provided by the Buyer for the Acquired Assets pursuant to the Agreement (i) is fair and reasonable, (ii) is the highest or best offer for the Acquired Assets, (iii) will provide a greater recovery for the Debtor's creditors and estate than would be

provided by any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.

M.    The Buyer is not a mere continuation of the Debtor or its estate, there is no continuity or common identity between the Buyer and the Debtor, and there is no continuity of enterprise between the Buyer and the Debtor. The Buyer is not holding itself out to the public as a continuation of the Debtor. The Buyer is not a successor to the Debtor or its estate and the Sale does not amount to a consolidation, merger or de facto merger of the Buyer and the Debtor. The Sale of the Acquired Assets to the Buyer is not being undertaken for the purpose of escaping liability for the Debtor's debts or hindering, delaying or defrauding creditors under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.

## Approval

N.    Subject only to the entry of this Order, the Debtor has (or at all relevant times had) (i) full corporate power and authority to execute and deliver the Agreement and all other documents contemplated thereby, (ii) all corporate authority necessary to consummate the transactions contemplated by the Agreement, and (iii) taken all corporate action necessary to authorize and approve the Agreement and the consummation of the transactions contemplated thereby. Subject only to the entry of this Order, no consents or approvals, other than those expressly provided for in the Agreement are required for the Debtor and Buyer to consummate the Sale of the Acquired Assets, the Agreement and the transactions contemplated thereby.

## Free and Clear

O.    Except as otherwise expressly provided in the Agreement or this Order, the Acquired Assets shall be sold free and clear of all interests, obligations, rights,

encumbrances, pledges, liens (including, without limitation, mechanics', materialmens' and other consensual and non-consensual liens and statutory liens), mortgages, deeds of trust, security interests, claims (including, any "claim" as defined in section 101(5) of the Bankruptcy Code), leases, charges, offsets, contracts, options, rights of first refusal, easements, servitudes, proxies, voting trusts or agreements, transfer restrictions under any agreement, conditional sale or other title retention agreements, judgments, hypothecations, demands, licenses, sublicenses, assignments, indentures, loan agreements, instruments, debts, rights of recovery, obligations, guaranties, contractual commitments, restrictions, recoupment, employee benefit obligations, collective bargaining agreements, claims based on reimbursement, contribution, indemnity, exoneration, products liability, alter-ego or taxes, claims based on pension plan contributions and related liabilities, environmental liabilities, and options to purchase, in each case of whatever kind, nature, or description in, against or with respect to any of the Acquired Assets, having arisen, existed or accrued prior to and through the date of the closing of the Sale (the "**Closing Date**"), whether direct or indirect, absolute or contingent, choate or inchoate, known or unknown, matured or unmatured, liquidated or unliquidated, arising or imposed by agreement, understanding, law, equity, statute or otherwise and whether arising prior to, on or after the Petition Date, including claims otherwise arising under doctrines of successor liability, de facto merger or substantial continuity (collectively, "**Interests**").

P.    The transfer of the Acquired Assets to the Buyer free and clear of all Interests (other than Liens created by the Buyer and the Permitted Encumbrances) will not result in any undue burden or prejudice to any holders of any Interests as such Interests shall attach to the net proceeds of the sale of the Acquired Assets received by the Debtor in the order of their priority, with the same validity, force and effect which they now have as against the Acquired

Assets and subject to any claims and defenses the Debtor, its estate or other parties may possess with respect thereto.

Q.    The Debtor may sell the Acquired Assets free and clear of all Interests (other than Liens created by the Buyer and the Permitted Encumbrances) because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Holders of Interests against the Debtor, its estate or any of the Acquired Assets who did not object, or who withdrew their objections, to the Sale or the Motion are deemed to have consented thereto pursuant to section 363(f)(2) of the Bankruptcy Code. Holders of Interests, including those who did object, fall within one or more of the other subsections of section 363(f) and are adequately protected by having their Interests, if any, attach to the proceeds of the Sale ultimately attributable to the Acquired Assets in which such creditor alleges an Interest, in the same order of priority, with the same validity, force and effect that such creditor had prior to the Sale, subject to any claims and defenses the Debtor, its estate or other parties may possess with respect thereto.

R.    The Buyer would not have entered into the Agreement and would not consummate the transactions contemplated thereby if the Sale were not free and clear of all Interests (other than Liens created by the Buyer and the Permitted Encumbrances), or if the Buyer would, or in the future could be liable for any such Interests.

S.    Not selling the Acquired Assets free and clear of all Interests (other than Liens created by the Buyer and the Permitted Encumbrances and Assumed Liabilities) would adversely impact the Debtor's efforts to maximize the value of its estate, and the sale of the Acquired Assets other than one free and clear of all Interests (other than Liens created by the

Buyer and the Permitted Encumbrances) would be of substantially less benefit to the Debtor's estate.

### Validity of Transfer

T.    The consummation of the Sale is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), and 363(m), and all of the applicable requirements of such sections have been complied with in respect of the transactions contemplated under the Agreement.

U.    The Acquired Assets constitute property of the Debtor's estate and good title thereto is vested in the Debtor's estate within the meaning of section 541(a) of the Bankruptcy Code, and the transfer of the Acquired Assets to the Buyer complies with section 541(f) of the Bankruptcy Code and applicable non-bankruptcy law.

### Compelling Circumstances for an Immediate Sale

V.    To maximize the value of the Acquired Assets, it is essential that the Sale of the Acquired Assets occur within the time constraints set forth in the Motion, the Bidding Procedures Order, and the Agreement. Time is of the essence in consummating the Sale. Accordingly, there is cause to waive the stay contemplated by Bankruptcy Rules 6004.

W.    The Debtor has demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the approval and consummation of the Sale prior to, and outside of, a chapter 11 plan. The Sale pursuant to the Agreement neither impermissibly restructures the rights of the Debtor's creditors nor impermissibly dictates the terms of a liquidating chapter 11 plan for the Debtor and therefore, does not constitute a sub rosa plan.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

### General Provisions

1.      The Motion is granted and approved as provided herein. The Motion complies with all applicable provisions of Local Bankruptcy Rules other than those previously waived by the Court.

2.      All objections and responses to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections and responses, are overruled on the merits and denied with prejudice.

3.      Any party who did not object, or withdrew their objection, to the Sale Motion or to the sale of the Acquired Assets to Buyer are deemed to have consented to the relief requested in the Motion and to the sale of the Acquired Assets to Buyer pursuant to sections 363(f)(2) and 365(c)(1)(B) of the Bankruptcy Code.

4.      This Court's findings of fact and conclusions of law set forth in the Bidding Procedures Order are incorporated herein by reference.

### Approval of the Agreement

5.      The Sale, the Agreement and all other ancillary documents, and all of the terms and conditions thereof, are approved.

6.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtor is authorized and directed to take any and all actions necessary or appropriate to execute and deliver, perform under, consummate, implement and effectuate the Agreement together with any and all instruments and documents that may be reasonably necessary or desirable to implement and effectuate the terms of the Agreement, this Order and the Sale, and to take all further actions as may be reasonably requested by the Buyer for the purpose of assigning, transferring, granting,

conveying and conferring to the Buyer, or reducing to possession, the Acquired Assets, or as may be necessary or appropriate to the performance of the Debtor's obligations as contemplated by the Agreement, without any further corporate action or order of this Court.

7.    The failure specifically to include any particular provision of the Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Agreement and all related ancillary documents be authorized and approved in their entirety.

## **Transfer of the Acquired Assets**

8.    Except as otherwise expressly provided in the Agreement or this Order, pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, the Debtor is authorized to transfer the Acquired Assets to the Buyer on the Closing Date on an "as is, where is, and with all faults" basis and free and clear of all Interests of any kind whatsoever with all such Interests to attach to the net proceeds of the sale of the Acquired Assets received by the Debtor in the order of their priority, with the same validity, force and effect which they now have as against the Acquired Assets and subject to any claims and defenses the Debtor, its estate or other parties may possess with respect thereto.

9.    The transfer of the Acquired Assets to the Buyer will be, as of the Closing Date, a legal, valid, binding and effective transfer of the Acquired Assets, and, except as otherwise expressly provided in the Agreement or this Order, shall vest the Buyer with all right, title, and interest of the Debtor in and to the Acquired Assets free and clear of all Interests accruing, arising or relating thereto any time prior to and through the Closing Date. Except as otherwise expressly provided in the Agreement or this Order, the Buyer shall not assume or become liable for any Interests relating to the Acquired Assets, provided, however, that the

Buyer shall not be relieved of liability with respect to Liens created by the Buyer and the Permitted Encumbrances or Assumed Liabilities.

10.    Nothing in the Agreement or this Order releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under police or regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of entry of this Order.

11.    On the Closing Date, this Order shall be construed as, and shall constitute for any and all purposes, a full and complete general assignment, conveyance and transfer of the Debtor's interests in the Acquired Assets to Buyer. Each and every federal, state and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement.

12.    On the Closing Date, each holder of an Interest in the Acquired Assets (other than Liens created by the Buyer and the Permitted Encumbrances) is authorized and directed to execute such documents and take all other actions as may be necessary to release such Interest, if any, as provided for herein, as such Interests may have been recorded or may otherwise exist.

13.    The transactions authorized herein shall be of full force and effect, regardless of the Debtor's lack of good standing in any jurisdiction in which the Debtor is formed or authorized to transact business.

14.    Upon consummation of the transactions contemplated in the Agreement, the Buyer shall be authorized to file termination statements or lien terminations in any required jurisdiction to remove any record, notice filing, or financing statement recorded to attach, perfect

or otherwise notice any lien or encumbrance that is extinguished or otherwise released pursuant to this Order under section 363 and the related provisions of the Bankruptcy Code.

15.    All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtor to sell and transfer the Acquired Assets to the Buyer in accordance with the terms of the Agreement and this Order.

16.    All persons and entities that are in possession of some or all of the Acquired Assets on the Closing Date are directed to surrender possession of such Acquired Assets to the Buyer or its assignee on the Closing Date.

17.    A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any of the Interests of record in the Acquired Assets (other than Liens created by the Buyer and the Permitted Encumbrances or Assumed Liabilities).

18.    If any person or entity which has filed statements or other documents or agreements evidencing Interests with respect to all or any portion of the Acquired Assets shall not have delivered to the Debtor prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary or desirable to the Buyer for the purpose of documenting the release of all Interests that the person or entity has or may assert with respect to all or any portion of the Acquired Assets (other than Liens created by the Buyer and the Permitted Encumbrances), the Debtor and the Buyer are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the Debtor or such person or entity with respect to the Acquired Assets.

19.    This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease, and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement.

**<u>Related Relief</u>**

20.    Upon the Closing Date and except as otherwise expressly provided in the Agreement or by stipulations filed with or announced to this Court with respect to a specific matter, all persons and entities are forever prohibited, estopped, and permanently enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Buyer, its successors and assigns, or the Acquired Assets, with respect to any (a) Interest (other than Liens created by the Buyer and the Permitted Encumbrances and Assumed Liabilities) arising under, out of, in connection with or in any way relating to the Debtor, the Buyer, the Acquired Assets, or the operation of the Acquired Assets prior to the Closing Date, or (b) successor liability, including, without limitation, the following actions: (i) commencing or continuing in any manner any action or other proceeding against the Buyer, its successors or assigns, assets or properties, (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Buyer, its successors, assets or properties, (iii) creating, perfecting or enforcing

any Interest (other than Liens created by the Buyer and the Permitted Encumbrances) against the Buyer, its successors or assigns, assets or properties, (iv) asserting any setoff, right of subrogation or recoupment of any kind against any obligation due the Buyer or its successors or assigns, (v) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Order or other orders of this Court, or the agreements or actions contemplated or taken in respect thereof, or (vi) revoking, terminating or failing or refusing to issue or renew any license, permit or authorization to operate any of the Acquired Assets or conduct any of the businesses operated with the Acquired Assets.

21.    Except as otherwise expressly provided in the Agreement or this Order, the Buyer shall not have any liability or other obligation of the Debtor arising under or related to any of the Acquired Assets except with respect to Liens created by the Buyer and the Permitted Encumbrances and Assumed Liabilities. Without limiting the generality of the foregoing, and except as otherwise specifically provided in the Agreement or this Order, the Buyer shall not be liable for any claims against the Debtor or any of its predecessors or affiliates, and the Buyer shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtor or any obligations of the Debtor arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of any of the Acquired Assets prior to the Closing Date. The Buyer has given substantial consideration under the Agreement for the benefit of the holders of any Interest in the Debtor or any of the Acquired

-16-

Assets. The consideration given by the Buyer shall constitute valid and valuable consideration for the releases of any potential claims of successor liability of the Buyer, which releases shall be deemed to have been given in favor of the Buyer by all holders of Interests in the Debtor or any of the Acquired Assets (other than Liens created by the Buyer and the Permitted Encumbrances and Assumed Liabilities).

22.    The transactions contemplated by the Agreement are undertaken by the Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale, unless such authorization and consummation of such Sale are duly stayed pending such appeal.

23.    Upon the Closing Date, the Debtor is authorized to apply the net proceeds of the Sale in accordance with section 363 of the Bankruptcy Code, pursuant to a confirmed chapter 11 plan, or as otherwise authorized by the Court.

24.    Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in (a) this chapter 11 case, (b) any subsequent chapter 7 case into which any this chapter 11 case may be converted, or (c) any related proceeding subsequent to entry of this Order, shall conflict with or derogate from the provisions of the Agreement or the terms of this Order.

25.    Notwithstanding the possible applicability of Bankruptcy Rules 6004, 7062, 9014, or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry. The Debtor is not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order, and may, in their discretion and

without further delay, close the transactions contemplated under the Agreement and take any action and perform any act authorized under this Order.

26.     Nothing in this Order or the Agreement approves or provides for the transfer to the Buyer of any of Seller's avoidance claims under chapter 5 of the Bankruptcy Code or under state fraudulent conveyance, fraudulent transfer or other similar state laws.

27.     No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

28.     The failure specifically to include any particular provision of the Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Agreement be authorized and approved in its entirety.

29.     The Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof, without further order of this Court; provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtor's estate.

30.     The terms and provisions of the Agreement and this Order shall be binding in all respects upon the Debtor, its estate and creditors, all holders of equity interests in the Debtor, all holders of any Interest in the Acquired Assets, the Buyer and all successors and assigns of the Buyer, and any trustees, if any, subsequently appointed in the Debtor's chapter 11 case or upon a conversion to chapter 7 under the Bankruptcy Code of the Debtor's case. This Order and the Agreement shall inure to the benefit of the Debtor, its estate and creditors, the Buyer and their respective successors and assigns.

31.     Any amounts that become due and payable by the Debtor under the Agreement or any of the documents delivered by the Debtor in connection with the Agreement

shall be paid in the manner provided in the Agreement, without further order of this Court, and

shall be allowed administrative claims in an amount equal to such payments in accordance with

sections 503(b) and 507(a)(2) of the Bankruptcy Code, and shall not be discharged, modified or

otherwise affected by any reorganization plan for the Debtor, except by an express agreement

with Buyer, its successors, or assigns.

32.     Opportunity Nocks, Inc. ("**ONI**") shall serve as Back-Up Bidder and will

adopt the terms of the Agreement, such that, if the Back-Up Bid becomes the Successful Bid,

ONI will execute a version of the Agreement that has been conformed to reflect ONI as the

buyer of the Circus Assets.  ONI will immediately increase its Good Faith Deposit from $50,000

to $125,000, based on the following provisions regarding the ultimate disposition of its Good

Faith Deposit: (a) if, upon selection of the Back-Up Bid as the Successful Bid, the Debtor seeks

to vary the terms of the Agreement by bad faith insistence on terms with which ONI cannot

reasonably comply, the full $125,000 of the Good Faith Deposit shall be returned to ONI and no

part of the Good Faith Deposit shall become property of the Debtor; and (b) if, having executed a

conformed version of the Agreement (the "**ONI APA**"), ONI fails to consummate the purchase

of the Circus Assets in accordance with the terms of the ONI APA, other than as a result of

circumstances beyond its control (including, without limitation, the failure of the Court to

approve the Sale), the Debtor shall have no obligation to return any part of the Good Faith

Deposit, and the full $125,000 deposited by ONI shall irrevocably become property of the

Debtor, in each case without affecting or reducing any of the Debtor's other rights or claims

against ONI.

33.     The findings of fact and conclusions of law set forth herein constitute this

Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made

-19-

applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any finding of fact constitutes a conclusion of law, it is adopted as such, and to the extent any conclusion of law constitutes a finding of fact, it is adopted as such.

34.    This Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtor is a party, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Agreement, the Sale or this Order.

35.    A copy of this Order shall be served on the New York State Attorney General, who shall also receive written notice that the sale of the Acquired Assets has closed, if such sale has been abandoned, or if it is still pending 90 days after entry of this Order.

36.    Each and every federal, state, and local governmental agency or department is directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement and this Order.

37.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

38.    To the extent that the provisions of this Order is inconsistent with any prior order or pleading with respect to the Motion in this chapter 11 case, the terms of this Order shall govern. To the extent there are any inconsistencies between the provisions of this Order and the Agreement (including all ancillary documents executed in connection therewith), the terms of this Order shall govern.

39.    The provisions of this Order are nonseverable and mutually dependent.

Dated: February 17, 2017

*/s/ Sean H. Lane*
THE HONORABLE SEAN H. LANE
UNITED STATES BANKRUPTCY JUDGE

## **Exhibit 1**

Asset Purchase Agreement

**ASSET PURCHASE AGREEMENT**

**DATED AS OF FEBRUARY __, 2017**

**BY AND BETWEEN**

**COMPASS PARTNERS, L.L.C.**

**AND**

**THE BIG APPLE CIRCUS, LTD.**

# TABLE OF CONTENTS

Page

**ARTICLE I DEFINITIONS** ................................................................. **1**
    Section 1.1    Definitions................................................................. 1
    Section 1.2    Other Definitions and Interpretive Matters ......................................... 7

**ARTICLE II PURCHASE AND SALE** ................................................................. **9**
    Section 2.1    Purchase and Sale of the Acquired Assets ......................................... 9
    Section 2.2    Excluded Assets ................................................................. 10
    Section 2.3    Assumed Liabilities ................................................................. 10
    Section 2.4    Excluded Liabilities ................................................................. 11
    Section 2.5    Further Actions and Assurances ................................................................. 11

**ARTICLE III PURCHASE PRICE** ................................................................. **12**
    Section 3.1    Purchase Price ................................................................. 12
    Section 3.2    Deposit ................................................................. 12
    Section 3.3    Closing Date Payments ................................................................. 13
    Section 3.4    Discharge of Assumed Liabilities After Closing ................................. 13
    Section 3.5    Allocation of Purchase Price ................................................................. 13
    Section 3.6    Withholding ................................................................. 13

**ARTICLE IV CLOSING** ................................................................. **13**
    Section 4.1    Closing Date ................................................................. 13
    Section 4.2    Buyer's Deliveries ................................................................. 14
    Section 4.3    Seller's Deliveries ................................................................. 14

**ARTICLE V REPRESENTATIONS AND WARRANTIES OF SELLER** ........................... **15**
    Section 5.1    Organization and Good Standing ................................................................. 15
    Section 5.2    Authority; Validity; Consents ................................................................. 15
    Section 5.3    No Conflict................................................................. 15
    Section 5.4    Title to Acquired Assets................................................................. 15
    Section 5.5    Taxes ................................................................. 15
    Section 5.6    Legal Proceedings................................................................. 16
    Section 5.7    Compliance with Laws ................................................................. 16
    Section 5.8    Intellectual Property................................................................. 16
    Section 5.9    Personal Information................................................................. 17
    Section 5.10    Brokers or Finders................................................................. 17
    Section 5.11    No Other Representations or Warranties ......................................... 17

**ARTICLE VI REPRESENTATIONS AND WARRANTIES OF BUYER** ........................... **18**
    Section 6.1    Organization and Good Standing ................................................................. 18
    Section 6.2    Authority; Validity; Consents ................................................................. 18
    Section 6.3    No Conflict................................................................. 18
    Section 6.4    Brokers or Finders................................................................. 18

22715698.14

**TABLE OF CONTENTS** *(continued)*

Page

**ARTICLE VII COVENANTS** ........................................................................... **18**
    Section 7.1        Operations Prior to the Closing Date ................................. 18
    Section 7.2        Reasonable Efforts ............................................................. 19
    Section 7.3        Bankruptcy Court Filings and Approval............................ 20
    Section 7.4        Use of Name. ..................................................................... 20
    Section 7.5        Updating of Schedules. ...................................................... 20
    Section 7.6        Related Assets. .................................................................... 21
    Section 7.7        Walden Property. ................................................................ 21

**ARTICLE VIII ADDITIONAL AGREEMENTS** .................................................. **21**
    Section 8.1        Taxes ................................................................................. 21
    Section 8.2        Payments Received ............................................................ 22
    Section 8.3        Confidentiality .................................................................. 22
    Section 8.4        Acquired Assets "AS IS"; Buyer's Acknowledgment
                                  Regarding Same ................................................................. 22
    Section 8.5        Post-Closing Access........................................................... 23

**ARTICLE IX CONDITIONS PRECEDENT TO OBLIGATIONS OF**
                 **BUYER TO CLOSE** ...................................................................... **24**
    Section 9.1        Accuracy of Representations ............................................. 24
    Section 9.2        Seller's Performance .......................................................... 24
    Section 9.3        No Order ............................................................................ 24
    Section 9.4        Seller's Deliveries ............................................................. 24
    Section 9.5        Sale Order; Final Order...................................................... 24

**ARTICLE X CONDITIONS PRECEDENT TO THE OBLIGATION OF**
                 **SELLER TO CLOSE** ..................................................................... **24**
    Section 10.1      Accuracy of Representations ............................................. 24
    Section 10.2      Buyer's Performance .......................................................... 25
    Section 10.3      No Order ............................................................................ 25
    Section 10.4      Buyer's Deliveries ............................................................. 25

**ARTICLE XI TERMINATION** ....................................................................... **25**
    Section 11.1      Termination Events............................................................ 25
    Section 11.2      Effect of Termination........................................................ 27

**ARTICLE XII GENERAL PROVISIONS**........................................................... **27**
    Section 12.1      Public Announcements ...................................................... 27
    Section 12.2      Notices .............................................................................. 27
    Section 12.3      Waiver............................................................................... 28
    Section 12.4      Entire Agreement; Amendment ........................................ 28
    Section 12.5      Assignment ....................................................................... 28
    Section 12.6      Severability ....................................................................... 28
    Section 12.7      Expenses ........................................................................... 29
    Section 12.8      Governing Law; Consent to Jurisdiction and Venue; Jury
                                  Trial Waiver...................................................................... 29

-ii-

**TABLE OF CONTENTS** *(continued)*

Page

| | | |
|---|---|---|
| Section 12.9 | Counterparts | 29 |
| Section 12.10 | Parties in Interest; No Third-Party Beneficiaries | 30 |
| Section 12.11 | Non-Recourse | 30 |
| Section 12.12 | Schedules; Materiality | 30 |
| Section 12.13 | Specific Performance | 30 |
| Section 12.14 | Survival | 30 |

## <u>SCHEDULES</u>

| | |
|---|---|
| Schedule 1.1(a) | Copyrights |
| Schedule 1.1(b) | Domain Names |
| Schedule 1.1(c) | Patents |
| Schedule 1.1(d) | Trademarks |
| Schedule 1.1(e) | Knowledge |
| Schedule 2.1(a) | Vehicles |
| Schedule 2.1(b) | Equipment |
| Schedule 2.2(a) | Excluded Assets |
| Schedule 3.5 | Allocation Schedule |
| Schedule 5.6 | Legal Proceedings |
| Schedule 5.8(b) | Intellectual Property Encumbrances |
| Schedule 5.8(c) | Intellectual Property Proceedings |
| Schedule 5.10 | Brokers and Finders |

## <u>EXHIBITS</u>

| | |
|---|---|
| Exhibit 1.1(b) | Email List |
| Exhibit 4.3(a) | Form of Assignment of Patents |
| Exhibit 4.3(b) | Form of Assignment of Trademarks |
| Exhibit 4.3(c) | Form of Assignment of Copyrights |
| Exhibit 4.3(d) | Form of Assignment of Domain Names |

22715698.14

# TABLE OF DEFINED TERMS

The following terms have the meanings set forth on the pages referenced below:

| Term | Page |
|------|------|
| $ | 8 |
| Accounts Receivable | 2 |
| Acquired Assets | 9 |
| Acquired Copyrights | 2 |
| Acquired Domain Names | 2 |
| Acquired Equipment | 2 |
| Acquired Intellectual Property | 2 |
| Acquired Patent Rights | 2 |
| Acquired Trademarks | 2 |
| Acquired Vehicles | 2 |
| Affiliate | 2 |
| Agreement | 1 |
| Allocation Schedule | 14 |
| Assignment of Copyrights | 15 |
| Assignment of Domain Names | 15 |
| Assignment of Patents | 15 |
| Assignment of Trademarks | 15 |
| Assumed Liabilities | 11 |
| Avoidance Actions | 2 |
| Back-Up Bidder | 2 |
| Bankruptcy Case | 3 |
| Bankruptcy Code | 3 |
| Bankruptcy Court | 1 |
| Bidding Procedures | 3 |
| Bidding Procedures Order | 3 |
| Business | 1 |
| Business Day | 3 |
| Business Know-How | 3 |
| Buyer | 1 |
| Buyer Default Termination | 13 |
| Buyer Termination Notice | 27 |
| Cash and Cash Equivalents | 3 |
| Cash Consideration | 3 |
| Claims | 3 |
| Closing | 14 |
| Closing Date | 14 |
| Closing Date Seller Payment | 13 |
| Closing Legal Impediment | 25 |
| Code | 3 |

| Term | Page |
|------|------|
| Contract | 3 |
| Copyrights | 3 |
| Debtor | 1 |
| Deposit | 13 |
| Documents | 4 |
| Domain Names | 4 |
| Encumbrance | 4 |
| Equipment | 4 |
| Escrow Agent | 4 |
| Excluded | 4 |
| Excluded Assets | 10 |
| Excluded Liabilities | 11 |
| Execution Date | 1 |
| Final Order | 4 |
| Governmental Authority | 4 |
| Identified | 4 |
| Intellectual Property | 4 |
| Inventory | 5 |
| IRS | 5 |
| IT Systems | 5 |
| Know-How | 5 |
| Knowledge | 5 |
| Law | 5 |
| Liability | 5 |
| Marketing Materials | 5 |
| Material Adverse Effect | 5 |
| Order | 6 |
| Ordinary Course of Business | 6 |
| Outside Date | 26 |
| Party or Parties | 6 |
| Patent Rights | 6 |
| Permits | 6 |
| Permitted Encumbrances | 6 |
| Person | 6 |
| Personal Information | 18 |
| Phase I Auction | 6 |
| Proceeding | 6 |
| Purchase Price | 13 |
| Real Property | 6 |

| Term | Page | Term | Page |
|---|---|---|---|
| Related | 7 | Tax or Taxes | 7 |
| Representative | 7 | Tax Return | 7 |
| Sale Motion | 7 | Third Party | 8 |
| Sale Order | 7 | Trademarks | 8 |
| Seller | 1 | Transaction Documents | 8 |
| Seller Termination Notice | 27 | Transfer Taxes | 22 |
| Software | 7 | Vehicles | 8 |
| Subsidiary | 7 | Walden Property | 8 |
| Successful Bidder | 7 | | |

22715698.14

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "**Agreement**") is made as of February __, 2017 (the "**Execution Date**"), by and between Compass Partners, L.L.C., a Delaware limited liability company ("**Buyer**") and The Big Apple Circus, Ltd. a Type B not-for-profit corporation organized under section 201 of the New York Not-for-Profit Corporation Law ("**Seller**"). Capitalized terms used herein and not otherwise defined herein have the meanings set forth in Article I.

## RECITALS

**WHEREAS**, on November 20, 2016, Seller (the "**Debtor**") filed a voluntary petition for relief commencing a case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

**WHEREAS**, prior to filing of the Bankruptcy Case, Seller was engaged in the business of operating a performing circus and school for the instruction and artistic development of circus arts (such business, the "**Business**");

**WHEREAS**, Seller desires to sell to Buyer certain assets and transfer to Buyer certain liabilities and Buyer desires to purchase from Seller such assets and assume such liabilities, upon the terms and conditions set forth herein and as authorized under, *inter alia*, sections 105, 363, 365, 503, 507 and 541 of the Bankruptcy Code;

**WHEREAS**, the execution and delivery of this Agreement and Seller's ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of the Sale Order by the Bankruptcy Court under, *inter alia*, sections 105, 363, 365, 503, 507 and 541 of the Bankruptcy Code; and

**WHEREAS**, the Parties desire to consummate the proposed transaction as promptly as practicable after the Bankruptcy Court enters the Sale Order.

**WHEREAS**, pursuant to the Bidding Procedures Order, Buyer has delivered to the Escrow Agent the Deposit to be administered in accordance with Section 3.2;

**NOW, THEREFORE**, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged and intending to be legally bound hereby, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    <u>Definitions</u>.  For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"**Accounts Receivable**" means all of Seller's trade accounts receivable and other rights to payment from customers, licensees or other third parties.

"**Acquired Copyrights**" means:  (a) the Copyrights Identified on Schedule 1.1(a); and (b) all Copyrights Related to the Business, other than the Copyrights Excluded on Schedule 1.1(a).

"**Acquired Domain Names**" means:  (a) the Domain Names Identified on Schedule 1.1(b); and (b) all Domain Names Related to the Business, other than the Domain Names Excluded on Schedule 1.1(b).

"**Acquired Equipment**" means:  (a) the Equipment Identified on Schedule 2.1(b); and (b) all Equipment Related to the Business, other than the Equipment Excluded on Schedule 2.1(b) or Schedule 2.2(a).

"**Acquired Intellectual Property**" means, collectively; (a) all Acquired Copyrights; (b) all Acquired Trademarks; (c) all Acquired Domain Names; (d) all Acquired Patent Rights; (e) all Business Know-How; and (f) all other intellectual property owned by Seller or that Seller has the legal right to use, as the term intellectual property is defined in section 101(35A) of the Bankruptcy Code, that is Related to the Business, other than the Intellectual Property Excluded on Schedule 2.2(a).

"**Acquired Patent Rights**" means: (a) the Patent Rights Identified on Schedule 1.1(c); and (b) all Patent Rights Related to the Business, other than the Patent Rights Excluded on Schedule 1.1(c).

"**Acquired Trademarks**" means:  (a) the Trademarks Identified on Schedule 1.1(d); and (b) all Trademarks that are Related to the Business, other than the Trademarks Excluded on Schedule 1.1(d).

"**Acquired Vehicles**" means:  (a) the Vehicles Identified on Schedule 2.1(a); and (b) all Vehicles Related to the Business, other than the Vehicles Excluded on Schedule 2.1(a) or Schedule 2.2(a).

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such other Person.  For purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings.

"**Avoidance Actions**" means any Claims for relief of Sellers under chapter 5 of the Bankruptcy Code, or state fraudulent conveyance, fraudulent transfer or other similar state laws.

"**Back-Up Bidder**" has the meaning assigned to such term in the Bidding Procedures.

"**Bankruptcy Case**" means the bankruptcy case commenced by Seller under chapter 11 of the Bankruptcy Code in the Bankruptcy Court on November 20, 2016.

2

"**Bankruptcy Code**" means title 11 of the United States Code, sections 101, *et seq.*

"**Bidding Procedures**" means the bidding procedures for the sale of the Acquired Assets set forth in the Bidding Procedures Order.

"**Bidding Procedures Order**" means the order of the Bankruptcy Court entered on January 12, 2017, approving procedures for submitting bids and conducting an auction for the sale of the Acquired Assets.

"**Business Day**" means any day of the year on which national banking institutions in New York, New York are open to the public for conducting business and are not required by Law to close.

"**Business Know-How**" means all of Seller's Know-How Related to the Business if and to the extent in written form, but excluding any Documents or Personal Information related to Seller's fundraising or personnel other than the Email List included by reference in Schedule 1.1(b) as Exhibit 1.1(b) and the Documents set forth in Section 2.1(i).

"**Cash and Cash Equivalents**" means all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit and other bank deposits, securities, securities entitlements, instruments and other investments of Seller and all bank accounts and securities accounts, including any cash collateral that is collateralizing any letters of credit.

"**Cash Consideration**" means for all of the Acquired Assets, cash in U.S. dollars in the aggregate amount of one million three hundred thousand dollars ($1,300,000).

"**Claims**" means all claims, causes of action, choses in action, rights of recovery and rights of set-off of whatever kind or description against any Person arising out of or relating to any Acquired Asset or Assumed Liability.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Contract**" means any contract, agreement, insurance policy, capitalized lease, license, sublicense, sales order, purchase order, instrument or other commitment, whether written or oral, that is binding on any Person or any part of its property under applicable Law.

"**Copyrights**" means: (a) the copyright registrations and applications for registration Identified on Schedule 1.1(a); (b) works of authorship whether or not copyrightable in published and unpublished works; and (c) any other copyrights and works, together with all copyrightable materials and common law rights, all moral rights (and the benefits of waivers thereof) and any applications and registrations therefor, owned by Seller or which Seller has the legal right to use (including any license or other rights of Seller, whether as a licensor, a licensee or otherwise, relating to any of the foregoing).

"**Documents**" means, with respect to the Business and Seller all (a) books, records, manuals, files, invoices, inventory records, product specifications, customer lists, cost and pricing information, supplier lists, business plans, catalogs, customer literature, quality control records and customer records; (b) research, design and development files and records; and (c) Marketing Materials, in each case including all data and other information stored on discs, tapes

3

or other media.

"**Domain Names**" means any domain names, uniform resource locators, social media "pages" including those maintained on Facebook, Twitter, Pinterest, YouTube and Foursquare, owned, licensed or controlled by Seller and used by Seller in connection with the Business.

"**Encumbrance**" means any charge, lien, interest, security interest, claim, mortgage, lease, sublease, hypothecation, deed of trust, pledge, option, right of use or possession, right of first offer or first refusal, easement, servitude, restrictive covenant, encroachment, encumbrance, transfer restriction or other similar restriction of any kind.

"**Equipment**" means all personal property to which Seller holds title, including all machinery, equipment, replacement and component parts, spare parts, furniture, fixtures, office and other supplies, data processing equipment and peripheral equipment, training materials, and videos and other similar personal property, including all of the equipment Identified on Schedule 2.1(b) attached hereto.

"**Escrow Agent**" means Stampler Auctions.

"**Excluded**" means, with respect to any item and a particular Schedule, that such item is explicitly identified, listed or described on such Schedule as being "Excluded".

"**Final Order**" means an Order as to which the time to file an appeal or a petition for writ of certiorari has expired and no such appeal or petition is pending.

"**Governmental Authority**" means any United States federal, provincial, state, municipal or local or any foreign government, governmental agency or authority, or regulatory or administrative authority, or any court, tribunal or judicial body having jurisdiction, including the Bankruptcy Court.

"**Identified**" means, with respect to any item and a particular Schedule, such item is explicitly identified, listed or described on such Schedule as being "Acquired".

"**Intellectual Property**" means, collectively, (a) all Copyrights; (b) all Patent Rights; (c) all Trademarks; (d) all Know-How; (e) all Domain Names; (f) all moral rights (*droit moral*), rights of integrity and paternity, neighboring rights, rental and lending rights, name, image and bio of the creator/author, publicity rights and other rights of authors, including the right to authorize, prohibit and/or control the fixation, reproduction and/or other exploitation of the Acquired Assets by any media and means now known or hereafter devised as may be conferred upon Seller or its employees or contractors under applicable laws, regulations or directives; (g) all other intellectual property owned by Seller or which Seller has the legal right to use, as the term intellectual property is defined in section 101(35A) of the Bankruptcy Code; and (h) all derivatives and improvements arising out of or related to any of the above described items including all translations, adaptations and compilations of any of the foregoing.

"**Inventory**" means all raw materials, work-in-process, finished goods, supplies, samples, components, packaging materials, and other inventories to which Seller has title that are in the possession of Seller or any other Person and used or held for use in connection with the

Business.

"**IRS**" means the Internal Revenue Service.

"**IT Systems**"  means the hardware (excluding any Software) components of the computer and accounting systems, networks and interfaces owned or leased by Seller and used in or necessary for the conduct of the Business.

"**Know-How**"  means know-how, ideas, trade secrets, proprietary information, inventions, improvements, discoveries, developments, technology and technical information and data.

"**Knowledge**" means, with respect to any matter in question, in the case of Seller, the actual knowledge of the matter in question of those persons listed on Schedule 1.1(e).

"**Law**" means any foreign or domestic law, statute, code, ordinance, rule, regulation, order, judgment, writ, stipulation, award, injunction or decree by any Governmental Authority as in effect from time to time, including related to data protection, import/export and foreign corrupt practices.

"**Liability**" means any debt, loss, claim, damage, demand, fine, judgment, penalty, liability or obligation (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due).

"**Marketing Materials**" means all marketing materials, marketing research data, customer and sales information, product literature, promotional materials and data, advertising and display materials (including all underlying designs, samples, charts, diagrams, photos and electronic files related to the foregoing), trade show materials and all training materials, in each case in whatever form or medium (e.g., audio, visual, digital or print) owned or used by Seller or held for use in connection with the Business or Related to any Acquired Asset.

"**Material Adverse Effect**" means any effect, change, condition, circumstance, development or event that, individually or in the aggregate with all other effects, changes, conditions, circumstances, developments and events has had, or would reasonably be expected to have, a material adverse effect on the Business or the Acquired Assets (excluding the Excluded Assets and the Excluded Liabilities), in each case, taken as a whole, or would reasonably be expected to prevent or materially impair the ability of Seller to consummate the transactions contemplated by this Agreement.

"**Order**" means any award, writ, injunction, judgment, order or decree entered, issued, made, or rendered by any Governmental Authority.

"**Ordinary Course of Business**" means the operation of the Business in the ordinary and usual course consistent with past practice and custom of Seller, including taking any action in accordance with any Contract to which Seller is a party.

"**Party**" or "**Parties**" means, individually or collectively, Buyer and Seller.

"**Patent Rights**" means (a) any United States and foreign patent owned by Seller, (b) any

5

other United States and foreign patents and patent applications owned by Seller or licensed from a Third Party to Seller, (c) any continuation, continuation-in-part and divisional United States and foreign patent applications based on any of the foregoing and any patents issuing therefrom, and (d) any patentable materials.

"**Permits**" means all franchises, grants, authorizations, licenses, permits, easements, variances, exceptions, consents, certificates, approvals, clearances and Orders that are necessary for Seller to own, lease and operate its properties and assets or to carry on the Business.

"**Permitted Encumbrances**" means (a) Encumbrances on any Acquired Asset for utilities and Taxes not yet due and payable or being contested in good faith; and (b) immaterial materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens on any Acquired Asset incurred in the Ordinary Course of Business.

"**Person**" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization or other entity or Governmental Authority.

"**Phase I Auction**" has the meaning assigned to such term in the Bidding Procedures.

"**Proceeding**" means any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority.

"**Real Property**" means all real property owned by Seller and all unexpired leases or other occupancy agreements for real property under which Seller is a lessee (or the equivalent).

"**Related**" means, with respect to any business, product, asset or liability, owned or held by, required for, or used, intended for use, leased, licensed, accrued, reserved or incurred in connection with, such business, product, asset or liability.

"**Representative**" means, with respect to a particular Person, any director, officer, manager, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

"**Sale Motion**" means the motion filed on December 23, 2016 with the Bankruptcy Court seeking approval of, *inter alia*, the Sale Order.

"**Sale Order**" means an Order of the Bankruptcy Court in form and substance acceptable to Buyer approving the Sale, this Agreement and the transactions contemplated hereby.

"**Software**"  means any and all (a) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code; (b) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise; (c) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing; (d) screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons; and (e) documentation including user manuals and other training documentation related to any of the foregoing, in Seller's possession and/or control.

6

"**Subsidiary**" means any entity with respect to which a specified Person (or a Subsidiary thereof) has the power, through the ownership of securities or otherwise, to elect a majority of the board of directors or similar managing body.

"**Successful Bidder**" has the meaning assigned to such term in the Bidding Procedures.

"**Tax**" or "**Taxes**" means any income, alternative, minimum, add-on minimum, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental (including taxes under Section 59A of the Code), natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar tax, duty, levy, or other governmental charge in the nature of a tax, or assessment or deficiency thereof (including all interest and penalties thereon and additions thereto), in each case imposed by any Governmental Authority.

"**Tax Return**" means any return, declaration, report, claim for refund, information return, or other document (including any elections, schedules, statements, or supporting documents attached thereto) filed with or required to be filed with any Governmental Authority in connection with the determination, assessment or collection of any Tax or the administration of any laws, regulations or administrative requirements relating to any Tax.

"**Third Party**" means a Person who or which is neither a Party hereto nor an Affiliate of a Party hereto.

"**Trademarks**" means all trade names, logos, slogans, designs, brand names, common law trademarks and service marks, trademark and service mark registrations and applications therefor, in each case owned by Seller and Related to the Business or the Acquired Assets, and all goodwill appurtenant to any or all of the foregoing, including all of the marks and names Identified on Schedule 1.1(d) attached hereto.

"**Transaction Documents**" means this Agreement and any other agreements, instruments or documents entered into pursuant to this Agreement.

"**Vehicles**" means all vehicles to which Seller holds title, including power and non-power units, tractors, vans, pick-ups, RV travel trailers, 5th wheels, semi-trailers, semi-flatbed trailers, utility trailers, forklifts and other similar vehicles, including all of the vehicles Identified on Schedule 2.1(a) attached hereto.

"**Walden Property**" means the real property located at 39 Edmunds Lane, Walden, New York 12586.

Section 1.2        Other Definitions and Interpretive Matters.

(a)        Unless otherwise indicated to the contrary in this Agreement by the context or use thereof:

(i)        When calculating the period of time before which, within which or

7

following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day.

(ii)     Any reference in this Agreement to "$" means U.S. dollars.

(iii)     Unless the context otherwise requires, all capitalized terms used in the Exhibits and Schedules shall have the respective meanings assigned in this Agreement. No reference to or disclosure of any item or other matter in the Exhibits and Schedules shall be construed as an admission or indication that such item or other matter is material or that such item or other matter is required to be referred to or disclosed in the Exhibits and Schedules. No disclosure in the Exhibits and Schedules relating to any possible breach or violation of any agreement, law or regulation shall be construed as an admission or indication that any such breach or violation exists or has actually occurred. Any information, item or other disclosure set forth in any Schedule shall be deemed to have been set forth in all other applicable Schedules if the relevance of such disclosure to such other Schedule is reasonably apparent from the facts specified in such disclosure. All Exhibits and Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.

(iv)     Any reference in this Agreement to gender includes all genders, and words importing the singular number also include the plural and vice versa.

(v)     The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement. All references in this Agreement to any "**Exhibit**," "**Schedule**," "**Section**" or "**Article**" are to the corresponding Exhibit, Schedule, Section or Article of this Agreement unless otherwise specified.

(vi)     References herein to any contract or agreement (including this Agreement) mean such contract or agreement as amended, supplemented or modified from time to time in accordance with the terms thereof.

(vii)     Words such as "**herein**," "**hereof**" and "**hereunder**" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

(viii)     The word "**including**" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)     No Strict Construction. Buyer, on the one hand, and Seller, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the

8

event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and Seller, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.  Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

## ARTICLE II
## PURCHASE AND SALE

Section 2.1      Purchase and Sale of the Acquired Assets.  Upon the terms and subject to the conditions of this Agreement, on the Closing Date, Seller shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer, and Buyer shall purchase, all right, title and interest of Seller in, to or under the following property and assets, other than the Excluded Assets (collectively, the "**Acquired Assets**"):

(a)      Acquired Vehicles;

(b)      Acquired Equipment;

(c)      Acquired Intellectual Property;

(d)      Marketing Materials;

(e)      Inventory;

(f)      IT Systems;

(g)      Software Related to any Acquired Asset;

(h)      rights under nondisclosure or confidentiality, non-compete, or non-solicitation agreements Related to any Acquired Asset (or any portion thereof) including those agreements executed by Potential Bidders (as defined in the Bidding Procedures);

(i)      Documents Related to the Business or any Acquired Asset (other than those described in Section 2.2), to the extent specifically identified herein or on any Schedule to this Agreement, available and permitted by applicable Laws, including, without limitation, all (i) Contracts with venues, vendors or artists, (ii) Documents Related to Seller's insurance, accounting or budgeting, or Related to the operation of the Seller's special performances for those with autism, and the hearing and visually impaired, and (iii) vendor and private performance contact lists.

(j)      Claims and Proceedings of Seller as of the Closing Related to the Acquired Assets, including Seller's rights of indemnity, defense, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery, including insurance proceeds (regardless of whether such rights are currently exercisable) but excluding Avoidance Actions;

(k)      all Permits used by Seller in the Business, to the extent assignable; and

9

(l)        all goodwill associated with the Acquired Assets.

Section 2.2    Excluded Assets.  Notwithstanding anything herein to the contrary, the Acquired Assets shall not include any of the any of the following (collectively, the "**Excluded Assets**"):

(a)        all assets Excluded on Schedule 2.2(a);

(b)        any Real Property, including the Walden Property and any license or lease related thereto;

(c)        Seller's rights under this Agreement (including the right to receive the Purchase Price delivered to Seller pursuant to this Agreement);

(d)        Seller's Avoidance Actions;

(e)        Documents not Related to the Business or any Acquired Asset, including Documents prepared in connection with or relating to (i) this Agreement, or the transactions contemplated hereby, or (ii) the Bankruptcy Case;

(f)        Documents related to (i) Tax Returns or Tax work papers or records, (ii) legal actions asserted by or against Seller, (iii) the corporate governance of Seller, or (iv) other than the Email List included by reference in Schedule 1.1(b) as Exhibit 1.1(b) and the Documents set forth in Section 2.1(i), any Documents or Personal Information related to Seller's fundraising or personnel;

(g)        shares of capital stock or other equity interests of Seller, or its Affiliates, or securities convertible into or exchangeable or exercisable for shares of capital stock or other equity interests of Seller, or its Affiliates;

(h)        any interest in or right to any refunds, rebates or credits of Taxes, and any interest in any tax loss or other tax attribute of Seller;

(i)        only as Related to Excluded Assets, all claims, refunds and credits from insurance policies or binders due or to become due with respect to such policies or binders and all rights to proceeds thereof;

(j)        Cash and Cash Equivalents;

(k)        Accounts Receivable, including any rights to grants awarded to Seller;

(l)        any other Documents, assets, properties and rights of Seller that are Excluded on any Schedule to this Agreement; or

(m)        Permits, leases and licenses necessary for Seller to (i) continue operating as a New York not-for-profit corporation or (ii) lease Seller's offices at One MetroTech Center North, Brooklyn, NY 11201.

Section 2.3    Assumed Liabilities.  Upon the terms and subject to the

10

conditions of this Agreement, on the Closing Date, Buyer shall assume and agree to perform and discharge, when due (in accordance with their respective terms and subject to the respective conditions thereof), only the following Liabilities of Seller and no others (collectively, the "**Assumed Liabilities**"):

       (a)     Liabilities arising from the ownership of the Acquired Assets on and after the Closing Date, it being understood that Liabilities arising from the ownership of the Acquired Assets or the operation of the Business prior to the Closing Date shall not constitute Assumed Liabilities regardless of when the obligation to pay such Liabilities arises, other than as set forth in Section 8.1.

       Section 2.4     <u>Excluded Liabilities</u>.  Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume and shall not be obligated to assume or be obliged to pay, perform or otherwise discharge any Liability that is not an Assumed Liability, and Seller shall be solely and exclusively liable with respect to any Liability of Seller that is not an Assumed Liability (such Liabilities, collectively, the "**Excluded Liabilities**"), including, but not limited to:

       (a)     any existing debt of Seller;

       (b)     any existing letters of credit of Seller;

       (c)     any outstanding health care claims, workers' compensation claims or EEOC claims or violations;

       (d)     any employee claims, union contract claims or pension liabilities of Seller, including, without limitation, claims of the American Federation of Musicians and Employers Pension Fund;

       (e)     any post-petition, priority, administrative and unsecured claims and expenses, including professional fees and expenses related to the Bankruptcy Case;

       (f)     any fines, penalties or other amounts owing for failure of Seller to obtain requisite Permits;

       (g)     any other Liabilities of Seller's operations, including debts, Taxes (including, without limitation, sales and use Taxes and Taxes Related to the Walden Property), accrued liabilities, consumer claims, warranty claims, litigation claims, accounts payable or any environmental liabilities of Seller; or

       (h)     any Liabilities as a successor of Seller.

Buyer and Seller hereby acknowledge and agree that disclosure of any Liability on any Schedule to this Agreement shall not create an Assumed Liability or other Liability of Buyer, except where such disclosed obligation has been expressly assumed by Buyer as an Assumed Liability in accordance with the provisions of Section 2.3.

       Section 2.5     <u>Further Actions and Assurances</u>.  At the Closing, Seller shall execute and deliver to Buyer such other instruments of transfer as shall be reasonably

22715698.14

necessary or appropriate to vest in Buyer title to the Acquired Assets free and clear of all Encumbrances (other than Permitted Encumbrances) and to comply with the purposes and intent of this Agreement; *provided, however*, to the extent any of the Acquired Assets embody third-party materials, including trademarks, technology, or content that Seller is not able to convey, Buyer shall be responsible for securing any such rights; *provided further*, that Seller shall use commercially reasonable efforts to assist Buyer in securing any such rights. Each of Seller, on the one hand, and Buyer, on the other hand, shall use its commercially reasonable efforts to take, or cause to be taken, all appropriate action, do or cause to be done all things necessary, proper or advisable under applicable Law, and execute and deliver such documents and other papers, as may be required to consummate the transactions contemplated by this Agreement at or after the Closing, including, assistance by Seller with the transfer of the Acquired Intellectual Property (including with respect to making all appropriate filings and submissions with the United States Copyright Office, United States Patent and Trademark Office and any applicable similar agencies in foreign jurisdictions promptly after Closing, and in any event within thirty (30) days of Closing). Prior to the Closing, the Parties shall cooperate in good faith to identify any assets, properties, rights, titles or interests that may not be able to be conveyed at Closing.

## ARTICLE III
## PURCHASE PRICE

Section 3.1    Purchase Price.  The purchase price (the "**Purchase Price**") for the purchase, sale, assignment and conveyance of Seller's right, title and interest in, to and under the Acquired Assets shall consist of:

(a)    cash in the amount of the Cash Consideration; plus

(b)    the assumption of the Assumed Liabilities.

Section 3.2    Deposit

(a)    The Buyer has deposited into a segregated trust account to be held in escrow by the Escrow Agent the amount of one hundred thirty thousand dollars ($130,000) (such amount, the "**Deposit**") by wire transfer of immediately available funds pursuant to Section (J) of the Bidding Procedures.  The Deposit shall not be subject to any lien, attachment, trustee process or any other judicial process of any creditor of Seller or Buyer.

(b)    In the event that, pursuant to the terms of the Bidding Procedures, Buyer is selected as the Back-Up Bidder, the Escrow Agent shall no later than the tenth (10th) Business Day following (i) the closing of a sale transaction by the Seller with the Successful Bidder, or (ii) the termination of the Back-Up Bid, each pursuant to the terms of the Bidding Procedures, deliver the Deposit to an account designated by Buyer by wire transfer of immediately available funds.

(c)    In the event that, pursuant to the terms of the Bidding Procedures, Buyer is selected as the Successful Bidder and the Parties have executed this Agreement pursuant to Section 12.9, the Deposit shall become payable to (a) Seller (i) upon the Closing or (ii) in the event of the termination of this Agreement pursuant to Section 11.1(c), in

12

accordance with Section 11.2 (a "**Buyer Default Termination**"), in each case of clauses (i) and (ii) above, the Parties shall instruct the Escrow Agent to deliver the Deposit to an account designated by Seller by wire transfer of immediately available funds as payment of a portion of the Cash Consideration, or (b) Buyer in accordance with Section 11.2, in which case, the Parties shall instruct the Escrow Agent to deliver the Deposit to an account designated by Buyer by wire transfer of immediately available funds.

Section 3.3    Closing Date Payments.  At the Closing, Buyer shall pay to Seller in cash by wire transfer of immediately available funds an amount equal to the Cash Consideration, less the amount of the Deposit (such amount to be paid to Seller at the Closing, the "**Closing Date Seller Payment**").

Section 3.4    Discharge of Assumed Liabilities After Closing.  From and after the Closing, Buyer shall pay, perform or satisfy the Assumed Liabilities in accordance with their respective terms.

Section 3.5    Allocation of Purchase Price.  The Purchase Price, including the Assumed Liabilities to the extent such Liabilities are required to be treated as part of the purchase price for Tax purposes, shall be allocated between and among the Acquired Assets of Seller in accordance with Schedule 3.5 (the "**Allocation Schedule**").  The Allocation Schedule shall be completed by the Parties prior to Closing.  In administering any Proceeding, the Bankruptcy Court shall not be required to apply the Allocation Schedule in determining the manner in which the Purchase Price should be allocated as between Seller and its estate.  Buyer and Seller will each file all Tax Returns (including IRS Forms 8594) consistent with the Allocation Schedule.  Seller, on the one hand, and Buyer, on the other hand, each agree to provide the other promptly with any other information required to complete IRS Forms 8594.  Neither Buyer nor Seller shall take any Tax position inconsistent with such Allocation Schedule and neither Buyer nor Seller shall agree to any proposed adjustment based upon or arising out of the Allocation Schedule by any Governmental Authority without first giving the other Party prior written notice; provided, however, that nothing contained herein shall prevent Buyer or Seller from settling any proposed deficiency or adjustment by any Governmental Authority based upon or arising out of the Allocation Schedule, and neither Buyer nor Seller shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Authority based upon or arising out of such Allocation Schedule.

Section 3.6    Withholding.  If Buyer is required by applicable Laws to withhold or deduct any amount of Tax from the payment of the Purchase Price hereunder, then Buyer shall withhold or deduct (and, to the extent required by applicable Laws, remit to the appropriate Governmental Authority) the amount of any such Tax and, to the extent any amount of Tax is properly withheld and remitted to the proper Governmental Authority pursuant to this Section 3.6, such amount shall be treated for all purposes of this Agreement as having been paid to Seller.

# ARTICLE IV
# CLOSING

Section 4.1    Closing Date.  Upon the terms and subject to the conditions hereof, the closing of the sale of the Acquired Assets and the assumption of the Assumed

13

Liabilities contemplated hereby (the "**Closing**") shall take place remotely via the exchange of documents and signatures, no later than the fifth (5th) Business Day following the date on which the conditions set forth in Article IX and Article X have been satisfied or (if permissible) waived (other than the conditions which by their nature are to be satisfied by actions taken at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions), or at such other place or time as Buyer and Seller may mutually agree.  The date and time at which the Closing actually occurs is referred to as the "**Closing Date.**"

Section 4.2    <u>Buyer's Deliveries</u>.  At the Closing, Buyer shall deliver to Seller:

(a)    the Closing Date Seller Payment, in accordance with Section 3.3;

(b)    each Transaction Document to which Buyer is a party, duly executed by Buyer;

(c)    the certificates of Buyer to be received by Seller pursuant to Sections 10.1 and 10.2; and

(d)    such other assignments and other good and sufficient instruments of assumption and transfer, in form reasonably satisfactory to Seller, as Seller may reasonably request to transfer and assign the Acquired Assets and Assumed Liabilities to Buyer.

Section 4.3    <u>Seller's Deliveries</u>.  At the Closing, Seller shall deliver to Buyer:

(a)    each Transaction Document to which Seller is a party, duly executed by Seller;

(b)    instruments of assignment of the Acquired Patents (the "**Assignment of Patents**"), Acquired Trademarks (the "**Assignment of Trademarks**"), Acquired Copyrights (the "**Assignment of Copyrights**"), and Acquired Domain Names (the "**Assignment of Domain Names**"), if any, duly executed by Seller in a form appropriate for recordation with the appropriate Governmental Authorities substantially in the form of Exhibits 4.3(a) through 4.3(d), respectively;

(c)    a copy of the Sale Order entered by the Bankruptcy Court;

(d)    the certificates of Seller to be received by Buyer pursuant to Sections 9.1 and 9.2; and

(e)    such other bills of sale, special warranty deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Buyer, as Buyer may reasonably request to vest in Buyer all the right, title and interest of Seller in, to or under any or all the Acquired Assets.

14

# ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the corresponding sections or subsections of the Schedules attached hereto, Seller hereby represents and warrants to Buyer on the Execution Date (or such other date, to the extent expressly specified) as follows:

Section 5.1       Organization and Good Standing.  Seller is an entity duly organized, validly existing and in good standing under the Laws of the State of New York.  Seller has the requisite corporate or other power and authority to own or lease and to operate and use its properties and to carry on the Business.  Seller has previously made available to the Buyer true, accurate and complete copies of its certificate of incorporation and bylaws, as in effect on the date hereof.

Section 5.2       Authority; Validity; Consents.  Seller has, subject to requisite Bankruptcy Court approval, the requisite corporate or other power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which Seller is a party and to consummate the transactions contemplated hereby and thereby.  This Agreement has been duly and validly executed and delivered by Seller and each other Transaction Document required to be executed and delivered by Seller at the Closing will be duly and validly executed and delivered by the Seller at the Closing.  Subject to requisite Bankruptcy Court approval, this Agreement and the other Transaction Documents constitute, with respect to Seller, the legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms.  Subject to requisite Bankruptcy Court approval, except (a) for entry of the Sale Order and (b) for notices, filings and consents required in connection with the Bankruptcy Case, Seller is not required to give any notice to, make any filing with or obtain any consent from any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation or performance of any of the transactions contemplated hereby and thereby, except for such notices, filings and consents, the failure of which to provide, make or obtain, would not, individually or in the aggregate, have a Material Adverse Effect.

Section 5.3       No Conflict.  When the consents and other actions described in Section 5.2 have been obtained and taken, the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions provided for herein and therein will not result in the material breach of any of the terms and provisions of, or constitute a material default under, or materially conflict with, or require consent or the giving of notice under, or cause any acceleration of any material obligation of Seller under (a) any Order, or (b) any Law.

Section 5.4       Title to Acquired Assets.  Upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by Section 4.3, and subject to the terms of the Sale Order, Seller will thereby transfer to Buyer, all of Seller's right, title and interest in and to the Acquired Assets free and clear of all Encumbrances except (a) for the Assumed Liabilities; and (b) for Permitted Encumbrances.

Section 5.5       Taxes.

15

(a)      Except as would not result in a liability to Buyer, or as would not have, individually or in the aggregate, a Material Adverse Effect:

(i)      all income and other material Tax Returns required to be filed by Seller with respect to the Business have been timely filed (taking into account any extension of time to file granted, or to be obtained with respect thereto), and all such Tax Returns are complete and accurate in all material respects; (ii) to the Knowledge of Seller, on the Execution Date, no examination by any Governmental Authority of any such Tax Return is currently in progress; (iii) to the Knowledge of Seller, no material Tax deficiencies relating to the Business are being claimed, proposed or assessed in writing by any Governmental Authority against Seller, other than Tax deficiencies related to sales and use Taxes and certain property Taxes related to the Walden Property; and (iv) all material amounts of Tax that are due and payable by Seller (whether or not shown on any Tax Return) with respect to the Business have been duly and timely paid, other than Tax deficiencies related to sales and use Taxes and certain property Taxes related to the Walden Property; and

(ii)      there are no Encumbrances for Taxes upon any of the Acquired Assets, other than Permitted Encumbrances and, to the Knowledge of Seller, no taxing authority is in the process of imposing any Encumbrances for Taxes on any of the Acquired Assets (other than for current Taxes not yet delinquent).

Section 5.6      Legal Proceedings.  As of the date hereof, except for the Bankruptcy Case and as set forth on Schedule 5.6, there is no Proceeding or Order pending, outstanding or, to Seller's Knowledge, threatened against Seller that (a) seeks to restrain or prohibit or otherwise challenge the consummation, legality or validity of the transactions contemplated hereby or (b) would have, individually or in the aggregate, a Material Adverse Effect.

Section 5.7      Compliance with Laws.  To Seller's Knowledge, Seller is not and has not been in violation in any material respect of any Law or Order applicable to the operation of the Business and holds all material Permits required for Seller to conduct the Business as conducted prior to the filing of the Bankruptcy Case, other than with respect to Tax deficiencies related to sales and use Taxes.

Section 5.8      Intellectual Property.

(a)      The Intellectual Property Identified on Schedule 1.1 collectively constitutes all material (i) Copyright registrations and applications; (ii) Trademark registrations and applications; (iii) Domain Names and (iv) Patent Rights, in each case that are Related to the Business.

(b)      Seller owns or holds valid licenses to all material Intellectual Property used in the Business and, except as set forth on Schedule 5.8(b), all Acquired Intellectual Property is free and clear of any Encumbrances (other than (x) Encumbrances that will be removed at or prior to the Closing and (y) other than restrictions or limitations pursuant to written nonexclusive license agreements entered into in the Ordinary Course of

16

Business).

(c)     To Seller's Knowledge, the Acquired Intellectual Property is valid and enforceable. The conduct of the Business does not and has not infringed, misappropriated or violated the Intellectual Property of any other Person. Within the past three (3) years, none of the Acquired Intellectual Property has been or is the subject of (i) any pending or, to Seller's Knowledge, threatened adverse claim, judgment, injunction, order, decree or agreement restricting its use in connection with the Business or (ii) except as noted on Schedule 5.8(c), any threatened litigation or claim of infringement, misappropriation or violation.

Section 5.9     Personal Information. With respect to any information about an identifiable individual ("**Personal Information**" ) contained in the Documents included in the Acquired Assets, the Seller has collected, used and disclosed the Personal Information in accordance with applicable Laws, and has obtained consent, if required by applicable Law, to transfer the Personal Information to Buyer upon completion of the transactions contemplated by this Agreement. The Seller has not received any complaint, claim or notice from any individual alleging a violation of rights related to the Personal Information held by the Sellers.

Section 5.10     Brokers or Finders. Except as set forth on Schedule 5.10 hereof, Seller has not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which Buyer is or will become liable, and Seller shall indemnify, defend and hold harmless Buyer from any claims with respect to any such fees or commissions, irrespective of whether such items are set forth on Schedule 5.10.

Section 5.11     No Other Representations or Warranties. Except for the representations and warranties contained in this Agreement, neither Seller nor any other Person makes any other express or implied representation or warranty (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or non-infringement) with respect to Seller, the Acquired Assets, the Assumed Liabilities or the transactions contemplated by this Agreement, and Seller disclaims any other representations or warranties, whether made by Seller, any Affiliate of Seller or any of their respective officers, directors, employees, agents or representatives. Except for the representations and warranties contained herein, Seller (i) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Acquired Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or non-infringement) and (ii) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Buyer or its Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to Buyer by any director, officer, employee, agent, consultant, or representative of Seller or any of its Affiliates). Seller makes no representations or warranties to Buyer regarding the probable success or profitability of the Business or Acquired Assets. The disclosure of any matter or item in any schedule hereto shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material. The Acquired Assets are being transferred to Buyer on a "where is" and, as to condition, "as is and with all faults" basis, except as otherwise expressly

17

set forth herein.

# ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller on the Execution Date that the statements contained in this Article VI are true and correct:

Section 6.1 <u>Organization and Good Standing</u>. Buyer is a company with limited liability, duly organized, validly existing and in good standing under the laws of Delaware.

Section 6.2 <u>Authority; Validity; Consents</u>. Buyer has the requisite power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement by Buyer and the consummation by Buyer of the transactions contemplated herein have been duly and validly authorized by all requisite corporate actions in respect thereof. This Agreement has been duly and validly executed and delivered by Buyer and each other Transaction Document to which Buyer is a party will be duly and validly executed and delivered by Buyer at the Closing. This Agreement and the other Transaction Documents to which Buyer is a party constitute the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Buyer is not and will not be required to give any notice to or obtain any consent from any Person in connection with the execution and delivery of this Agreement and the other Transaction Documents to which it is a party or the consummation or performance of any of the transactions contemplated hereby or thereby.

Section 6.3 <u>No Conflict</u>. The execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions provided for herein and therein will not result in the breach of any of the terms and provisions of, or constitute a default under, or conflict with, or cause any acceleration of any obligation of Buyer under (a) any agreement, indenture, or other instrument to which it is bound; (b) the organization documents of Buyer; (c) any Order; or (d) any Law.

Section 6.4 <u>Brokers or Finders</u>. Neither Buyer nor any Person acting on behalf of Buyer has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent or intermediary for or on account of the transactions contemplated by this Agreement for which Seller is or will become liable, and Buyer shall hold harmless and indemnify Seller and its Affiliates from any claims with respect to any such fees or commissions.

# ARTICLE VII
## COVENANTS

Section 7.1 <u>Operations Prior to and After the Closing Date</u>Seller covenants and agrees that, except (i) as expressly contemplated by this Agreement; (ii)

18

with the prior written consent of Buyer (which consent shall not be unreasonably withheld or delayed); (iii) as required by, arising out of, relating to or resulting from the Bankruptcy Case or otherwise approved by the Bankruptcy Court; or (iv) as otherwise required by Laws, after the Execution Date and prior to the Closing Date:  Seller shall use commercially reasonable efforts, taking into account Seller's status as a debtor-in-possession in the Bankruptcy Case, to maintain and preserve the Acquired Assets in their present condition, reasonable wear and tear excepted, and to keep intact the business relationships relating to the Acquired Assets, including without limitation, maintaining and not deleting, or otherwise disposing of  Software and Documents of Seller. Following the Closing Date and during the pendency of the Bankruptcy Case, Seller agrees to provide at least fifteen (15) days' prior written notice to Buyer of Seller's intent to delete or dispose of any Software or Documents of Seller that are Related to the Business or any Acquired Assets.

(b)     Following the Closing Date and during the pendency of the Bankruptcy Case, Seller shall use reasonable efforts to provide assistance and to make available to Buyer, upon written request and reasonable advance notice any Documents, assets, or properties of Seller Related to the Business or the Acquired Assets.

(c)     Within two (2) weeks following the Closing Date, Seller shall, upon written request and reasonable advance notice from Buyer, use reasonable efforts to make available to Buyer for a period of up to two (2) Business Days such current employees, officers, and agents (excluding directors) of Seller who have expertise or knowledge with respect to the Business or the Acquired Assets, for the purpose of consultation.

*provided, however*, that, with respect to Section 7.1(b) and Section 7.1(c) hereof,  (x) Buyer agrees to cooperate with Seller in giving consideration to business demands of Seller's employees, officers, and agents and Seller shall not be obligated to comply with such Sections to the extent compliance unreasonably interferes with the operation of its business, and (y) Buyer shall pay for reasonable out-of-pocket expenses actually incurred by Seller in connection with such Sections.

Without in any way limiting any Party's rights or obligations under this Agreement, the Parties understand and agree that (i) nothing contained in this Agreement shall give Buyer, directly or indirectly, the right to control or direct the operations of Seller or the Business prior to the Closing; and (ii) prior to the Closing, Seller shall exercise, consistent with, and subject to, the terms and conditions of this Agreement, complete control and supervision over the Business and its operations.

Section 7.2     Reasonable Efforts. Seller, on the one hand, and Buyer, on the other hand, shall use all reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby.

(b)     Neither Buyer nor Seller shall, after the entry of the Sale Order, enter into any agreement that would have the effect of delaying the consummation of any action contemplated by this Agreement without the written consent of the other Party.

19

(c)       Neither Buyer nor any of its controlled Affiliates shall take any action or acquire any assets or securities of any other Person or agree to acquire assets or securities of any other Person if such action, acquisition or agreement would reasonably be expected to impair Buyer's ability to consummate the transactions contemplated hereby.

Section 7.3       Bankruptcy Court Filings and Approval.

(a)       Seller will file the notice of the Successful Bidder in accordance with the Bidding Procedures and with the Bankruptcy Court prior to Closing.

(b)       Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and a finding by the Bankruptcy Court of adequate assurance of future performance by Buyer.  Seller shall use its reasonable best efforts to secure entry of the Sale Order (in form and substance acceptable to Buyer) and expedited resolution of any appeal, petition or motion for reconsideration, modification, amendment, vacation, stay rehearing or re-argument related thereto.

(c)       Seller and Buyer acknowledge that this Agreement and the sale of the Acquired Assets are subject to Bankruptcy Court approval.  Seller and Buyer acknowledge that to obtain such approval, Seller must demonstrate that it has taken reasonable steps to obtain the highest, best or otherwise financially superior offer possible for the Acquired Assets.

(d)       Seller shall give appropriate notice, and provide appropriate opportunity for hearing, to all Persons entitled thereto, of all motions, orders, hearings and other proceedings relating to this Agreement and the transactions contemplated hereby and thereby and such additional notice as ordered by the Bankruptcy Court.

(e)       After entry of the Sale Order, neither Seller nor Buyer shall take any action that is intended to, or fail to take any action the intent of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order.

Section 7.4       Use of Name.

Seller agrees not to use any Acquired Trademarks or any names reasonably similar thereto after the Closing Date in connection with any business related to, competitive with, or an outgrowth of, the Business.  Buyer agrees to grant a license for a period not to exceed fifteen (15) days to Seller upon terms reasonably satisfactory to Buyer to use the "Big Apple Circus" name solely in connection with the Bankruptcy Case.  No later than fifteen (15) days following the Closing, Seller shall (i) file appropriate documents with the Bankruptcy Court changing the caption of  the Bankruptcy Case to one that does not contain the name of any of the Acquired Intellectual Property or any similar or confusing name and (ii) file amendments with the appropriate Governmental Authorities changing its corporate name, "doing business as" name, trade name, and any other similar corporate identifier to one that does not contain the name of any of the Acquired Intellectual Property or any similar or confusing name.

Section 7.5       Updating of Schedules.

20

At any time prior to the Closing, Buyer shall have the right to revise and amend Schedules 1.1(a), 1.1 (b), 1.1 (c), 1.1 (d), Schedule 2.1(a), and Schedule 2.1(b) to Exclude any item listed on any such Schedule by delivering such revised Schedule(s) to Seller. The Parties shall prior to Closing mutually cooperate to complete Schedule 3.5.

Section 7.6    <u>Related Assets.</u>

To the extent that Seller has any Asset that (i) is not an Acquired Asset but Relates to the Business, (ii) is not an Excluded Asset or Excluded on any Schedule, and (iii) is necessary to operate, or otherwise material to the operation of the Business in a manner consistent with the operation of the Business by Seller immediately prior to filing of the Bankruptcy Case, Seller shall use commercially reasonable efforts to identify such Assets and enter into an arrangement with Buyer (promptly after the date hereof) under which Buyer is provided the benefits of such Assets.  To the extent there is any such Asset that Seller no longer owns, Seller will cooperate with Buyer in good faith to identify any such Asset (promptly after the date hereof).   Seller shall use commercially reasonable efforts to assist Buyer in securing the right to share in the use of such Assets, including facilitating negotiations between Buyer and the purchaser who acquired such Asset from Seller.

Section 7.7    <u>Walden Property.</u>

Seller covenants and agrees that for the period beginning at the Closing Date and ending on May 15, 2017, Seller shall use reasonable efforts to provide Buyer with full access to the Walden Property (or the applicable portion thereof and ingress and egress thereto/therefrom) at no additional cost to Buyer in order to permit Buyer to continue to store the Acquired Assets at the Walden Property for such period; provided that, as soon as possible following the Closing Date, Buyer shall use commercially reasonable efforts to remove all Acquired Assets from the Walden Property or separately negotiate rights to access the Walden Property (or the applicable portion thereof and ingress and egress thereto/therefrom) at its own cost; provided, further, that for the avoidance of doubt, Seller shall not be required to maintain, preserve, insure, or oversee the Acquired Assets located at the Walden Property following the Closing Date.

**ARTICLE VIII**
**ADDITIONAL AGREEMENTS**

Section 8.1    <u>Taxes</u>

(a)    Any sales, use, property transfer or gains, documentary, stamp, registration, recording or similar Tax (including, for certainty, goods and services tax, harmonized sales tax and land transfer tax) payable solely as a result of the sale or transfer of the Acquired Assets pursuant to this Agreement ("**Transfer Taxes**") shall (to the extent not subject to an exemption under the Bankruptcy Code) be borne by Buyer. Seller and Buyer shall use reasonable efforts and cooperate in good faith to exempt the sale and transfer of the Acquired Assets from any such Transfer Taxes.  Buyer and Seller shall cooperate to prepare and file all necessary Tax Returns or other documents with respect to all such Transfer Taxes.

(b)    Buyer and Seller agree to furnish or cause to be furnished to each other,

21

upon reasonable request, as promptly as practicable, such information, documents and assistance relating to the Business and the Acquired Assets as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Governmental Authority and the prosecution or defense of any claims, suit or proceeding relating to any Tax; *provided, however*, that neither Buyer nor Seller, or its Affiliates, shall be required to disclose the contents of its income tax returns to any Person.  Any expenses incurred in furnishing such information or assistance pursuant to this Section 8.1(b) shall be borne by the Party requesting it.

(c)    Notwithstanding any other provisions in this Agreement, Buyer and Seller hereby waive compliance with all "bulk sales," "bulk transfer" and similar laws that may be applicable with respect to the sale and transfer of any or all of the Acquired Assets to Buyer.

(d)    Buyer shall not make or permit its Affiliates to make any Tax-related elections with respect to the Acquired Assets that could have an adverse impact on Seller or its Affiliates without the advance written consent of Seller.

Section 8.2    Payments Received.  Seller, on the one hand, and Buyer, on the other hand, each agree that, after the Closing, each will hold and will promptly transfer and deliver to the other (or their assignee or designee), from time to time as and when received by them, any cash, checks with appropriate endorsements (using their best efforts not to convert such checks into cash) or other property that they may receive on or after the Closing that properly belongs to the other (or their assignee or designee) and will account to the other (or their assignee or designee) for all such receipts.

Section 8.3    Confidentiality.  Seller agrees not to, and shall use commercially reasonable efforts to cause its employees not to, divulge to any Person (other than Buyer or its Affiliates or any persons employed or designated by such entities), directly or indirectly (including through a Subsidiary), publish or make use of any information of any type whatsoever of a confidential nature relating to the Business or the Acquired Assets, including all types of Intellectual Property, trade secrets, client lists or information, information regarding product development, marketing plans, management organization information, operating policies or manuals, performance results, packaging design or other financial, commercial, business or technical information, except (a) such knowledge or information that is in the public domain through no wrongful act by Seller or any of its employees or Representatives without the prior written consent of Buyer or its Affiliates (as the case may be); (b) for disclosure made pursuant to and in accordance with any Contract to which Seller or any Affiliate of Seller is a party; (c) for disclosures made to facilitate the Auction in accordance with the Bidding Procedures; and (d) as required by applicable law, by an order of a court having competent jurisdiction or under subpoena from an appropriate government agency.  This confidentiality provision has no temporal or geographical limitation.

Section 8.4    Acquired Assets "AS IS"; Buyer's Acknowledgment Regarding Same.  Buyer agrees, warrants and represents that (a) Buyer is purchasing the Acquired Assets on an "AS IS" and "WITH ALL FAULTS" basis based solely on Buyer's own investigation of the Acquired Assets, and (b) except as set forth in this Agreement, neither Seller nor any Representative of Seller has made any warranties, representations or guarantees,

22

express, implied or statutory, written or oral, respecting the Acquired Assets, any part of the Acquired Assets, the financial performance of the Acquired Assets or the Business, or the physical condition of the Acquired Assets.  Buyer further acknowledges that the consideration for the Acquired Assets specified in this Agreement has been agreed upon by Seller and Buyer after good-faith arms-length negotiation in light of Buyer's agreement to purchase the Acquired Assets "AS IS" and "WITH ALL FAULTS."  Buyer agrees, warrants and represents that, except as set forth in this Agreement, Buyer has relied, and shall rely, solely upon its own investigation of all such matters, and that Buyer assumes all risks with respect thereto.  EXCEPT AS SET FORTH IN THIS AGREEMENT, SELLER HEREBY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, PROJECTION, FORECAST, STATEMENT, OR INFORMATION MADE, COMMUNICATED, OR FURNISHED (ORALLY OR IN WRITING) TO BUYER OR ITS AFFILIATES OR REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION, PROJECTION, OR ADVICE THAT MAY HAVE BEEN OR MAY BE PROVIDED TO BUYER BY ANY DIRECTOR, OFFICER, MANAGER, EMPLOYEE, AGENT, CONSULTANT, OR REPRESENTATIVE OF SELLER OR ANY OF ITS AFFILIATES).  SELLER MAKES NO REPRESENTATIONS OR WARRANTIES TO BUYER REGARDING THE PROBABLE SUCCESS, PROFITABILITY OR VALUE OF ANY OF THE ACQUIRED ASSETS.

Section 8.5    Post-Closing Access.  After the Closing, Buyer and its Affiliates shall use reasonable efforts to provide assistance to Seller with respect to any Claims related to the Business and to make available to Seller (or any liquidation trustee or other person authorized as a successor in interest to Seller by the Bankruptcy Court), upon written request and reasonable advance notice:

(a)    such employees who have expertise or knowledge with respect to the Business or matters involved in any such Claims, for the purpose of consultation and/or as a witness; and

(b)    Documents provided by Seller to Buyer under this Agreement and its directors, officers, other employees and agents, as witnesses, in each case to the extent that Seller believes any such Document or person may reasonably be useful or required in connection with any such Claim in which Seller may from time to time be involved;

*provided, however*, in each case of clauses (a) and (b) above, that Seller (or any liquidation trustee or other person authorized as a successor in interest to Seller by the Bankruptcy Court) agrees to cooperate with Buyer and its Affiliates in giving consideration to business demands of such persons and Buyer and its Affiliates shall not be obligated to comply with this Section 8.5 to the extent compliance unreasonably interferes with the operation of its business.

Buyer, shall provide the access described above for a period that is the longer of (i) five (5) years, (ii) the pendency of any Claim, (iii) the pendency of any tax audit or investigation by any Governmental Authority commenced during the first five (5) years after the Closing, and (iv) the pendency of the Bankruptcy Case.  Seller (or any liquidation trustee or other person authorized as a successor in interest to Seller by the Bankruptcy Court) shall pay for reasonable out-of-pocket expenses actually incurred by Buyer or its Affiliates in connection with this Section 8.5.

23

# ARTICLE IX
## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction or waiver, at or prior to the Closing, of each of the following conditions:

Section 9.1    Accuracy of Representations.  The representations and warranties of Seller contained in Article V shall be true and correct as of the Closing Date as though made on and as of the Closing Date (except that those representations and warranties that address matters only as of a particular date need only be true and correct as of such date), except where the failure to be so true and correct (without giving effect to any limitation or qualification as to "materiality" (including the word "material") or "Material Adverse Effect" set forth therein) would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Buyer shall have received a certificate of Seller, signed by a duly authorized officer of Seller, to that effect.

Section 9.2    Seller's Performance.  Seller shall have performed and complied with in all material respects the covenants and agreements that Seller is required to perform or comply with pursuant to this Agreement at or prior to the Closing, and Buyer shall have received a certificate of Seller to such effect signed by a duly authorized officer thereof.

Section 9.3    No Order.  No Governmental Authority shall have enacted, issued, promulgated or entered any Order that is in effect and has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement (a "**Closing Legal Impediment**").

Section 9.4    Seller's Deliveries.  Each of the deliveries required to be made to Buyer pursuant to Section 4.3 shall have been so delivered.

Section 9.5    Sale Order; Final Order.  The Bankruptcy Court shall have entered the Sale Order in form and substance satisfactory to Buyer, and such Sale Order shall have become a Final Order.  Without limiting the foregoing, it is a condition to Buyer's obligation to consummate the transactions contemplated by this Agreement that the Bankruptcy Court find the Buyer to have entered into such transactions in good faith and to be entitled to the benefits and protections of section 363(m) of the Bankruptcy Code.

# ARTICLE X
## CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLER TO CLOSE

Seller's obligation to consummate the transactions contemplated by this Agreement is subject to the satisfaction or waiver, at or prior to the Closing, of each of the following conditions:

Section 10.1    Accuracy of Representations.  The representations and warranties of Buyer contained in this Agreement shall be true and correct as of the Closing Date

24

as though made on and as of the Closing Date (except that those representations and warranties that address matters only as of a particular date need only be true and correct as of such date), except where the failure to be so true and correct (without giving effect to any limitation or qualification as to "materiality" (including the word "material") or "Material Adverse Effect" set forth therein) would not, individually or in the aggregate, reasonably be expected to prevent or materially impair the ability of Buyer to consummate the transactions contemplated by this Agreement.  Seller shall have received a certificate of Buyer, signed by a duly authorized officer of Buyer, to that effect.

Section 10.2    Buyer's Performance.  Buyer shall have performed and complied with in all material respects the covenants and agreements that Buyer is required to perform or comply with pursuant to this Agreement at or prior to the Closing, and Seller shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof.

Section 10.3    No Order.  No Closing Legal Impediment shall be in effect.

Section 10.4    Buyer's Deliveries.  Each of the deliveries required to be made to Seller pursuant to Section 4.2 shall have been so delivered.

## ARTICLE XI
## TERMINATION

Section 11.1    Termination Events.  Anything contained in this Agreement to the contrary notwithstanding, this Agreement may be terminated at any time prior to the Closing Date:

(a)    by either Seller or Buyer:

(i)    if a Governmental Authority issues a final, non-appealable ruling or Order permanently prohibiting the transactions contemplated hereby; *provided, however*, that the right to terminate this Agreement pursuant to this Section 11.1(a)(i) shall not be available to any Party whose breach of any of its representations, warranties, covenants or agreements contained herein results in such ruling or Order;

(ii)    by mutual written consent of Seller and Buyer; or

(iii)    if the Closing shall not have occurred by 11:59 p.m. EST on March 31, 2017 (the "**Outside Date**"); *provided, however*, that (A) Buyer shall be permitted to terminate this Agreement pursuant to this Section 11.1(a)(iii) only if (x) Buyer is not in breach of any of its representations, warranties, covenants or agreements contained herein in such a way that would result in the failure of a condition set forth in Section 10.1 or Section 10.2 to be satisfied and (y) Buyer has provided written notice to Seller of its intention to exercise its rights under this Section 11.1(a)(iii) and Seller has not taken all actions necessary to close the transactions contemplated by this Agreement on or before the date that is five (5) Business Days after the date of such notice from Buyer, and (B) Seller shall be permitted to terminate this Agreement pursuant to this Section 11.1(a)(iii) only if

25

(x) Seller is not in breach of any of its representations, warranties, covenants or agreements contained herein in such a way that would result in the failure of a condition set forth in Section 9.1 or Section 9.2 to be satisfied and (y) Seller has provided written notice to Buyer of its intention to exercise its rights under this Section 11.1(a)(iii) and Buyer has not taken all actions necessary to close the transactions contemplated by this Agreement on or before the date that is five (5) Business Days after the date of such notice from Seller; or

(b)    by Buyer:

(i)    in the event of any material breach by Seller of any of its agreements, covenants, representations or warranties contained herein (provided such breach would result in the failure of a condition set forth in Section 9.1 or Section 9.2 to be satisfied), and the failure of Seller to cure such breach by the earlier of (A) the Outside Date and (B) the date that is fifteen (15) days after receipt of the Buyer Termination Notice; *provided, however*, that (1) Buyer is not in material breach of any of its representations, warranties, covenants or agreements contained herein or in the Sale Order, (2) Buyer notifies Seller in writing (the "**Buyer Termination Notice**") of its intention to exercise its rights under this Section 11.1(b)(i) as a result of the breach, and (3) Buyer specifies in the Buyer Termination Notice the representation, warranty, covenant or agreement contained herein of which Seller is allegedly in breach;

(ii)    if the Bankruptcy Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement;

(iii)    if the Sale Order is vacated or stayed;

(iv)    if Seller withdraws or seeks authority to withdraw the Sale Motion; or

(v)    if any conditions to the obligations of Buyer set forth in Article IX shall have become incapable of fulfillment other than as a result of a breach by Buyer of any covenant or agreement contained in this Agreement; or

(c)    by Seller:  in the event of any material breach by Buyer of any of its agreements, covenants, representations or warranties contained herein (provided such breach would result in the failure of a condition set forth in Section 10.1 or Section 10.2 to be satisfied), and the failure of Buyer to cure such breach by the earlier of (A) the Outside Date and (B) the date that is thirty (30) days after receipt of Seller Termination Notice; *provided, however*, that Seller (1) is not itself in material breach of any of its representations, warranties, covenants or agreements contained herein or in the Sale Order, (2) Seller notifies Buyer in writing (the "**Seller Termination Notice**") of its intention to exercise its rights under this Section 11.1(c) as a result of the breach, and (3) Seller specifies in the Seller Termination Notice the representation, warranty, covenant or agreement contained herein of which Buyer is allegedly in breach.

26

Section 11.2      Effect of Termination.  In the event of a termination of this Agreement pursuant to Section 11.1(c), Seller shall retain the Deposit; *provided, however*, that retention of the Deposit shall constitute liquidated damages and the sole and exclusive remedy of Seller in the event of a termination hereunder and shall limit Seller's remedies against Buyer in any respect of any claim against Buyer arising under this Agreement or otherwise.  In the event of all other terminations of this Agreement prior to Closing, the Deposit shall be refunded to the Buyer.

## ARTICLE XII
## GENERAL PROVISIONS

Section 12.1      Public Announcements.  Buyer, on the one hand, and Seller, on the other hand, shall consult with each other before issuing any press release or otherwise making any public statement with respect to this Agreement, the transactions contemplated hereby or the activities and operations of the other and shall not issue any such release or make any such statement without the prior written consent of the other (such consent not to be unreasonably withheld or delayed).

Section 12.2      Notices.  All notices, consents, waivers and other communications under this Agreement must be in writing and shall be deemed to have been duly given when (a) sent by email (with written confirmation of receipt); (b) delivered by hand (with written confirmation of receipt); (c) sent by facsimile (with written confirmation of receipt); (d) received by the addressee, if sent by a delivery service (prepaid, receipt requested); or (e) received by the addressee, if sent by registered or certified mail (postage prepaid, return receipt requested), in each case to the appropriate addresses, representatives (if applicable) and facsimile numbers set forth below (or to such other addresses, representatives and facsimile numbers as a Party may designate by notice to the other Parties):

(a)      If to Seller, then to:

The Big Apple Circus, Ltd.
One MetroTech Center North, 3rd Floor
Brooklyn, NY 11201
Attn: Will Maitland Weiss
Email: wmweiss@bigapplecircus.org

with a copy (which shall not constitute notice) to:

Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
Attn:  Christopher Updike
Facsimile:  (212) 909-6836
Email: cupdike@debevoise.com

(b)      If to Buyer:

27

Compass Partners, L.L.C.
1820 Ringling Blvd.,
Sarasota, Florida 34236
Attn: Richard Perlman; Barry Salzman
Facsimile: (212) 888-8133
Email: richard.perlman@compasspartners.us;
barrysalzman@compasspartners.us

with a copy (which shall not constitute notice) to:

Torys LLP
1114 Avenue of the Americas
23rd Floor
New York, New York  10036
Attn:  Alison Bauer
Facsimile:  (212) 682-0200
Email: abauer@torys.com

Section 12.3    Waiver.  Neither the failure nor any delay by any Party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power, or privilege shall preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege.  To the maximum extent permitted by applicable law, (a) no waiver that may be given by a Party shall be applicable except in the specific instance for which it is given, and (b) no notice to or demand on one Party shall be deemed to be a waiver of any right of the Party giving such notice or demand to take further action without notice or demand.

Section 12.4    Entire Agreement; Amendment.  This Agreement (including the Schedules and the Exhibits) and the other Transaction Documents supersede all prior agreements between Buyer, on the one hand, and Seller, on the other hand, with respect to its subject matter and constitute a complete and exclusive statement of the terms of the agreements between Buyer, on the one hand, and Seller, on the other hand, with respect to their subject matter.  This Agreement may not be amended except by a written agreement executed by both of the Parties.

Section 12.5    Assignment.  This Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any Party by operation of law or otherwise without the express written consent of the other Party (which consent may be granted or withheld in the sole discretion of such other Party); *provided*, *however*, that Buyer shall be permitted to assign all or part of its rights or obligations hereunder to an Affiliate of Buyer, but such assignment shall not relieve Buyer of its obligations under this Agreement, and Seller shall be permitted to assign all or part of its rights or obligations hereunder pursuant to a plan of reorganization or liquidation approved by the Bankruptcy Court.

Section 12.6    Severability.  The provisions of this Agreement shall be

28

deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

              Section 12.7      <u>Expenses</u>.  Whether or not the transactions contemplated by this Agreement are consummated, the Parties shall bear their own respective expenses (including all compensation and expenses of counsel, financial advisors, consultants, actuaries and independent accountants) incurred in connection with this Agreement and the transactions contemplated hereby (except as otherwise specified herein).

              Section 12.8      <u>Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver</u>.

       (a)      Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to Contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of New York applicable hereto.

       (b)      Without limitation of either Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes that may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding; *provided, however*, that, if the Bankruptcy Case is closed, all Proceedings arising out of or relating to this Agreement shall be heard and determined in a New York state court or a federal court sitting in the State of New York, and the Parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such Proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding.  The Parties consent to service of process by mail (in accordance with Section 12.2) or any other manner permitted by law.

       (c)      THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF SELLER OR BUYER OR THEIR RESPECTIVE REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

              Section 12.9      <u>Counterparts</u>.  This Agreement and any amendment hereto

29

may be executed in one or more counterparts, each of which shall be deemed to be an original of this Agreement or such amendment and all of which, when taken together, shall be deemed to constitute one and the same instrument.  Notwithstanding anything to the contrary in Section 12.2, delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by facsimile or email attachment shall be effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

Section 12.10      Parties in Interest; No Third-Party Beneficiaries.  This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns.  This Agreement is for the sole benefit of the Parties and their permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind.

Section 12.11      Non-Recourse.  No past, present or future director, manager, officer, employee, incorporator, member, unitholder, partner or equityholder of any Party hereto shall have any liability for any obligations or liabilities of the Parties under this Agreement or any other Transaction Document, for any claim based on, in respect of, or by reason of the transactions contemplated hereby and thereby, and each Party hereby covenants, on behalf of itself and its Affiliates, not to sue any past, present or future director, manager, officer, employee, incorporator, member, unitholder, partner or equityholder of the other Party for any such claim.

Section 12.12      Schedules; Materiality.  The inclusion of any matter in any Schedule shall be deemed to be an inclusion for all purposes of this Agreement, but inclusion therein shall not be deemed to constitute an admission, or otherwise imply, that any such matter is material or creates a measure for materiality for purposes of this Agreement.  The disclosure of any particular fact or item in any Schedule shall not be deemed an admission as to whether the fact or item is "material" or would constitute a "Material Adverse Effect."

Section 12.13      Specific Performance.  The Parties acknowledge and agree that (a) irreparable injury, for which monetary damages, even if available, would not be an adequate remedy, will occur in the event that any of the provisions of this Agreement are not performed in accordance with the specific terms hereof or are otherwise breached, and (b) the non-breaching Party or Parties shall therefore be entitled, in addition to any other remedies that may be available, to obtain (without the posting of any bond) specific performance of the terms of this Agreement.  If any Proceeding is brought by the non-breaching Party to enforce this Agreement, the Party in breach shall waive the defense that there is an adequate remedy at law.

Section 12.14      Survival.  All covenants and agreements contained herein that by their terms are to be performed in whole or in part, or that prohibit actions, subsequent to the Closing (including Sections 2.5, 7.4, 7.5, 8.1, and 8.2 and Articles I, II, VIII, XI and XII) shall survive the Closing in accordance with their terms.  All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder, shall not survive the Closing and shall thereupon terminate.

30

*Signature pages follow.*

22715698.14

**IN WITNESS WHEREOF**, the undersigned have caused this Agreement to be executed and delivered by their duly authorized representatives, all as of the Execution Date.

**COMPASS PARTNERS, L.L.C.**

By:  _____

Name:  Richard Perlman

Title:  Managing Member

**THE BIG APPLE CIRCUS, LTD.**

By:  _____

Name:  Will Maitland Weiss

Title:  Executive Director

**SELLER DISCLOSURE SCHEDULES**

**TO THE**

**ASSET PURCHASE AGREEMENT**

**DATED AS OF FEBRUARY __, 2017**

**BY AND BETWEEN**

**COMPASS PARTNERS, L.L.C.**

**AND**

**THE BIG APPLE CIRCUS, LTD.**

These disclosure schedules (these "Seller Disclosure Schedules") are referred to in, and part of, the Asset Purchase Agreement, dated as of February __, 2017 (the "Agreement"), by and between Compass Partners, L.L.C., a Delaware limited liability company ("Buyer"), and The Big Apple Circus, Ltd., a Type B not-for-profit corporation organized under section 201 of the New York Not-for-Profit Corporation Law ("Seller"). Capitalized terms used but not defined herein shall have the respective meanings ascribed to them in the Agreement.

Reference to any document herein is qualified in its entirety by the text of the document, as amended or supplemented to the extent provided or made available to Buyer, and such document is deemed to include all exhibits, schedules, annexes and other documents attached thereto or referenced therein as constituting part of the terms of such document, to the extent provided or made available to Buyer.

The schedule numbers in these Seller Disclosure Schedules correspond to the section numbers in the Agreement, provided, however, that any information set forth in one schedule of these Seller Disclosure Schedules (excluding Schedules 1.1(a) to 1.1(e), 2.1(a), 2.1(b) and 2.2(a)) shall be deemed to apply to any other section under Article V of the Agreement to which the relevance of such information is reasonably apparent.

These Sellers Disclosure Schedules are qualified in their entirety by reference to the Agreement and they are not intended to constitute, and shall not be construed as constituting, representations and warranties except as and to the extent provided in the Agreement. Nothing set forth in these Seller Disclosure Schedules shall be deemed to broaden or otherwise amplify the representations and warranties contained in the Agreement or to interpret the meaning of any of the representations or warranties in the Agreement.

The inclusion of any information in these Seller Disclosure Schedules shall not be deemed an admission or acknowledgment by Seller that such information (or any non-disclosed item or information of comparable or greater significance) is material to Seller, or has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. No disclosure in these Seller Disclosure Schedules relating to any possible breach or violation of any contract or Law shall be construed as an admission or indication that such breach or violation exists or has actually occurred or will actually occur, an admission of any liability or obligation of Seller with respect to any third Person, or an admission against the interest of Seller to any third Person.

22754211.3

# TABLE OF CONTENTS

SCHEDULE 1.1(A): COPYRIGHTS ................................................................................... 4

SCHEDULE 1.1(B): DOMAIN NAMES ........................................................................... 5

SCHEDULE 1.1(C): PATENTS ......................................................................................... 6

SCHEDULE 1.1(D): TRADEMARKS ............................................................................... 7

SCHEDULE 1.1(E): KNOWLEDGE PERSONS ............................................................. 11

SCHEDULE 2.1(A): VEHICLES ..................................................................................... 12

SCHEDULE 2.1(B): EQUIPMENT ................................................................................. 15

SCHEDULE 2.2(A): EXCLUDED ASSETS .................................................................... 19

SCHEDULE 3.5: ALLOCATION SCHEDULE ............................................................... 22

SCHEDULE 5.6: LEGAL PROCEEDINGS ..................................................................... 23

SCHEDULE 5.8(B): INTELLECTUAL PROPERTY ENCUMBRANCES ........................... 24

SCHEDULE 5.8(C): INTELLECTUAL PROPERTY PROCEEDINGS ................................ 25

SCHEDULE 5.10: BROKERS AND FINDERS ................................................................ 26

22754211.3

## SCHEDULE 1.1(A): COPYRIGHTS

None.

22754211.3

## SCHEDULE 1.1(B): DOMAIN NAMES

| IP TYPE | TYPE OF WORK | TITLE | EXCLUDE? |
|---|---|---|---|
| URL | | www.bigapplecircus.org | Acquired |
| Social Media | Facebook | | Acquired |
| Social Media | Twitter | | Acquired |
| Social Media | Pinterest | | Acquired |
| Social Media | Youtube | | Acquired |
| Social Media | Foursquare | | Acquired |
| Email Service Provider | Constant Contact | | Acquired |
| Email Lists of ticket buyers and potential buyers for each venue | See Exhibit 1.1(b) | | Acquired |

22754211.3

## SCHEDULE 1.1(C): PATENTS

None.

## SCHEDULE 1.1(D): TRADEMARKS

| SERIAL NUMBER | REG. NUMBER | REG. DATE | WORD MARK | LIVE / DEAD | NOTES | EXCLUDE? |
|---|---|---|---|---|---|---|
| 77545625 | 3591055 | | CIRCUSCHARGE | DEAD | | Acquired |
| 75768904 | 2351980 | | BEYOND THE RING | DEAD | | Acquired |
| 75751059 | 2375024 | | CIRCUS TO GO! | LIVE | | Acquired |
| 75545678 | 2372094 | | CIRCUS OF THE SENSES | LIVE | | Acquired |
| 75475480 | 2260868 | 7/13/1999 | CIRCUS FOR ALL | LIVE | entertainment in the nature of circus performances | Acquired |
| 75473498 | 2259308 | 7/6/1999 | CIRCUS FOR ALL | LIVE | charitable services, namely, fund raising activities to support a service which provides free and discounted tickets to circusperformances to children with economic disadvantages or physical disabilities. | Acquired |
| 75473496 | 2228887 | | CIRCUS THE WAY IT WAS MEANT TO BE | DEAD | | Acquired |
| 75473495 | 2228886 | | FAMILY ENTERTAINMENT THE WAY IT WAS MEANT TO BE | DEAD | | Acquired |
| 74643455 | 2037681 | | BIG APPLE CIRCUS | LIVE | toys and games, namely, board games, jigsaw puzzles, parlor games, plush | Acquired |

7

| SERIAL NUMBER | REG. NUMBER | REG. DATE | WORD MARK | LIVE / DEAD | NOTES | EXCLUDE? |
|---|---|---|---|---|---|---|
| | | | | | toys, toy vehicles | |
| 74643454 | 2053297 | | BIG APPLE CIRCUS | DEAD | clothing, namely belts, hats, caps, shorts, jeans, ties, coats, vests, sweaters, shirts, jerseys, shoes and sandals | Acquired |
| 74643453 | 2041171 | | BIG APPLE CIRCUS | DEAD | piece goods, namely towels, bath linens, bed linens, table linens, kitchen towels, cloth flags, cloth pennants and cloth banners | Acquired |
| 74643452 | 2037680 | | BIG APPLE CIRCUS | DEAD | household and novelty items, namely, cups, dishes, glass beverageware, commemorative plates, and decorative plates | Acquired |
| 74643451 | 2049670 | | BIG APPLE CIRCUS | LIVE | paper goods, namely, magazines and brochures regarding circuses, paper flags, paper pennants and paper banners, calendars, bumper stickers, decals, coloring books, comic books, scrap books, address books, photo albums, appointment books, gift wrapping paper and stationery, playing cards | Acquired |

8

| SERIAL NUMBER | REG. NUMBER | REG. DATE | WORD MARK | LIVE / DEAD | NOTES | EXCLUDE? |
|---|---|---|---|---|---|---|
| 74498648 | 1893391 | | BIG APPLE CIRCUS | DEAD | entertainment services in the nature of circus performances. Mark Drawing Code (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS Design Search Code 03.03.01 - Elephants; Mammoths; Mastodons 03.03.24 - Stylized Elephants, hippopotami, rhinoceri, giraffes, alpacas, camels, llamas 03.03.26 - Costumed Elephants, hippopotami, rhinoceri, giraffes, alpacas, camels, llamas 21.01.07 - Blocks, toy; Building blocks (toy); Building pieces (toy) 21.03.01 - Balls including playground balls, beach balls, billiard balls, tennis balls, bingo balls and lottery balls; Beach balls; Billiard balls; Bingo balls; Lottery balls; Paddle balls; Playground | Acquired |

9

| SERIAL NUMBER | REG. NUMBER | REG. DATE | WORD MARK | LIVE / DEAD | NOTES | EXCLUDE? |
|---|---|---|---|---|---|---|
| | | | | | balls; Table tennis balls; Tennis balls 26.05.21 - Triangles that are completely or partially shaded 27.03.05 - Objects forming letters or numerals | |
| 73280891 | 1236748 | | BIG APPLE CIRCUS | LIVE | Entertainment Services in the Nature of a Circus | Acquired |
| 75545679 | | 8/31/1998 | CIRCUS OF THE SENSES | DEAD | | Acquired |
| 75545644 | | 8/31/1998 | CIRCUS ARTS IN EDUCATION | DEAD | | Acquired |
| 74643456 | | 3/8/1995 | BIG APPLE CIRCUS | DEAD | | Acquired |

10

## SCHEDULE 1.1(E): KNOWLEDGE PERSONS

1. Will Maitland Weiss
2. Karen Zornow Leiding
3. Rick Mayberry

22754211.3

## SCHEDULE 2.1(A): VEHICLES

| BAC # | YEAR | MAKE | MODEL | VIN / SERIAL NO. | COLOR | EXCLUDED? |
|---|---|---|---|---|---|---|
| **VEHICLES - POWER UNITS** | | | | | | |
| **Tractors / Vans / Pickups** | | | | | | |
| TR6 | 2007 | MACK | Tractor | | Green | Acquired |
| TRC2 | 2009 | Capacity | Yard Dog Truck | | White | Acquired |
| PK24 | 2007 | Ford F350 | F350 Pickup | | White | Acquired |
| PK25 | 2007 | Ford F350 | F350 Pickup | | White | Acquired |
| PK26 | 2007 | Ford F350 | F350 Pickup | | White | Acquired |
| TR1 | 1995 | MACK | Tractor | 1M1AA13Y8SW053621 | Teal | Acquired |
| V4 | 1999 | Ford E350 | E350 Club Van | 1FBSS31LXXHB12348 | White | Acquired |
| V5 | 2002 | Ford E350 | E350 Club Van | 1FBSS31L42HA26462 | Red | Acquired |
| V6 | 2003 | Ford E350 | E350 Club Van | 1FBSS31L83HA27583 | White | Acquired |
| V7 | 2007 | Ford E350 | E350 Club Van | 1FBSS31L57DA45844 | Silver | Acquired |
| SU02 | 2008 | Jeep | Cherokee | 1J8GR48K48C198814 | | Acquired |
| PK4 | 1997 | Ford F350 | F350 Pickup | 1FTJX35F1VEB63832 | Red | Acquired |
| PK9 | 1996 | Ford F350 | F350 Pickup | 1FTJW35F0TEA77184 | Blue | Acquired |
| PK10 | 1997 | Ford F350 | F350 Pickup | 1FTJX35F3VEA67734 | Red | Acquired |
| PK15 | 1997 | Ford F350 | F350 Pickup (stick) | 1FTJW35F3VEC70254 | Black | Acquired |
| PK27 | 2006 | Ford F350 | F350 Pickup | 1FTWW33PX6EA84231 | Blue | Acquired |
| GD007 | 1998 | Freightliner | Utility | 1FV6GLBC2WH923450 | | Acquired |
| **RV Travel Trailers / 5th Wheel** | | | | | | |
| RV21 | 1995 | Chateau | Chateau RV | 4CH7HT80SM002970 | | Acquired |
| RV26 | 2001 | Citation | Citation RV | 1CNTD85211M002226 | | Acquired |
| RV30 | 2005 | Citation | Citation RV | 1CNTD77285M003094 | | Acquired |
| RV31 | 2005 | Citation | Citation RV | 1CNTD85255M003093 | | Acquired |
| RV32 | 2005 | Citation | Citation RV | 1CNTD772X5M003095 | | Acquired |
| RV33 | 2006 | Gulfstream | Conquest RV | 1NL1GTN2761072726 | | Acquired |
| RV34 | 2006 | Gulfstream | Conquest RV | 1NL1GTN2961072727 | | Acquired |
| RV37 | 2008 | Starwood | Starwood LE RV | 4K01A1H298E176764 | | Acquired |
| RV38 | 2007 | Marathon | Marathon 5th Wheel | 1M93M0Z3871019282 | | Acquired |
| RV39 | 2008 | Gulfstream | StreamLite RV | 1NL1XTP2781024577 | | Acquired |
| RV40 | 2006 | Savoy | Holiday Rambler RV | 1KB1B1M286E166137 | | Acquired |
| RV41 | 1995 | Solaris | Sunline RV | 1LC2S2N2XSL298040 | | Acquired |
| RV42 | 2005 | Springdale | Springdale RV | 4YDT266205C117017 | | Acquired |
| **Semi Trailers** | | | | | | |
| S1 | 1992 | Fruehauf | Sleeper Semi | 1H2V04828NB017943 | | Acquired |

12

| BAC # | YEAR | MAKE | MODEL | VIN / SERIAL NO. | COLOR | EXCLUDED? |
|---|---|---|---|---|---|---|
| | | | Trailer | | | |
| S2 | 2001 | Uni-Glide | Sleeper Semi Trailer | 1U9CT48291V019035 | | Acquired |
| S3 | 1993 | Great Dane | Sleeper Semi Trailer | 1GRAA962XPS013308 | | Acquired |
| S7 | 1998 | Kentucky | Semi Trailer | 1KKVD5324WL111832 | | Acquired |
| S8 | 1991 | Great Dane | Semi Trailer | 1GRAA062XMS081003 | | Acquired |
| S9 | 1988 | Great Dane | Semi Trailer | 1GRAA9624JB145634 | | Acquired |
| S10 | 1997 | Beckman | Cookhouse Semi Trailer | 1BTT53209WAB12283 | | Acquired |
| S16 | 1988 | Great Dane | Semi Trailer | 1GRAA9623JB122605 | | Acquired |
| S19 | 1988 | Great Dane | Semi Trailer | 1GRAA9626JB145604 | | Acquired |
| S20 | 1988 | Great Dane | Semi Trailer | 1GRAA9622JB145647 | | Acquired |
| S23 | 1988 | Great Dane | Semi Trailer | 1GRAA9625JB122623 | | Acquired |
| S24 | 1988 | Great Dane | Semi Trailer | 1GRAA9621JB145607 | | Acquired |
| S25 | 1988 | Great Dane | Semi Trailer | 1GRAA9627JB145627 | | Acquired |
| S26 | 1988 | Great Dane | Semi Trailer | 1GRAA9624JB145648 | | Acquired |
| S27 | 1994 | Great Dane | Semi Trailer | 1GRAA9025RS071404 | | Acquired |
| S28 | 1994 | Great Dane | Semi Trailer | 1GRAA9628RB130016 | | Acquired |
| S29 | 2001 | Uni-Glide | Semi Trailer | 1U9CT53281V019010 | | Acquired |
| S30 | 2003 | Pegasus | Horse Trailer | 1P9AC48223E338182 | | Acquired |
| S31 | 2004 | Stoughton | Seat Box Trailer | 1DW1A48264S710801 | | Acquired |
| **Semi Flatbed Trailers** | | | | | | |
| F3 | 1988 | Dorsey | Drop Deck Trailer | 1DTP36Z20JA184050 | | Acquired |
| F4 | 1988 | Dorsey | Drop Deck Trailer | 1DTP36Z22JA184051 | | Acquired |
| F5 | 1988 | Dorsey | Drop Deck Trailer | 1DTP36Z24JA184049 | | Acquired |
| F6 | 1999 | Uniglide | Drop Deck Trailer | 1U9CT5024XV019194 | | Acquired |
| F8 | 2006 | Fontaine | Flatbed Trailer | 13N1532C861532416 | | Acquired |
| F9 | 2006 | Fontaine | Flatbed Trailer | 13N1532C661532415 | | Acquired |
| F19 | 1990 | Fontaine | Flatbed Trailer | 13N248200L1550429 | | Acquired |
| F20 | 1993 | Fontaine | Flatbed Trailer | 13N248204P1557809 | | Acquired |
| F34 | 1998 | Fruehauf | Drop Deck Trailer | 1JJF482F6WS531027 | | Acquired |
| F35 | 1998 | Dorsey | Flatbed Trailer | 1DTP16Z24WG051916 | | Acquired |
| F36 | 2008 | Kaufman | Drop Deck Trailer | 5VGFR50228L002083 | | Acquired |
| F37 | 2008 | Pitts | Flatbed Trailer | 5JYDF48288P080942 | | Acquired |
| F38 | 2008 | Pitts | Flatbed Trailer | 5JYDF482X8P080943 | | Acquired |
| F39 | 2000 | Dorsey | Flatbed Trailer | 1DTP80Z24YG055220 | | Acquired |
| **Utility Trailers / Forklift** | | | | | | |
| UT26 | 1998 | Modular | Donniker/Port-o-Sans Trailer | 1M9BA452981235538 | | Acquired |
| UT29 | 1996 | Trailboss | Bobcat Trailer | 1T9DP2923T1118842 | | Acquired |

13

| BAC # | YEAR | MAKE | MODEL | VIN / SERIAL NO. | COLOR | EXCLUDED? |
|-------|------|------|-------|------------------|-------|-----------|
| Frklft | 2001 | Eagle Pitcher | Forklift | 5BB01210 | | Acquired |

14

## SCHEDULE 2.1(B): EQUIPMENT

| EQUIPMENT / PROPS / OFFICE EQUIPMENT / RESTAURANT EQUIPMENT / MISCELLANEOUS | | EXCLUDED? |
|---|---|---|
| LOT | Framed Circus Posters | Acquired |
| 28 | Cases Toy Trucks | Acquired |
| 24 | Cases Juggling Balls | Acquired |
| 10 | Cases Sippy Cups | Acquired |
| 6 | Cases Push Puzzles | Acquired |
| 9 | Cases Umbrellas | Acquired |
| 1 | Case Slinkys | Acquired |
| 1,500 | Red Paper Goody Bags | Acquired |
| 2,000 | Small White Goody Bags | Acquired |
| 1 | Welder | Acquired |
| 1 | Drill Press | Acquired |
| 2 | Band Saws | Acquired |
| 2 | Circular Saws | Acquired |
| 1 | Mounted Circular Saw | Acquired |
| 1 | Electric Sander | Acquired |
| LOT | Paint Guns | Acquired |
| LOT | Assorted Tools | Acquired |
| LOT | Fresh Water Pumps | Acquired |
| LOT | Gray Water Pumps | Acquired |
| 1 | Truck Jack | Acquired |
| 1 | Transmission Jack | Acquired |
| 3 | Road Boxes with Tools | Acquired |
| LOT | Hard Hats and Vests | Acquired |
| LOT | Sledge Hammers | Acquired |
| LOT | Paint | Acquired |
| LOT | Wardrobe Washer & Dryer | Acquired |
| 2 | Projectors | Acquired |
| LOT | Traffic Cones | Acquired |
| LOT | Palletainer of Fire Extinguishers | Acquired |
| 1 | Drum Set | Acquired |
| 1 | Electric Drum Set | Acquired |
| LOT | Bandstand Chairs | Acquired |
| LOT | Music Stands | Acquired |
| 2 | Big Apple Circus-Branded Big Top Performance Tents - 1 Blue / 1 White | Acquired |
| 3 | Palletainers with Extra Elex Cable & Feeder | Acquired |
| 2 | Acrobat Platforms | Acquired |
| LOT | Spot Operator Chairs | Acquired |
| LOT | Spot Operator Towers | Acquired |
| LOT | Spot Tower Legs | Acquired |
| LOT | Emergency Lights & Exit Signs | Acquired |
| 2 | Palletainers of Elex Extension Cords & Feeders | Acquired |
| 1 | Blue Reception Tent | Acquired |
| LOT | Old Ring Carpets | Acquired |

15

| | | |
|---|---|---|
| LOT | Aluminum Trusses for Backstage Curtain | Acquired |
| LOT | Big Top Stable Parts | Acquired |
| LOT | Steel Cables & Steel Pipe | Acquired |
| LOT | Fencing | Acquired |
| 1 | Pallet of Sand Bags | Acquired |
| 4 | X Holders for Masts | Acquired |
| LOT | Seat Steel Stringers, Frames, Braces, Kick Boards | Acquired |
| LOT | Seating System Floorboards | Acquired |
| LOT | Backstage Flooring | Acquired |
| 1 | Cupola / Mast | Acquired |
| 4 | Mast Plate Feet | Acquired |
| 2 | Pallets of Wood Blocks | Acquired |
| LOT | Ladders | Acquired |
| LOT | Floor Boards / Metal Containers | Acquired |
| LOT | Ring Curb | Acquired |
| 1 | Palletainer of Show Lights & Lenses | Acquired |
| LOT | Aluminum Channeling from Ring Crew Area | Acquired |
| LOT | Bandstand - Floor, Truss, Pieces, Etc | Acquired |
| LOT | Steel Stringers for Grandstand Seats and Boxes | Acquired |
| LOT | Assorted Sizes of Concrete Blocks for Lincoln Center Counter Weight System | Acquired |
| LOT | Assorted Sizes of Steel Plates for Lincoln Center for Counter Weight System | Acquired |
| LOT | Floorboards for Seating System | Acquired |
| LOT | Stables | Acquired |
| LOT | Ramps for Stables | Acquired |
| LOT | Rubber Flooring for Stables | Acquired |
| LOT | Leftover Carpet Rolls from Lincoln Center Rotunda Tent | Acquired |
| LOT | Side Poles | Acquired |
| LOT | Tent Stakes | Acquired |
| 2 | Pallets of Yellow Cable Covers for ELEX Cables | Acquired |
| LOT | Crash Mats | Acquired |
| LOT | Old Portafloor | Acquired |
| 1 | Palletainer of Orange Cable Covers for Phone Cables | Acquired |
| 2 | Palletainers of Fresh Water Hoses | Acquired |
| 1 | Palletainer of 3" Waste Water Hose | Acquired |
| 1 | Large Hoses for Gray Water System | Acquired |
| 2 | Palletainers of Large Yellow Cable Covers for Hoses | Acquired |
| 3 | Red Guard Booths | Acquired |
| 1 | Little Box Office Kiosk | Acquired |
| 2 | Membership Booths | Acquired |
| 1 | Novelty Wagon | Acquired |
| 1 | Bar | Acquired |
| 1 | Concession Table | Acquired |
| 1 | Beer Bar | Acquired |
| 1 | Coffee Counter Stand | Acquired |
| 2 | Condiment Stands | Acquired |
| 1 | Donut Machine | Acquired |
| 1 | Hot Dog Stand | Acquired |

16

| 1 | Pretzel Stand | Acquired |
|---|---|---|
| 4 | Convection Ovens (2 Stacked) | Acquired |
| 5 | Warmers | Acquired |
| 1 | Tilt Skillet | Acquired |
| 1 | Deli Slicer | Acquired |
| 1 | Keurig Coffee Machine | Acquired |
| 11 | Trash Bins | Acquired |
| 2 | Soda Coolers | Acquired |
| 1 | Push Cart | Acquired |
| 1 | Freezer | Acquired |
| 2 | Table Top Warmers | Acquired |
| 1 | Soda Machine | Acquired |
| 1 | Coffee Grinder and Machine | Acquired |
| 1 | Salad Bar | Acquired |
| 5 | Cases Kids Meal Boxes | Acquired |
| 8 | Cases Adults Meal Boxes | Acquired |
| LOT | Old Costumes - Approximately 30-35 Racks | Acquired |
| 3 | Wardrobe Road Boxes | Acquired |
| LOT | Assorted Shoes | Acquired |
| LOT | Assorted Hats | Acquired |
| LOT | Assorted Fabric | Acquired |
| LOT | Assorted Props | Acquired |
|  | CONTAINER A | Acquired |
| 1 | "Legendarium" Set | Acquired |
|  | CONTAINER B | Acquired |
| 1 | "Bello's Back" Set | Acquired |
|  | CONTAINER C | Acquired |
| LOT | Assorted Floors | Acquired |
|  | CONTAINER D | Acquired |
| 1 | Large 12' x 12' Juggling Floor | Acquired |
|  | CONTAINER E | Acquired |
| 1 | Stage Show "Oops" Props | Acquired |
| LOT | Mylar Rolls | Acquired |
| LOT | Foam Rubber Rolls | Acquired |
| 1 | Old Calliope (Broken) | Acquired |
| LOT | Tables - Approximately 30 | Acquired |
| LOT | TVs for Lounges & Lobby Tents | Acquired |
| LOT | Black Couches | Acquired |
| LOT | Café Tables | Acquired |
| LOT | Red Chairs | Acquired |
| 1 | Lounge Table | Acquired |
| LOT | Assorted Tables and Chairs | Acquired |
| 3 | Generators | Acquired |
| 18 | Diesel Heaters for Big Top | Acquired |
| 2 | Elogic Waste Oil Heaters - 340 H w/ 500 Gallon Tanks by Dunn | Acquired |
| 1 | 500 Gallon Auxiliary Oil Tank for Waste Oil to be Used with Heaters | Acquired |
| 1 | 800 Gallon Auxiliary Oil Tank for Waste Oil to be Used with | Acquired |

17

|  | Heaters |  |
|---|---|---|
| 3 | 275 Gallon Diesel Storage Tanks on Outside | Acquired |
| 2 | 200 Gallon Containers of Absorbent for Fuel Spills | Acquired |
| 1 | Orange Tractor with lawn mower and snow plow/bucket | Acquired |
| 8 | Laptop Computers | Acquired |
|  | Hp Pavilion Entertainment PC- Vista Operating System | Acquired |
|  | ThinkPad- XP Operating System | Acquired |
|  | Dell Inspiron 1150 - XP Operating System | Acquired |
|  | Dell Inspiron 15 - Windows 8 Operating System | Acquired |
|  | Dell Inspiron 17 - Windows 7 Operating System | Acquired |
|  | Sony Vaio - Vista Operating System | Acquired |
|  | Sony Vaio - XP Operating System | Acquired |
|  | Toshiba Satellite P205 - Vista Operating System | Acquired |
| 6 | Desktop Computers | Acquired |
|  | HP Compaq d530 CMT - XP Operating System | Acquired |
|  | HP Compaq DC 5100 MT - XP Operating System | Acquired |
|  | HP Compaq DC5700 Microtower - XP Operating System | Acquired |
|  | HP Pavillion P6-2127C - Windows 7 Operating System | Acquired |
|  | Gateway DX4870 - Windows 7 Operating System | Acquired |
|  | Apple Computer - Mac Operating System | Acquired |
| 5 | Printers | Acquired |
|  | Epson Stylus Pro 3800 - Color | Acquired |
|  | Epson WF2540 - Fax / Copy / Scan | Acquired |
|  | Epson Workforce Pro - Color | Acquired |
|  | HP Laserjet CP1215 - Color | Acquired |
|  | HP Officejet Pro 8600 Multi-Function Center MFC9970CDW - Fax / Copy / Scan | Acquired |
| 1 | Royal Sovereign RBC-2100 Money Counter | Acquired |
| 6 | Cash Drawers - 2 Small / 4 Large | Acquired |
| 1 | Boca Printer | Acquired |
| 1 | Counterfeit Bill Detector | Acquired |
| 1 | Apple Square | Acquired |
| 1 | Dock for Apple Square | Acquired |
| LOT | Apple Square Stands | Acquired |
| 1 | Thermal Receipt Printer | Acquired |
| 1 | Tabletop Microphone | Acquired |
| 1 | Acer Projector | Acquired |
| 1 | Doc-U-Seal Laminator | Acquired |
| 1 | 8" Samsung Galaxy 4 Tablet | Acquired |
| LOT | Assorted Keyboards, Mice, Etc. | Acquired |
| 1 | Arris Router | Acquired |
| LOT | Phones | Acquired |

18

## SCHEDULE 2.2(A): EXCLUDED ASSETS

| OWNED BY NYC DEPARTMENT OF CULTURAL AFFAIRS | | | |
|---|---|---|---|
| **VEHICLES** | | | **EXCLUDED?** |
| S4 | 1 | Great Dane | Excluded |
| S5 | 1 | Great Dane | Excluded |
| TR5 | 1 | 2004 Western Star Tractor - 42,337 miles | Excluded |
| PK22 | 1 | 2003 Ford F350 Pickup - White - 58,884 miles | Excluded |
| PK23 | 1 | 2003 Ford F350 Pickup - White - 53,249 miles | Excluded |
| **COMPUTERS & PHONES IN BROOKLYN OFFICE** | | | **EXCLUDED?** |
| | 1 | Auxiliary tenting equipment, etc. (see list below) | Excluded |
| | 1 | Computers in Brooklyn office | Excluded |
| | 1 | Phones in Brooklyn office | Excluded |
| **AUXILIARY TENTING EQUIPMENT, ETC.** | | | **EXCLUDED?** |
| Tent | | | Excluded |
| T1 | 1 | Vinyl tent | Excluded |
| T2 | 972 | Biljax decks | Excluded |
| T3 | 486 | Top Deck sections | Excluded |
| Ceiling System | | | Excluded |
| C1 | 20 | Full Design 12' Moon pillow-cased fabric with frame | Excluded |
| C2 | 4 | Full Deign 20' Moon pillow-cased fabric with frame | Excluded |
| C3 | 25 | Full Design Pink Powered by Monn 9' dia Moon - Single skin with frame | Excluded |
| C4 | 1 | Full Design 145'L x 9'H (48' Radius) Arc Projection Screen | Excluded |
| C5 | 1 | Full Design 127'L x 9'H (78' Radius) Arc Projection Screen | Excluded |
| Wall System | | | Excluded |
| W1 | 10 | 19.5' x 93" Half-Width Wall, Welded Asembly | Excluded |
| W2 | 174 | 39" x 93" Full Wall, Welded Assembly | Excluded |
| W3 | 14 | Door for EZ Fabric | Excluded |

19

| | | Walls | |
|---|---|---|---|
| W4 | 40 | PreDesigned Oval Baseplate with Stud | Excluded |
| W5 | 10 | PreDesigned 93.5" Adjustable Corner Column | Excluded |
| W6 | 14 | PreDesigned 93.5" Four Way Corner Column | Excluded |
| W7 | 4 | PreDesigned End Cap - 93.5" | Excluded |
| W8 | 176 | Wall Stacking Connector | Excluded |
| W9 | 178 | 39" x 46.5" Half-Height Wall, Locked Assembly | Excluded |
| W10 | 10 | PreDesigned 93.5" Low Profile Accessory Column | Excluded |
| W11 | 348 | PreDesigned EZ Fabric Cover | Excluded |
| W12 | 20 | PreDesigned EZ Fabric Cover | Excluded |
| W13 | 356 | PreDesigned EZ Fabric Cover | Excluded |
| W14 | 28 | PreDesigned EZ Fabric Cover | Excluded |
| W15 | 1 | Full Design 127' Curved Groove Wall | Excluded |
| W16 | 1 | Full Design 145' Curved Groove Wall | Excluded |
| Lighting & AV System | | | Excluded |
| L1 | 124 | eW Color Blast Dimmable Warm | Excluded |
| L2 | 12 | 10' Truss 12" | Excluded |
| L3 | 8 | 10' Truss 14" tri | Excluded |
| L4 | 19 | Hand Hoists 1/2 Ton | Excluded |
| L5 | 12 | Source Four 36 Degree Unit Specials | Excluded |
| L6 | 8 | Vari Lite VLX | Excluded |
| L7 | 1 | 24 way Edison Distro | Excluded |
| L8 | 4 | ETC Smart Pack 10 x 1.2K | Excluded |
| L9 | 1 | Hog 500 | Excluded |
| L10 | 3 | Lep Console 12 chan | Excluded |
| L11 | 3 | Power Distribution | Excluded |
| L12 | 4 | Feeder Cable Extension Set FS505W-100 | Excluded |
| L13 | 6 | 55" LCD Commercial Display | Excluded |

20

| L14 | 1 | HDMI Splitter | Excluded |
|---|---|---|---|
| L15 | 2 | Christie series M Projector 10k | Excluded |
| L16 | 2 | 1.5 Lens | Excluded |
| L17 | 2 | Ceiling Mount | Excluded |
| L18 | 2 | Dual HDMI Output | Excluded |
| L19 | 2 | DMX Interface | Excluded |
| L20 | 1 | Mac Playback System | Excluded |
| L21 | 2 | JBL Sound Package | Excluded |
| **OWNED BY AUDIENCEVIEW TICKETING CORPORATION** | | | |
| | 15 | Thermal Ticket Printers | Excluded |
| | 7 | Laptop Computers | Excluded |
| | 6 | Credit Card Readers | Excluded |
| | 1 | Access Control Hardware | Excluded |
| **NOT OWNED BY BAC / NOT PART OF IP PACKAGE** | | | |
| URL - www.bigapplecircus.com | | | Excluded |
| "Clown Care" | | | Excluded |
| "Vaudeville Visits" | | | Excluded |
| "Vaudeville Caravan" | | | Excluded |
| "Circus After School" | | | Excluded |

| **NOT PART OF THE PACKAGE** | | | | | |
|---|---|---|---|---|---|
| **IP TYPE** | **REG. NUMBER** | **DATE** | **TYPE OF WORK** | **TITLE** | **EXCLUDED?** |
| Copyright | TXu000522895 | 4/16/1992 | Text | The Big Apple Circus Clown Care Unit : a report on its development, impact, implications for research, and possible future directions / by Jill Vorenberg Alberts | Excluded |
| Copyright | TX0003319701 | 4/16/1992 | Text | The Big Apple Circus Clown Care Unit: Training Manual | Excluded |

21

## SCHEDULE 3.5: ALLOCATION SCHEDULE

## SCHEDULE 5.6: LEGAL PROCEEDINGS

| CASE | CASE NUMBER | COURT |
|---|---|---|
| Billups Inc. v. The Big Apple Circus, Ltd. | 16CV37919 | Circuit Court for the State of Oregon for the County of Multnomah |
| Performance Food Group, Inc. d/b/a Performance Foodservice Metro NY v. The Big Apple Circus, Ltd. | DC-007123-16 | Superior of New Jersey |
| Ohio Cat v. The Big Apple Circus, Ltd. | 255241 | Civil Court of the City of New York for the County of Kings |
| The Whelan Group Incorporated v. The Big Apple Circus, Ltd. | 501085/2013 | Kings County Supreme Court |
| SB New York, Inc. d/b/a METRO v. The Big Apple Circus, Ltd. | CV-016827-16/NY | County of New York Civil Court |
| Sunbelt Rentals, Inc. v. The Big Apple Circus, Ltd. | 608463/2016 | Supreme Court of the State of New York, County of Nassau |

22754211.3

**SCHEDULE 5.8(B): INTELLECTUAL PROPERTY ENCUMBRANCES**

22754211.3

**SCHEDULE 5.8(C): INTELLECTUAL PROPERTY PROCEEDINGS**

22754211.3

### SCHEDULE 5.10: BROKERS AND FINDERS

| AUCTIONEER | COMPENSATION |
| --- | --- |
| Stampler Auctions | Fees and expenses owed by Seller to Stampler Auctions pursuant to that certain Agreement made between Stampler Auctions and the Seller, dated December 23, 2016. |

26

## EXHIBIT 1.1(B) EMAIL LIST

See Attached.

22754211.3

## BIG APPLE CIRCUS EMAIL LISTS

**STORED IN CONSTANT CONTACT – largest list for each venue:**

| Venue | List Name | # of Emails | Date of Upload |
|-------|-----------|-------------|----------------|
| LC | 2016 LC Holiday Resend List A - E (5) | 87,954 | 12/9/2015 |
| NJ | NJ Box Office Open A + B (2) | 34,947 | 1/29/2016 |
| BOS | Last Chance Reminder List A + B (2) | 54,973 | 5/2/2016 |
| QNS | EARLYBIRD Extended List A - D (4) | 85,421 | 1/20/2016 |
| LC | | | |
| NJ | NJ Groups List | 304 | 1/5/2016 |
| BOS | BOS Groups List | 4,638 | 1/13/2016 |
| QNS | QNS Groups List | 2,070 | 1/13/2016 |

**LISTS ON O DRIVE/Eric Hagmueller:**

**LINCOLN CENTER**

| | |
|---|---|
| 15-16 Lincoln Center Pop up donors under $75.xlsx | 5/4/2016 10:54 AM |
| FY16 Online Donors under $75 10-1-2015 thru 12-31-2015.xlsx | 1/26/2016 11:29 AM |
| FY16 LC non-buyers for WINTER16 as of 1-8-16.xlsx | 1/8/2016 10:32 AM |
| FY16 LC non-buyers for WINTER16 as of 1-4-16.xlsx | 1/4/2016 2:54 PM |
| FY16 LC non-buyers for NYESAVE as of 12-30-15.xlsx | 12/30/2015 1:29 PM |
| FY16 LC Current Trustees for CIRCUS NOW email as of 12-28-15.xlsx | 12/28/2015 3:26 PM |
| FY16 LC Current Members for CIRCUS NOW email as of 12-28-15.xlsx | 12/28/2015 3:23 PM |
| FY16 LC non-buyers for NYESAVE as of 12-28-15.xlsx | 12/28/2015 2:24 PM |
| FY16 LC Current buyers for CIRCUS NOW email as of 12-24-15.xlsx | 12/24/2015 1:19 PM |
| FY16 LC Do Not Email list.xlsx | 12/23/2015 10:09 ... |
| FY16 LC HOLIDAY CARD IL FL GA email list as of 12-22-2015.xlsx | 12/22/2015 11:09 ... |
| FY16 LC HOLIDAY CARD New England email list as of 12-22-2015.xlsx | 12/22/2015 11:07 ... |
| FY16 LC non-buyers for WINTER16 as of 12-16-15.xlsx | 12/16/2015 1:54 PM |
| FY16 LC non-buyers for NYE as of 12-9-15 past NYE buyers.xlsx | 12/9/2015 3:37 PM |
| FY16 LC non-buyers for WINTER16 as of 12-8-15.xlsx | 12/8/2015 3:37 PM |
| FY16 LC non-buyers for WINTER16 as of 12-3-15.xlsx | 12/3/2015 5:09 PM |
| 1516 Boston and NJ MEMBERS current lapsed.xlsx | 12/1/2015 6:13 PM |
| FY16 LC non-buyers for HOLIDAY16 as of 11-25-15.xlsx | 11/25/2015 2:34 PM |
| FY16 LC non-buyers for NOFEE16 as of 11-17-15.xlsx | 11/17/2015 5:06 PM |
| 15-16 Autism Show email list.xlsx | 11/13/2015 3:41 PM |
| BOGO email list 75 under weeknight buyers 11-11-15.xlsx | 11/12/2015 7:53 AM |
| 15-16 Lincoln Center Autism list latest entry 10-22-2015.xlsx | 11/4/2015 12:54 PM |
| 15-16 Lincoln Center Reviews Email non-buyers 11-4-2015.xlsx | 11/4/2015 11:40 AM |
| FY16 LC non-buyers for BESTSEATS last chance as of 10-20-2015.xlsx | 10/20/2015 11:47 ... |
| FY16 LC non-buyers for FUN FACTS as of 10-14-2015.xlsx | 10/14/2015 12:56 ... |
| FY16 LC non-buyers for BESTSEATS as of 10-14-2015.xlsx | 10/14/2015 12:54 ... |
| FY16 LC Current Buyers for FUN FACTS as of 10-14-2015.xlsx | 10/14/2015 11:39 ... |

**NEW JERSEY**

| | |
|---|---|
| FY16 NJ Email Family Fun Day attendees l... | 3/11/2016 12:48 PM |
| FY16 NJ Email AUTISM attendees list 2-29... | 2/29/2016 5:28 PM |
| FY16 NJ Email AUTISM attendees list 2-29... | 2/29/2016 3:05 PM |
| FY16 NJ Email FIFTEEN list 2-18-16.xlsx | 2/18/2016 1:05 PM |
| FY16 NJ Email BESTSEATS list as of 2-17-... | 2/17/2016 12:16 PM |
| FY16 NJ Email BOGO list as of 2-17-16.xlsx | 2/17/2016 12:01 PM |
| FY16 NJ Email PREZDAY16 list 2-12-16.xlsx | 2/12/2016 12:17 PM |
| FY16 NJ Email Lapsed Members list 2-10-... | 2/11/2016 9:49 AM |
| FY16 NJ Email AUTISM metro area list 2-1... | 2/10/2016 4:00 PM |
| FY16 NJ Email AUTISM past buyers list 2-... | 2/10/2016 3:59 PM |
| FY16 NJ Email AUTISM list 2-10-16.xlsx | 2/10/2016 3:58 PM |
| NJ Group Past VALUE Buyers list for emai... | 2/9/2016 5:38 PM |
| 1516 NJ Box Office Open List 1.29.16.csv | 1/29/2016 1:02 PM |
| FY16 NJ Email BIGAPPLE list as of 1-25-16... | 1/25/2016 7:13 PM |
| NJPubSchoolsNorthenNJ.xlsx | 1/20/2016 4:58 PM |
| FY16 NJ Email BIGAPPLE list 1-12-16.xlsx | 1/12/2016 1:03 PM |
| NJPubSchoolsNorthenNJ.pdf | 1/11/2016 3:06 PM |
| Northern NJ Public and Charter School li... | 1/11/2016 12:55 PM |
| NJ Buyers Past 3 years - no groups or co... | 1/11/2016 12:55 PM |
| Northern NJ Public School Email list as of... | 1/5/2016 1:13 PM |
| NJ Group Past Buyers list for email as of 1... | 1/5/2016 1:13 PM |
| NJPubSchoolsMid_Cha.xlsx | 1/4/2016 5:54 PM |
| NJPubSchoolsAtl_Mer.xlsx | 1/4/2016 5:52 PM |
| NJNonPubSchools.xlsx | 1/4/2016 5:49 PM |
| NJ Group Past Buyers.xlsx | 12/22/2015 3:59 PM |
| 14-15 NJ Group Buyers.xlsx | 12/22/2015 3:58 PM |
| NJ Autism List.xlsx | 12/18/2015 2:46 PM |
| 13-14 New Jersey CFA groups.xlsx | 12/18/2015 2:15 PM |
| 14-15 New Jersey CFA groups.xlsx | 12/18/2015 2:11 PM |
| NJ Lapsed Group Buyers.xlsx | 12/18/2015 2:07 PM |
| NJ email list for Autism Show.xlsx | 12/15/2015 4:03 PM |
| FY16 NJ Email EARLYBIRD list 12-8-15.xlsx | 12/8/2015 11:25 AM |

**BOSTON**

| | |
|---|---|
| Boston Past Buyers 3 years - no groups or comps.xlsx | 12/14/2015 4:53 PM |
| Boston Past Buyers 3 years.xlsx | 12/14/2015 4:47 PM |
| FY16 BOS STB non-buyers 1.20.16 | 1/20/2016 4:59 PM |
| FY16 Boston 4-2 430 list with emails as of 3-22-2016.xlsx | 3/22/2016 2:09 PM |
| FY16 Boston AUTISM past attendees email list as of 2-10-2015.xlsx | 2/10/2016 4:15 PM |
| FY16 Boston CFA list with emails as of 3-17-2016.xlsx | 3/17/2016 3:46 PM |
| FY16 Boston COS past attendees email list as of 2-10-2015.xlsx | 3/14/2016 6:40 PM |
| FY16 Boston email Group non-buyers as of 1-13-16.xlsx | 1/13/2016 5:47 PM |
| FY16 Boston email list current MEMBERS as of 2-23-2016.xlsx | 2/23/2016 3:44 PM |
| FY16 Boston email list EARLYBIRD as of 12-14-2015.xlsx | 12/14/2015 2:20 PM |
| FY16 Boston email list VALUE as of 3-30-2015.xlsx | 3/30/2016 4:34 PM |
| FY16 Boston Past Buyers 6 years - no groups or comps as of 2-3-2016.xlsx | 2/3/2016 11:55 AM |
| FY16 Boston Prospect Groups as of 2-3-2016.xlsx | 2/3/2016 12:43 PM |

**QUEENS**

| | |
|---|---|
| 2016 QNS Final Two weeks 05-31-2016.xlsx | 5/31/2016 12:41 PM |
| 2016 QNS Final week 06-08-2016  List a.xlsx | 6/8/2016 1:05 PM |
| 2016 QNS Final week 06-08-2016 List B.csv | 6/8/2016 1:44 PM |
| 2016 QNS Final week 06-08-2016 List B.xlsx | 6/8/2016 1:06 PM |
| 2016 QNS Final week 06-08-2016.xlsx | 6/8/2016 12:22 PM |
| FY16 Queens email list AUTISM current buyers as of 5-16-16.xlsx | 5/16/2016 11:58 AM |
| FY16 Queens email list AUTISM NY list as of 3-2-16.xlsx | 3/2/2016 10:28 AM |
| FY16 Queens email list AUTISM NY list as of 3-21-16.xlsx | 3/21/2016 4:24 PM |
| FY16 Queens email list AUTISM past buyers as of 2-29-16.xlsx | 2/29/2016 3:14 PM |
| FY16 Queens email list AUTISM past buyers as of 3-21-16.xlsx | 3/21/2016 4:23 PM |
| FY16 Queens email list BIGAPPLE as of 2-18-16.xlsx | 2/18/2016 12:42 PM |
| FY16 Queens email list group non-buyers as of 1-13-16.xlsx | 1/13/2016 5:55 PM |
| FY16 Queens email list VALUE as of 4-6-16.xlsx | 4/6/2016 6:55 PM |
| Fy16 Queens Group email list as of 5-1-2016.xlsx | 5/5/2016 3:30 PM |

**FILED UNDER LC FY17**

| | |
|---|---|
| QNS Groups Buyers past 5 years.xlsx | 6/21/2016 12:22 PM |
| LC Groups Buyers past 5 years.xlsx | 6/21/2016 12:20 PM |

## EXHIBIT 4.3(A) FORM OF ASSIGNMENT OF PATENTS

See Attached.

PATENT ASSIGNMENT

This Patent Assignment (this "Assignment Agreement") is made as of _____, 2017 by and among The Big Apple Circus, Ltd., a Type B not-for-profit corporation organized under section 201 of the New York Not-for-Profit Corporation Law ("Seller" or the "Assignor"), and Compass Partners, L.L.C., a Delaware limited liability company ("Assignee").  Assignor and Assignee are sometimes herein referred to collectively as the "Parties" and each individually as a "Party."

WHEREAS, Assignor and Assignee entered into a certain Asset Purchase Agreement dated as of ___, 2017 (the "Purchase Agreement");

WHEREAS, pursuant to the Purchase Agreement, Assignor agreed to convey its entire right, title and interest in, to, and under the United States and foreign issued patents and patent applications listed in the Patent Assignment Schedule attached hereto to Assignee; and

WHEREAS, Assignor and Assignee wish to enter into this Assignment Agreement for the sole purpose of confirming and memorializing the applicable terms of the Purchase Agreement, and making said terms of record in the U.S. Patent and Trademark Office and foreign patent offices.

For good and valuable consideration set forth in the Purchase Agreement, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree:

Assignor hereby confirms that it hereby sells, assigns, and transfers to Assignee, its successors and assigns, all of Assignor's right, title, and interest in, to and under the patents set forth in Patent Assignment Schedule, and all applications, registrations, and renewals for any of the foregoing, including the right to recover damages, for any past, present, or future infringement and/or violation of the patents (collectively, the "Transferred Patents").  The Transferred Patents are being assigned, and such applications therefor are being transferred.

Assignor hereby agrees and undertakes to execute, whenever requested by Assignee, all documents and to take such further actions that are reasonably deemed necessary for Assignee's securing, prosecuting and maintaining all of the Transferred Patents, with all actual costs being paid by Assignee, but without any further compensation to Assignor.

Assignor hereby authorizes and requests the U.S. Patent and Trademark Office, and the corresponding entities or agencies in any applicable foreign countries, to record Assignee as the owner of the Transferred Patents.

This Assignment Agreement shall be governed by, and construed in accordance with, the laws of the United States in respect to patent issues and in all other respects by the laws of the state of New York. Notwithstanding anything to the contrary herein, in the event of any conflict or inconsistency between the terms of this Assignment Agreement and the terms of the Purchase Agreement, the terms of the Purchase Agreement will prevail, and nothing contained herein shall be deemed to alter, modify, expand or diminish the terms of the Purchase Agreement.

**[Signature page follows]**

2

22912112.1

IN WITNESS WHEREOF, Assignor and Assignee have caused this Assignment Agreement to be executed by its duly authorized representatives as of the date first set forth above.

**ASSIGNORS:**                                    **ASSIGNEE:**

**The Big Apple Circus, Ltd.**                    **Compass Partners, L.L.C.**

By:_____          By:_____
Name:_____        Name:_____
Title:_____        Title:_____

PATENT ASSIGNMENT SCHEDULE

**EXHIBIT 4.3(B) FORM OF ASSIGNMENT OF TRADEMARKS**

See Attached.

22754211.3

TRADEMARK ASSIGNMENT

This Trademark Assignment (this "Assignment Agreement") is made as of _____, 2017 by and among The Big Apple Circus, Ltd., a Type B not-for-profit corporation organized under section 201 of the New York Not-for-Profit Corporation Law ("Seller" or the "Assignor"), and Compass Partners, L.L.C., a Delaware limited liability company ("Assignee").    Assignor and Assignee are sometimes herein referred to collectively as the "Parties" and each individually as a "Party."

WHEREAS, Assignor and Assignee entered into a certain Asset Purchase Agreement dated as of ___, 2017 (the "Purchase Agreement");

WHEREAS, pursuant to the Purchase Agreement, Assignor agreed to convey its entire right, title and interest in, to, and under the United States and foreign trademark registrations and trademark applications listed in the Trademark Assignment Schedule attached hereto to Assignee; and

WHEREAS, Assignor and Assignee wish to enter into this Assignment Agreement for the sole purpose of confirming and memorializing the applicable terms of the Purchase Agreement, and making said terms of record in the U.S. Patent and Trademark Office and foreign trademark offices.

For good and valuable consideration set forth in the Purchase Agreement, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree:

Assignor hereby confirms that it hereby sells, assigns, and transfers to Assignee, its successors and assigns, all of Assignor's right, title, and interest in, to and under the marks set forth in Trademark Assignment Schedule, and all applications, registrations, and renewals for any of the foregoing, together with the goodwill associated with and symbolized by each of the foregoing, and including the right to recover damages, for any past, present, or future infringement, misappropriation and/or dilution of the marks (collectively, the "Transferred Marks").    The Transferred Marks are being assigned, and such applications therefor are being transferred.

Assignor hereby agrees and undertakes to execute, whenever requested by Assignee, all documents and to take such further actions that are reasonably deemed necessary for Assignee's securing, prosecuting and maintaining all of the Transferred Marks, with all actual costs being paid by Assignee, but without any further compensation to Assignor.

Assignor hereby authorizes and requests the U.S. Patent and Trademark Office, and the corresponding entities or agencies in any applicable foreign countries, to record Assignee as the owner of the Transferred Marks.

This Assignment Agreement shall be governed by, and construed in accordance with, the laws of the United States in respect to trademark issues and in all other respects by the laws of the state of New York. Notwithstanding anything to the contrary herein, in the event of any

conflict or inconsistency between the terms of this Assignment Agreement and the terms of the Purchase Agreement, the terms of the Purchase Agreement will prevail, and nothing contained herein shall be deemed to alter, modify, expand or diminish the terms of the Purchase Agreement.

**[Signature page follows]**

2

IN WITNESS WHEREOF, Assignor and Assignee have caused this Assignment Agreement to be executed by its duly authorized representatives as of the date first set forth above.

**ASSIGNORS:**                                    **ASSIGNEE:**

**The Big Apple Circus, Ltd.**                    **Compass Partners, L.L.C.**

By:_____    By:_____
Name:_____    Name:_____
Title:_____    Title:_____

TRADEMARK ASSIGNMENT SCHEDULE

## EXHIBIT 4.3(C) FORM OF ASSIGNMENT OF COPYRIGHTS

See Attached.

22754211.3

COPYRIGHT ASSIGNMENT

THIS COPYRIGHT ASSIGNMENT dated as of _____, 2017 (this "Copyright Assignment"), by and among The Big Apple Circus, Ltd., a Type B not-for-profit corporation organized under section 201 of the New York Not-for-Profit Corporation Law ("SELLER" or the "ASSIGNOR"), and Compass Partners, L.L.C., a Delaware limited liability company ("ASSIGNEE").  ASSIGNOR and ASSIGNEE are sometimes herein referred to collectively as the "Parties" and each individually as a "Party."

WHEREAS, ASSIGNOR and ASSIGNEE entered into a certain Asset Purchase Agreement dated as of ___, 2017 (the "Purchase Agreement");

WHEREAS, pursuant to the Purchase Agreement, ASSIGNOR agreed to convey to ASSIGNEE its entire right, title and interest in, to, and under the United States and foreign laws, the copyrights and copyright applications listed in the Copyright Assignment Schedule attached hereto as Exhibit A, including all works of authorship disclosed and/or claimed in said copyright and copyright applications (collectively the "WORKS"); and

WHEREAS, ASSIGNOR and ASSIGNEE wish to enter into this Copyright Assignment for the sole purpose of confirming and memorializing the applicable terms of the Purchase Agreement and making said terms of record in the U.S. Copyright Office and foreign copyright offices.

**TERMS AND CONDITIONS**

NOW, THEREFORE, in consideration of the premises and mutual promises and covenants set forth herein and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged, ASSIGNOR and ASSIGNEE, intending to be legally bound, hereby agree to the following terms and conditions:

ASSIGNOR confirms that it hereby sells, assigns, set overs, and transfers to ASSIGNEE, its successors and assigns, all of ASSIGNOR's right, title, and interest in, to, and under any and all works of authorship included in the WORKS including, but not limited to: (a) the WORKS themselves; (b) all copyrights and moral rights therein and thereto, (c) the registrations and applications therefor; and (d) all issuances, renewals, extensions, restorations and reversions thereof; (e) the right to sue for present, past, and future infringement or misappropriation relating to any such works of authorship; and (f) any other legal protection for any such WORKS.  The right, title, and interest is to be held and enjoyed by ASSIGNEE and its successors and assigns as fully and exclusively as it would have been held and enjoyed by ASSIGNOR had this assignment not been made.

ASSIGNOR waives all moral, attribution and integrity rights in such works of authorship and further agree that ASSIGNEE, its successors and assigns, and any of its direct or indirect licenses shall not be obligated to designate any ASSIGNOR, or any predecessors in interest to the ASSIGNOR, as an author of any such works of authorship.

ASSIGNOR hereby agrees and undertakes to execute, whenever requested by

1

ASSIGNEE, all documents and to take such further actions that are reasonably deemed necessary for ASSIGNEE's securing, prosecuting and maintaining all of the WORKS, with all actual costs being paid by ASSIGNEE, but without any further compensation to ASSIGNOR.

This Assignment Agreement shall be governed by, and construed in accordance with, the laws of the United States in respect to copyright issues and in all other respects by the laws of the state of New York.  Notwithstanding anything to the contrary herein, in the event of any conflict or inconsistency between the terms of this Copyright Assignment and the terms of the Purchase Agreement, the terms of the Purchase Agreement will prevail, and nothing contained herein shall be deemed to alter, modify, expand or diminish the terms of the Purchase Agreement.

[SIGNATURE PAGE FOLLOWS]

2

IN WITNESS WHEREOF, the undersigned have caused this Copyright Assignment to be duly executed as of the first set forth above.


**ASSIGNOR:**                                        **ASSIGNEE:**


**The Big Apple Circus, Ltd.**                       **Compass Partners, L.L.C.**


By:_____         By:_____
Name:_____          Name:_____
Title:_____         Title:_____

[Copyright Assignment]

<u>Exhibit A</u>

<u>COPYRIGHT ASSIGNMENT SCHEDULE</u>

22912198.1

**EXHIBIT 4.3(D) FORM OF ASSIGNMENT OF DOMAIN NAMES**

See Attached.

31

DOMAIN NAME ASSIGNMENT

This Domain Name Assignment (this "Assignment Agreement") is made effective as of _____, 2017 by and among The Big Apple Circus, Ltd., a Type B not-for-profit corporation organized under section 201 of the New York Not-for-Profit Corporation Law ("Seller" or the "Assignor"), and Compass Partners, L.L.C., a Delaware limited liability company ("Buyer" or "Assignee").

WHEREAS, Assignor and Assignee entered into that certain Asset Purchase Agreement, dated as of ___, 2017 (the "Purchase Agreement"); and

WHEREAS, pursuant to the Purchase Agreement, Assignor agreed to sell, convey, assign and transfer to Assignee, among other assets, Assignor's entire title, rights, interests, benefits, and privileges in and to the domain names listed on Exhibit A attached hereto (collectively, the "Domain Names").

NOW THEREFORE, for good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties agree as follows:

1.      Assignor hereby assigns, transfers and conveys unto Assignee all of its rights in and to the Domain Names, together with any goodwill symbolized by the Domain Names, the same to be held and enjoyed by Assignee for its own use and enjoyment, and for the use and enjoyment of its successors, assigns and/or other legal representatives.

2.      Upon the reasonable request by Assignee, Assignor shall take whatever reasonable steps are required by the applicable domain name registrars to effectuate and/or record the transfer of the Domain Names from Assignor to Assignee with such registrars, with all actual costs being paid by Assignee, but without any further compensation to Assignor.

3.      This Assignment Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

4.      This Assignment Agreement may be supplemented by subsequent assignments executed by one or more of the parties, which assignments may be required to effectuate and/or record this Assignment Agreement with the applicable registrars.

5.      This Assignment Agreement shall be governed by, and construed in accordance with, the laws of the United States in respect to intellectual property issues and in all other respects by the laws of the state of New York.  This Assignment Agreement is entered into pursuant to and is subject to all of the terms of the Purchase Agreement, and nothing herein shall be deemed to modify any of the representations, warranties, covenants and obligations of the parties thereunder.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties have caused this Assignment Agreement to be duly executed as of the date first set forth above.


**ASSIGNOR:**                                   **ASSIGNEE:**

**The Big Apple Circus, Ltd.**                  **Compass Partners, L.L.C.**


By:_____         By:_____
Name:_____         Name:_____
Title:_____         Title:_____


[Domain Name Assignment]

<u>Exhibit A</u>

Schedule of Domain Names

A-1